UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

DENNIS W. STRUTTON, et al.,        )
                                    )
        Plaintiffs,                 )
                                    )
    vs.                             )        Case No. 4:05CV02022 ERW
                                    )
JOHN W. HOOKER, et al.,            )
                                    )
        Defendants.                 )

## MEMORANDUM AND ORDER

This matter comes before the Court on Defendants' Motions to Dismiss [doc. #100],

Defendant Bellew-Smith's Motion to Substitute Pursuant to Fed. R. Civ. P. 25(d)(1) [doc. #102],

Defendants' Motion for Summary Judgment [doc. #103] and Defendants' Request for Oral

Argument [doc. #132].

## I.    PROCEDURAL BACKGROUND

Dennis Strutton and Mark Murrell filed their Second Amended Complaint on November

3, 2006.  They filed this Complaint against Alan Blake, Linda Meade, Janine Semar, Jonathan

Rosenboom, Mary Weiler, Martha Bellew-Smith (collectively, "Individual Defendants") and the

Department of Mental Health (collectively, "Defendants").  Count I alleged a claim against all

Defendants, stating that they developed rules, regulations, policies and practices regarding the

imposition of punishment arising from treatment decisions, and that these violated Dennis Strutton

and Mark Murrell's federal and state constitutional rights to procedural and substantive due

process.  Count II stated a claim against the all Defendants under the Religious Land Use and

Institutionalized Persons Act ("RLUIPA") and the First Amendment via 42 U.S.C. § 1983.

Count III stated an "as applied" challenge to Missouri's Sexually Violent Predator Act ("SVPA").

Finally, Count IV asserts the denial of Dennis Strutton and Mark Murrell's constitutional rights to refuse treatment.

Defendants filed a Motion to Dismiss in November 2006.  The Court found that Dennis Strutton and Mark Murrell's statutory and constitutional rights were not clearly established rights of which a reasonable person would have known, and that the actions of the Individual Defendants were protected by qualified immunity.  As a result, in a Memorandum and Order dated March 9, 2007, the Court dismissed all claims against these Individual Defendants in their individual capacities.  On March 6, 2008, Plaintiff Mark Murrell filed a Motion for Voluntary Dismissal, and the Court dismissed his claims without prejudice.  Additionally, in Dennis Strutton's ("Plaintiff") response to the Motion for Summary Judgment, he states that he is not pursuing due process claims related to the Intensive Intervention Unit, Readiness Ward, recreational opportunities, and the visitation policy, and additionally states that he is withdrawing his equal protection claim.  Accordingly, Plaintiff's following claims remain pending against Defendants:

- Count I, alleging procedural due process claims for the use of the Restriction Table and the grievance policy for frivolous filers, and substantive due process claims for unconstitutional conditions of confinement related to inadequate treatment and personal property restrictions.

- Count II, alleging claims under RLUIPA and the First Amendment based upon harassment and discrimination in the exercise of his faith; the denial of access to religious literature; denial of the ability to maintain his religious text; denial of access to his religious circle by denying him the opportunity to maintain the circle; requiring that he express beliefs or participate in treatment contrary to his beliefs; conditioning the right to religious items

based upon behavior and treatment progress; denying him the opportunity to purchase religious items on the same terms as members of other religions, denying him opportunities for group worship that are granted to other religions, and withholding religious ceremonial items that other religions are permitted.

- Count III, alleging that the SVPA is unconstitutional as applied.

- Count IV, alleging a violation of Plaintiffs' right to refuse treatment.

## II.    DEFENDANTS' MOTIONS TO DISMISS

In addition to filing the pending Motion for Summary Judgment, Defendants have also filed a Motion to Dismiss. They assert that the Department of Mental Health ("DMH") is not a person within the meaning of 42 U.S.C. § 1983, or alternatively, that the Eleventh Amendment bars lawsuits against DMH as a state agency. Defendants also claim that official capacity state law claims against the Individual Defendants are barred. Additionally, Defendants ask that the Court decline to exercise supplemental jurisdiction and dismiss Plaintiff's state law claims.

## A.    LEGAL STANDARD

When deciding a motion to dismiss under Fed. R. Civ. P. 12(b)(6), the Court must assume that all material facts alleged in the complaint are true. *Davis v. Monroe City Bd. of Educ.*, 526 U.S. 629, 633 (1999). The Court must view all facts and inferences in the complaint in the light most favorable to the non-moving party. *Eckert v. Titan Tire Corp.*, 514 F.3d 801, 806 (8th Cir. 2008). "[O]nce a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint." *Bell Atlantic Corp. v. Twombly*, 127 S.Ct. 1955, 1969 (2007). A dismissal under Rule 12(b)(6) should be granted "only in the unusual case in which a plaintiff includes allegations that show, on the face of the complaint, that there is some

insuperable bar to relief." *Strand v. Diversified Collection Serv., Inc.*, 380 F.3d 316, 317 (8th Cir. 2004) (quoting *Frey v. Herculaneum*, 44 F.3d 667, 671 (8th Cir. 1995)).

**B.    DISCUSSION**

Defendants are correct that Defendant DMH is not a person within the meaning of 42 U.S.C. § 1983. *Barket, Levy & Fine, Inc. v. St. Louis Thermal Energy Corp.*, 948 F.2d 1084, 1086 (8th Cir. 1991). As a result, the Court will dismiss all of Plaintiff's claims against Defendant DMH based upon 42 U.S.C. § 1983. However, Missouri accepts federal correctional funds and therefore waived its Eleventh Amendment immunity and consents to suits under the RLUIPA. *See Madison v. Virginia*, 474 F.3d 118, 124 (4th Cir. 2006). As a result, Plaintiff's claims under Count II of his Second Amended Complaint remain pending before the Court.

With respect to Plaintiff's claims under Missouri state law, "the Eleventh Amendment bars all suits brought in federal court against a state, its agencies, and its officers acting in their official capacities, regardless of relief sought, when the claims are based on state law." *Harris v. Henneberry*, 2007 WL 805458, at *4 (E.D. Mo. March 14, 2007) (citing *Treleven v. University of Minnesota*, 73 F.3d 816, 819 n.4 (8th Cir. 1996)). However, this immunity only applies where the state law claims are brought under 42 U.S.C. § 1983. Plaintiff states that he is not bringing these claims under 42 U.S.C. § 1983, but through the Court's supplemental jurisdiction. As a result, dismissal is not appropriate.

Finally, Defendants ask that the Court decline to exercise supplemental jurisdiction over Plaintiff's state law claims. The Court's supplemental jurisdiction over state law claims arises under 28 U.S.C. § 1367(a). This statute provides that "the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within the [court's]

original jurisdiction." 28 U.S.C. § 1367(a). The Court has the discretion to reject supplemental jurisdiction where:

> (1) the claim raises a novel or complex issue of state law,
> (2) the claim substantially predominates over the claim or claims over which the district court has original jurisdiction,
> (3) the district court has dismissed all claims over which it has original jurisdiction, or
> (4) in exceptional circumstances, there are other compelling reasons for declining jurisdiction.

28 U.S.C. § 1367(c). In this instance, the Court finds that no reason to reject supplemental jurisdiction exists, and that it is appropriate to exercise supplemental jurisdiction over Plaintiff's state law claims. These claims are interrelated, and it would be a waste of time, money and judicial resources to require Plaintiff to bring these claims in a parallel action in state court.

## III.   DEFENDANT BELLEW-SMITH'S MOTION TO SUBSTITUTE

Defendant Bellew-Smith is the former Clinical Director for the Missouri Sexual Offender Treatment Center ("MSOTC"). Defendants asks that the Court substitute Defendant Rosenboom, the current Chief Clinical Director pursuant to Fed. R. Civ. P. 25(d)(1). Pursuant to the Federal Rules, "[a]n action does not abate when a public officer who is a party in an official capacity . . . resigns . . . The officer's successor is automatically substituted as a party." Fed. R. Civ. P. 25(d)(1).

The Plaintiff states that he filed a response to this Motion "to preserve his objection to the Court's previous ruling on qualified immunity." Plaintiff asserts that discovery has shown that clearly established rights were violated, and that Defendants are not entitled to qualified immunity. However, Plaintiff has not filed a motion asking the Court to reconsider the Memorandum and Order granting qualified immunity, and at this time the suit is only pending against the Individual Defendants in their official capacity. As a result, substitution under Fed. R. Civ. P. 25(d)(1) is

appropriate.[1]  Plaintiff asks that if Defendant Bellew -Smith is dismissed, that Plaintiff be given

leave to take her videotaped deposition.  Leave to take this deposition will be granted.

## IV.    MOTION FOR SUMMARY JUDGMENT

## A.    BACKGROUND FACTS[2]

MSOTC is a facility operated by Defendant DMH in Farmington, Missouri.  The MSOTC

houses sexual offenders who have been committed to the custody of Defendant DMH for

"control, care and treatment" as "sexually violent predators" pursuant to Mo. Rev. Stat. §

632.495.2 of the Missouri Sexually Violent Predator Act ("SVPA").  The residents at the

MSOTC are confined indefinitely.

In 1997, Plaintiff pled guilty to the offense of child molestation in the first degree, and was

sentenced to seven years in the Missouri Department of Corrections.  Plaintiff served five years of

his sentence and was referred automatically for assessment under the SVPA because he was

unable to complete a prison sex offender treatment program.  He has been confined at the

MSOTC since on or about October 23, 2002.

## 1.    FACTS RELATING TO DUE PROCESS & RIGHT TO REFUSE TREATMENT[3]

---

[1] For the purposes of this Memorandum and Order, the Court will continue to refer to
Martha Bellew-Smith as "Defendant Bellew-Smith."

[2] The Court's recitation of the facts is taken from Defendants' Statement of
Uncontroverted Material Facts [doc. #104], Plaintiff's Statement of Material Facts in Support of
Plaintiff's Opposition to Defendants' Motion for Summary Judgment [doc. #121], Plaintiff's
Response to Defendants' Statement of Uncontroverted Material Facts [doc. #122] and
Defendants' Response to Plaintiff's Statement of Material Facts in Support of Plaintiff's
Opposition to Defendants' Motion for Summary Judgment [doc. #128].

[3] Some of the facts in this section are from the deposition testimony of Defendant Bellew-
Smith, Defendant Rosenboom, Defendant Weiler and Defendant Semar.  Defendants object as
these individuals were not designated as Fed. R. Civ. P. 30(b)(6) witnesses.  An individual who is
not designated as a 30(b)(6) representative may still be deposed over facts and information in their
knowledge.  Their testimony is valid and may be used by the Court.  *See Static Control
Components, Inc. v. Lexmark Intern., Inc.*, 2006 WL 3702464, at *3 (E.D. Ky 2006).  The Court

The MSOTC treatment program was developed by Defendant Bellew-Smith and Defendant Englehart in or about the fall of 2001.  The MSOTC treatment program incorporates progressive phase and level systems.  The program is comprised of four phases.  To be recommended for release, a resident must successfully complete all four phases of the treatment program.  The levels correspond to the treatment phases.  Levels 1-3 correspond to phase 1, and levels 4-5 correspond to phase 2.  Defendant Bellew-Smith was the Clinical Director at MSOTC from February 28, 2001 to July 14, 2006, and she testified at her deposition that as of her resignation in July 2006, no resident had advanced beyond phase 2 of the program.  The lower levels experience the least autonomy and privileges, and the highest level of security.  Residents must meet specific treatment goals for each phase before proceeding to the next treatment phase.  These treatment goals included the absence of rules violations.  Incorporated into the phase system is the multi-tiered level system, through which residents earn privileges by demonstrating appropriate behavior and treatment progress.  These privileges include the alleviation of property restrictions, increased freedom of movement, and advancement in the program.  These privileges are directly related to the presence or absence of rules violations.

The MSOTC instituted a system of rules violations, and in this system, violations are defined by the nature and severity of the conduct.  The three categories of violations are minor, major, and intolerable.  Any MSOTC employee can issue a rules violation.  Members of the MSOTC staff were instructed to issue a rules violation immediately when a violation is observed.  Staff members were instructed to not exercise discretion, to assume the worst about the resident, and to issue a rule violation even if it seemed "silly or picky."  MSOTC employees were trained to

---

does not consider this testimony to have been made on behalf of MSOTC.  *Wechsler v. Hunt Health Systems, Ltd.*, 381 F.Supp.2d 135, 149-50 (S.D.N.Y. 2003).

"always assume the worse" and to report even "seemingly trivial behavior." Defendants assert that these procedures were necessary because seemingly trivial behaviors may be part of a resident's sexual offense cycle, and need to be dealt with through consistent and timely application of the rule violation system.

The Parties have provided the Court with examples of rule violations. A rule violation would be issued for possession of a post-it note as they are considered "contraband." A commonly issued violation was for "unauthorized use." Defendant Bellew-Smith stated in her deposition that residents would get "unauthorized use" violations "for writing a song or poem on a paper towel and using a piece of paper as a bookmark." She became "troubled by the wording and the interpretation given some rules violations, saying, "I am concerned that some of our rules and their interpretation may be used inappropriately. I don't want us engaging in therapy by intimidation." She also expressed her "concern about how petty and mean" the rules violations had become, and that "some of the rules [had] taken on outrageous interpretations."

The issuance of a rules violation was accompanied by the reduction of the resident's level status. A resident's level status determined what possessions they are allowed to have. When a resident's level status was reduced for a rules violation, MSOTC staff would remove from the resident's room any items that are not allowed at their new reduced status level. This included the removal of religious property. Any rules violation resulted in a reduction to Level One, the lowest level of privileges at the MSOTC. If the violation was an intolerable violation, the resident would not be automatically restored to their previously attained phase of the treatment program, and would instead have to apply for reinstatement.

Additionally, upon the issuance of a rules violation, the resident would be instructed to sit at the Restriction Table. The Restriction Table was a small table and plastic chair placed next to

8

the nurses' station. The resident would sit at the Restriction Table from "early in the morning until [the] late evening." The length of time that a resident would remain at the Restriction Table, and on reduced level status following a rule violation, was dependent on the severity of the rules violation. For a minor violation, the resident would remain at the Restriction Table for two days. For a major violation, the resident would remain at the Restriction Table for seven days. For an intolerable violation, the resident would remain at the Restriction Table for fourteen days. There was no restriction on the amount of Restriction Table days a resident could accumulate.

Upon issuance of a rules violation, MSOTC staff would advise supervisory staff of the violation. The resident's treatment team would review the documentation supporting the rules violation. The treatment team meets between one and three times a week, and as a result, some violations were not reviewed for several days after the violation was issued. Depending on when the treatment team meets, a resident may serve their full time at the Restriction Table prior to the treatment team reviewing the violation. After reviewing the rules violation, the treatment team could modify the violation or expunge the violation. However, there is no evidence that the treatment team ever modified a violation. The record does not show that any of Plaintiff's violations were ever modified by the treatment team. The treatment team may discuss the violation with the staff person who issued the violation, but they only rarely ask for the resident's version of the events. If the treatment team did not modify the violation, the resident could request an expungement. MSOTC had in place an expungement process that entailed mandatory review of the request by the treatment team. If the rule violation is not expunged, there is no appeal process by which the resident can appeal that decision.

When at the Restriction Table, the resident was permitted an hour of exercise. This hour was broken into four fifteen minute breaks in a day. Residents were also permitted to leave the

Restriction Table for meals, showers, and to do their laundry.  If a resident asked for permission, and permission was granted, they could then get a drink of water, use the bathroom or go to their room.  Residents could read books, complete their homework and play some games while at the Restriction Table.  The residents of some wards could watch television while at the Restriction Table.  Plaintiff could not watch television while at the restriction table in his ward.  Residents at the restriction table could speak to staff and other residents only if they were at the table as well. Residents were not physically restrained to sit at the Restriction Table, and some residents refused to remain at the Restriction Table.  A refusal became part of that resident's clinical record, and the refusal is a rules violation itself. As a result, a resident's refusal to sit at the table could impact their progress through treatment and eventual release.

The staff at the MSOTC began to question the effectiveness of the Restriction Table in light of the fact that there was no limit on the accumulation of rules violations.  As days accumulated for residents, the Restriction Table lost its effectiveness.  Some residents accumulated days of restriction equaling more than a year; Plaintiff accumulated 22 days of restriction.  When this was brought to Defendant Blake's attention, he wrote, "I am concerned that the process of serving violations has become ineffective for those with excessive violations - - no light at the end of the tunnel - and it gives the appearance of being punitive."  The next day, he described the accumulation of days as "clinically defeating."  Defendant Weiler stated that she had "problems with this 'restriction table.'" And that she did not "understand why we must go so far as keeping them at the table in a plastic chair.  It seems to me like we are moving beyond a therapeutic intervention into something else."  Despite these concerns, Defendant Weiler was ordered by Defendant Bellew-Smith to use the Restriction Table, even though in Defendant Weiler's "clinical opinion," it was not needed on her ward.  In an email, MSOTC staff member

Paula Adams wrote that "I am greatly concerned about his sitting hour on end [his] legs are very edematous and painful . . . He is old/antisocial and ill. I told the staff please check under the hood, I fear he will be the color of his Navy Blue Sweat suit before anyone notices." The MSOTC discontinued their use of the Restriction Table in May 2007, and presently residents are restricted to a day hall instead of a table.

Dr. Merrill Main ("Dr. Main") is the Clinical Director of the New Jersey sexual predator civil commitment program. Prior to occupying that position, he was the Director of Psychology at the New Jersey sexual predator civil commitment program. Dr. Main is a licensed psychologist with over twenty years of experience in mental health services, with twelve years experience involving the treatment and evaluation of sex offenders. He has designed, modified and implemented elements of inpatient sex offender treatment programming. Dr. Main is an expert for Defendants.

Dr. Main never actually observed the restriction table or how it was implemented at the MSOTC, but gives the opinion that the Restriction Table was designed and implemented with sound clinical underpinnings, and for valid professional reasons. He states that the Restriction Table was intended to remove residents from stimuli that fosters misbehavior, and that it was not overly aversive and was likely to be an effective clinical intervention in many cases. He stated in his deposition that the Restriction Table was "an intervention that's relatively low impact . . . considering the population that's being treated." He based this opinion on the fact that the Restriction Table was located close enough to the nurse's station to enable observation, but not so close that conversations could be overheard, and because residents could stand and move within the small area of the table without permission, and could move away from the table with permission. His opinion considered that residents at the Restriction Table could go to treatment

classes and were given exercise time. However, he also stated that the Restriction Table "may be devoid of valid professional reasoning if applied without regard for the functioning of the individual to whom they are applied."

Dr. Main testified at his deposition that sexual civil commitment programs are relatively new and are evolving. He stated that these programs are discovering "that the sexually civilly committed may only be effectively managed in a setting that is more restrictive than a psychiatric hospital . . . because the sexually civilly committed evince higher levels of antisocial tendencies and lower incidence of major mental illness than psychiatric patients." He stated that in his opinion, "mental health settings are not the appropriate comparison criteria."

Dr. Metzner was hired as an expert for the Plaintiff. He gave his opinion that the Restriction Table was not effective because its limitations were not safety driven, but punitive in nature, and because the Restriction Table was not consistently implemented, was infantilizing, and had no limit on the accumulations of time. Dr. Metzner found that the Restriction Table was not a "therapeutic-based restrictions because of the long time that could be imposed and the absence of similar restrictions" at other mental health facilities. He concluded that the Restriction Table was "a substantial departure from the standard of mental health treatment and should not be allowed at MSOTC."

The MSOTC instituted a grievance policy. This policy stated that those who file three grievances in a twelve month period that are determined to be frivolous can no longer use the regular grievance process. Plaintiff is not permitted to use the regular grievance process, and his grievances are reviewed by a single person from the treatment team who determines if it is frivolous. If it is found not to be frivolous, it is processed according to the regular grievance

procedures. Those grievances that are found to be frivolous are sent once a month to the facility grievance contact and the resident rights review committee to confirm that it is frivolous.

The property that a resident of the MSOTC may have in his room is affected by his level in the treatment program. Residents are permitted to keep more items in their room as they progress through the treatment program. Dr. Main gave his opinion that "access to snacks, toiletries, and writing implements are clearly not related to clinical considerations but to the safe and orderly operation of the facility."

As part of the treatment program offered at the MSOTC, residents may take process group and pyscho-educational (or skills group) courses. As stated by Defendant Bellew-Smith at her deposition, the combination of these two types of classes:

> helps them to understand their sex offending, understand their offense cycle, understand their triggers, their vulnerable areas, their high risk situations and when you combine that with skills groups, it helps them to learn how, once they're out and they're faced . . . with a high risk situation or trigger or whatever, how to get out of it and what else to do instead of re-offending. So these are very important for treatment.

MSOTC has suffered from staffing shortages. On January 30, 2004, Dr. Jay Engelhart wrote to Defendant Blake, Defendant Bellew-Smith, and David Schmidt, "[c]urrently we do not have enough staff to provide the level of treatment that we feel is appropriate (or that JCAHO or any other accrediting body would feel is appropriate.)" Additional staffing shortages occurred in the summer and fall of 2006. Defendant Bellew-Smith resigned in July 2006, and Dr. Deena Wolf and two social workers resigned in the fall of 2006.

A memorandum was sent to all MSOTC residents on September 28, 2006. This memorandum informed residents that treatment groups would be changed as a result of resignations and staff absences due to training requirements. The memorandum outlined the ways in which treatment groups would be changed, including: doubling up group therapists, increasing

group sizes to the maximum, and placing some residents on a temporary waiting list for figure group openings. Previous to this change, each group only had one leader, and when that leader was unable to hold class, there was no one who could hold the class for them. The introduction of the co-therapist model required a reduction in the number of process groups, and approximately ten residents were not assigned to any process group because they were full.

Psycho-educational classes have not met at MSTOC since September 2006. Psycho-educational classes are didactic courses that teach coping skills. These classes are important because they "augment the work that is done in process groups" and "offer additional information and education." while giving the resident the opportunity to focus on one particular topic for a given period of time. Prior to cancellation in September 2006, the following psycho-educational classes were offered: Anger Management I & II, Autobiography I, II, & III, Communication, Conflict Resolution, Cooperation, De-Stressing Sensors; Emotional Well-Being I & II, Leisure Education I & II, Mindfulness, Orientation, Problem Solving, Relapse Prevention I, II, & III, Responsibility Taking, Road to Resilience, Sex Education, Stress Management, Thinking Errors, Victim Empathy, Violence Identification Education Workshop 1 & II, and Wellness. These classes stopped meeting because there were not enough social workers to provide clinical services in both process groups and psycho-educational classes. With the exception of Thinking Errors and Problem Solving, these classes are no longer held at the MSOTC.

Additionally, many self-improvement classes are no longer being held due to staffing issues. Only the AA/NA Support Group and the Computer Basics classes are currently offered, while the Adult Basic Education (GED), Assertiveness Skills, and How to Deal with Loss classes are not longer available to residents.

The cancellation of treatment classes was a frequent occurrence. Former MSOTC employee Deanna Wolf wrote Defendant Bellew-Smith an email stating,

> I agree, I feel very sad for the residents as well. I have to believe that someone or some state office will intervene and get things back on track, because MSOTC's existence is necessary for the safety of society. What was difficult for me was that I saw progress in several of the residents and one or two I fear or [sic] going to end up backsliding bad. The only two therapists who rarely if ever cancelled their groups were myself and Anita. Without mentioning names one of the others only met twice during a whole trimester and another cancelled between 60 - 70% of their groups. The guys were upset by it.

The full extent of the cancellations cannot be accurately ascertained as documents containing information on treatment class cancellations were destroyed.

After Defendant Bellew-Smith resigned, Defendant Semar served as the acting Clinical Director at MSOTC for six months, from July 2006 to February 2007. In this role, she was responsible for developing the clinical program and supervising clinical staff, including social workers and clinical psychologists. Defendant Semar has no education or experience in those fields.

## 2. FACTS RELATING TO FREEDOM OF RELIGIOUS EXERCISE

Plaintiff is a practicing Wiccan. There is no central sacred scripture in Wicca. Each individual defines what materials are in their source books. The collection of these materials is known as a Grimore.

There are four recognized and approved religious faith groups that meet on a weekly basis at the MSOTC: Christian, Islam, Naive American and Wicca. Each of these faiths are allowed one hour per week for group worship. MSOTC provides extra staff for supervising these weekly services and escorting residents to and from the service. Some Wiccan group members are considered higher risk residents. In addition to the weekly group service, each recognized faith group is given an extra hour of service per calendar year in order to mark a special observance to

their faith. Secondary group services are allowed if the group has a volunteer religious advisor. Additionally, the four recognized groups are provided group property to use during their services. They are each allotted $150 every six months to purchase group property.

Residents are also permitted individual religious property. Plaintiff stated that upon his arrival at the MSOTC, most of his religious text was thrown away by the staff. Residents may purchase items, at their expense, in accordance with their chosen religion. They may also receive items as gifts or donations provided that those items conform to MSOTC policies and procedures. Residents are also permitted to privately practice their faith by having time to pray, study, or perform private rituals in their rooms. However, Plaintiff states that he shares a room, so is not guaranteed a private time to meditate.

Five MSOTC residents attend Wicca group services. Their services are generally held outside. However, if the temperature is greater than 90° or below 25° Fahrenheit, the members of the Wicca group meet indoors. The Wiccan group is provided with a special space on MSOTC grounds for their Wiccan circle. The Wiccan circle is out of bounds for those who do not attend the Wiccan group service. However, Plaintiff states that the space has been desecrated by MSOTC staff, who have thrown trash in the circle and have burned the grass with chemicals. The Wiccan group has many items of group property, including; a recorder, chalice, altar cloth, mortar & pistil, abalone shell, ritual bell, candles, approved herbs, gloves, rock salt, a feathered fan, feathers, wild onions, black tea bags, pine bark, flint, quartz, apple stems, oak leaves, crystallized pine sap, pine needles, bark, shells, walnut bark, various seeds, beads, incense, acorns, tarot cards, a pentagram, a group Grimore, plastic bowls and markers.

Wiccan residents are permitted a religious necklace and their chosen religious text. Residents may request other religious items by submitting a chaplain request form explaining the

item requested, and justifying how it will aid in the individual practice of the resident's religion. Plaintiff is enrolled in a study course offered by The American Ring of Wisdom, a Wiccan organization. The MSOTC library also contains many religious books, including books on the Wiccan religion. Residents may take advantage of the literature that is provided for them in the MSOTC library.

Hostility towards the Wiccan faith has been expressed by MSOTC staff. Defendant Blake is the Chief Operating Officer at the MSOTC. In an email to Rick Gowdy, an employee of Defendant DMH, Defendant Blake discussed religious space at the MSOTC and referred to the Wiccan religion, writing that it, "[s]ounds like my girlfriend in college who wanted to start the Church of the Holy Hippie and give homage to Ra." He also called the Wiccan faith "hippy-dippy." Sherry Buehler, a security aid, has called a Wiccan a "devil worshipper" and said that he would "burn in hell for abandoning God," and that he "never loved God if he had to practice something that worships the devil." Dr. Jay Englehart, the sole psychiatrist at MSOTC, told a Wiccan that there had been a problematic change in his behavior after his change in religion from Christianity to Wiccan.

Additionally, Defendants require Wiccan residents that attend addiction support groups to participate in Christian prayer. Residents that fail to do so do not get a grade for group participation. Linda Sayles refused to allow Plaintiff to access his religious text in the day hall, when other religious texts, such as the Christian Bible, are permitted in the day hall. After this denial, Plaintiff made a treatment team request to be allowed access, and access was granted. Linda Sayles again challenged Plaintiff's possession of his Grimore in the day hall, and when shown the request he made to the treatment team, she responded that, "this is a Christian facility, and they're not supposed to allow demon worshipers . . . in here." Deposition testimony states

that MSOTC staff discarded gum and other trash into the Wiccan circle and spayed chemicals on

the grass in the Wiccan circle.

Some of the religious items Plaintiff has requested have been denied. These denials are

discussed in more detail below:

When Plaintiff first arrived at MSOTC, the staff threw out the majority of his Grimore, along with
its cover. Plaintiff has made many requests for items to repair and protect his Grimore:
- Scotch tape to tape the pages of his Grimore together. Denies because scotch tape is not
  provided to residents to make folders, instead the MSOTC provided plastic folders to
  assist Wiccan residents in protecting the pages of their Grimores. However, the folder
  was what was causing the Grimore to tear.
- To be allowed to use thick poster board to make runes for a cover for Plaintiff's Grimore.
  Denied in Arts and Crafts because no religious expressions in Arts and Crafts, and
  otherwise denied because thick poster paper is not an approved item allowed on the
  wards. Plaintiff notes that despite ths professed religious limitation in Arts and Crafts,
  Christians can make Christmas cards containing religious expressions during Arts and
  Crafts.
- That Plaintiff be allowed to have a Grimore made from fabric and velcro. The fabric was
  permitted, but no velcro. No reason for the denial is given.
- Request for shoelaces to tie Plaintiff's Grimore. Denied because shoe laces may not be
  used for any other purpose than for shoes.

Plaintiff also sought to receive Wiccan religious teachings, books and newsletters. Residents may
order from Access Catalogs, which are catalogs designed for prison settings, but the Access
Catalogs do not sell Wiccan items. The MSOTC not yet approved any Wiccan vendors:
- To receive Wiccan religious newsletters. This request was approved by the chaplain, but
  then referred to the security and treatment team. It is unclear if they approved the request.
- To be allowed to attend a correspondence course from Sacred Oak Sanctuary. Denied
  because the MSOTC will "not help facilitate such studies" and the materials would not be
  made "exceptions to the basic items list."
- That Wiccans be allowed to purchase items from Magus Books. Denied because catalog
  was not approved.
- That the Wiccans be allowed to order books from Llewellyn, Hamilton and Azure Green.
  Denied because these vendors were not approved.
- Request that the Wiccans be allowed to order two books from Llewellyn Publications.
  Denied because this vendor was not approved.
- Request that the Chaplain order Plaintiff religious books through Crazy Crow. Denied
  because this vendor was not approved.

The Wiccan circle was initially completed in 2004, but was moved in 2006. Requests that were
made for tools to construct the Wiccan circle were denied:
- Two stones two to three inches in length and height to work on the Wiccan circle. Denied
  due to security concerns.

- To purchase grass seed, or transplant grass, for the Wiccan circle. Denied because grass seed is not a group item, but staff suggested that the item could be donated.
- Plastic tools to construct the circle. Denied for security reasons, although Native American residents had used such tools for their prayer circle.
- Permission to use sticks and stones to construct the circle. Denied for security reasons.
- Pea gravel to complete the new circle. Denied, reason unknown. The MSOTC had allowed Wiccan residents to use pea gravel in their original circle.

Other personal and group religious items were denied:
- A single piece of white sewing thread 8-10 inches in length to be kept in Plaintiff's akasha. Denied because only nature items are allowed in the akasha.
- To be allowed a specific time for meditation. Denied because residents are not given specific times to meditate, and instead practice mediation around scheduled activities.
- Four glasses and four bowls for Wiccan services. Denied due to security concerns.
- Twenty two feet of white yarn or white thread to form a circle when Wiccan services are held indoors. Denied due to security concerns.
- That Wiccan residents be allowed to 'donate' their level funds to purchase items for service and the Wiccan circle. Denied because MSOTC is unable to accept state money from its own facility. Staff suggested that the items be donated instead.
- That Plaintiff be allowed to place two extra small pieces of quartz in his spirit bag. Request was approved as long as the new quartz replaced his existing stones because residents not permitted to have more than two tiny stones. No reason for the two-stone limit is given.
- That the MSOTC order a new amethyst stone. Denied because although MSOTC purchased the original amethyst, it was not on their list of group property, so they refused to replace the item.
- That the Wiccans be allowed to order a pound of sandalwood chips, jasmine flowers, white willow bark and a mortar. The MSOTC response was that they were awaiting vendor approval.
- To be allowed to pass written information dealing with the Wiccan religion. Denied, but encouraged to create a group Grimore that could contain copies of lessons and rituals as needed by the Wiccan group.
- Request that the Wiccans be provided a second group service. Denied because the Wiccan group does not have a volunteer. Plaintiff notes that this denial was based on the lack of a volunteer, and not any staffing shortage.
- To be allowed to collect some of the rock salt around the MSOTC. Denied because chemicals may not be handled by any resident.
- To ask for donations in the MSOTC newsletter for aquarium stones to be put in the Wiccan circle. This request was denied by the Spirituality Committee, with no reason given.
- A fold-up table so that Wiccan residents could have something to write on when their service is held indoors. The request was denied for security reasons.

Plaintiff also states that he has requested permission to solicit the donation of Wiccan items, and that his request was refused even though other groups my make solicitations for their religious items.

Defendants assert that while a resident can lose religious property by dropping a level, all items that are determined to be instrumental to a resident's religious observance will be considered on an individual basis independent from their treatment level.

## B.  LEGAL STANDARD

Pursuant to Federal Rule of Civil Procedure 56(c), a court may grant a motion for summary judgment only if all of the information before the court shows "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  The Supreme Court has noted that "[s]ummary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed to 'secure the just, speedy and inexpensive determination of every action.'" *Id.* at 327 (quoting Fed. R. Civ. P. 1).  "By its very terms, [Rule 56(c)(1)] provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).  Material facts are those "that might affect the outcome of the suit under the governing law," and a genuine material fact is one "such that a reasonable jury could return a verdict for the nonmoving party."  *Id.* at 248.  Further, if the non-moving party has failed to "make a showing sufficient to establish the existence of an element essential to that party's case, . . . there can be 'no genuine issue as to any

material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex*, 477 U.S. at 322-23.

The initial burden of proof in a motion for summary judgment is placed on the moving party to establish "the non-existence of any genuine issue of fact that is material to a judgment in his favor." *City of Mt. Pleasant, Iowa v. Associated Elec. Co-op., Inc.*, 838 F.2d 268, 273 (8th Cir. 1988). Once this burden is discharged, if the record does in fact bear out that no genuine dispute exists, the burden then shifts to the non-moving party who must set forth affirmative evidence and specific facts showing there is a genuine dispute on that issue. *Anderson*, 477 U.S. at 256-57. When the burden shifts, the non-moving party may not rest on the allegations in its pleadings, but by affidavit and other evidence must "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). In fact, the non-moving party must show there is sufficient evidence favoring the non-moving party which would enable a jury to return a verdict for it. *Anderson*, 477 U.S. at 249; *Celotex*, 477 U.S. at 334. "If the non-moving party fails to produce such evidence, summary judgment is proper." *Olson v. Pennzoil Co.*, 943 F.2d 881, 883 (8th Cir. 1991).

The Court may not "weigh the evidence in the summary judgment record, decide credibility questions, or determine the truth of any factual issue." *Kampouris v. St. Louis Symphony Soc.*, 210 F.3d 845, 847 (8th Cir. 2000). The Court instead "perform[s] only a gatekeeper function of determining whether there is evidence in the summary judgment record generating a genuine issue of material fact for trial on each essential element of a claim." *Id.*

## C.    DISCUSSION

The Court begins by noting that Plaintiff's Second Amended Complaint alleges claims under Missouri state law. Specifically, Plaintiff has brought a due process claim under Mo. Const. Art. 1, § 10 and a freedom of religion claim under Mo. Const. Art. 1, § 5. Defendants have not addressed these claims in their Motion for Summary Judgment, and as a result, these claims remain pending against Defendants.

1.    **COUNT I: SUBSTANTIVE & PROCEDURAL DUE PROCESS VIOLATIONS**[4]

In Count I of his Second Amended Complaint, Plaintiff alleged several procedural and substantive due process violations based upon unconstitutional conditions of confinement. As stated above, Mark Murrell voluntarily dismissed his claims, and Plaintiff has stated that he is not pursuing several of his claims. As a result, all claims relating to the Intensive Intervention Unit and the Readiness Ward have been withdrawn, and claims relating to recreational opportunities and the visitation policy are no longer pending before the Court.

Still pending before the Court are Plaintiff's procedural due process claims for the Restriction Table and the grievance policy for frivolous filers. The substantive due process claims that remain are for unconstitutional conditions of confinement related to inadequate treatment and personal property restrictions. Defendants assert that some of Plaintiff's claims are moot or barred by res judicata. The Court will first consider these defenses, and will then discuss Plaintiff's remaining claims.

*i. Defendants Assert Claims are Moot and Barred by Doctrine of Res Judicata*

Defendants assert that Plaintiff's claims regarding the Restriction Table are moot because Defendants have discontinued their use of the Restriction Table, and now utilize a restriction area.

---

[4] Defendant DMH cannot be sued under 42 U.S.C. § 1983, and the Court will dismiss Plaintiff's substantive and procedural due process claims against Defendant DMH. The Court will analyze this claim against the Individual Defendants in their official capacity.

"Under Article III of the Constitution, federal courts may adjudicate only actual, ongoing cases or controversies." *Missouri ex rel. Nixon v. Craig*, 163 F.3d 482, 484 (8th Cir. 1998). However, Defendants' voluntary cessation of their use of the restriction table does not render Plaintiff's claims moot.

"Generally, the 'voluntary cessation of allegedly illegal conduct does not deprive the tribunal of power to hear and determine the case, *i.e.*, does not make the case moot.'" *St. Louis Fire Fighters Ass'n Intern. Ass'n of Fire Fighters Local 73 v. City of St. Louis*, 96 F.3d 323, 329 (8th Cir. 1996) (quoting *United States v. W.T. Grant Co.*, 345 U.S. 629, 632 (1953)). An exception to this rule exists where:

> (1) it can be said with assurance that there is no reasonable expectation that the alleged violation will recur, and (2) interim relief or events have completely and irrevocably eradicated the effects of the alleged violation . . . it may be said that the case is moot because neither party has a legally cognizable interest in the final determination of the underlying questions of fact and law.

*St. Louis Fire Fighters*, 96 F.3d at 329 (citing *County of Las Angeles v. Davis*, 440 U.S. 625, 631 (1979)). This presents a heavy burden for Defendants, who must demonstrate that "subsequent events make it absolutely clear that the allegedly wrong behavior could not be reasonably expected to reoccur." *Friends of the Earth, Inc. v. Laidlaw Envtl. Serv. Inc.*, 528 U.S. 167, 170 (2000). Defendants have not satisfied this burden. Their use of the restriction table only ended after this lawsuit was filed, and they give no assurance to the Court that they will not revert back to this practice afer Plaintiff's claim is dismissed. Additionally, their new practice is not dissimilar from the restriction table, as it appears that residents at the MSOTC are now made to sit at a table in a restriction area. This slight change to the challenged practice does not demonstrate that Defendants will not revert back to their use of a Restriction Table. Plaintiff's claims are not moot.

Additionally, the Court finds that these claims are not barred by the doctrine of res judicata. Res judicata bars the relitigation of issues that were or could have been raised in a previous action. *See Sumlin v. Krehbiel*, 876 F.Supp. 1080 (1994). Three elements must be satisfied for Plaintiff's claim to be barred, "(1) whether the prior judgment was entered by a court of competent jurisdiction; (2) whether the prior decision was a final judgment on the merits; and (3) whether the same cause of action and the same parties or their privies were involved in both cases." *Ripplin Shoals Land Co., LLC v. U.S. Army Corps of Engineers*, 440 F.3d 1038, 1042 (8th Cir. 2006) (quoting *Lundquist v. Rice Mem'l Hosp.*, 238 F.3d 975, 977 (8th Cir. 2001)). Defendants assert that Plaintiff's claims are barred due to *Strutton v. Helms*, No. 4:04CV01735 CEJ and *Strutton v. Blake*, No. 4:04CV00616 DJS.

Defendants' assertion of res judicata fails as to the *Strutton v. Blake* action because Plaintiff voluntarily dismissed himself from this action prior to judgment. This dismissal was without prejudice. As a result, there was no "final judgment on the merits." As the second element has not been satisfied, this previous action does not bar the claims currently pending before the Court.

The Court also finds that Defendants' assertion of res judicata from the *Strutton v. Helms* action fails. This action was very narrowly tailored; Plaintiff simply contested the due process he was afforded in one violation he received on November 14, 2004. The Court's review of this previous action demonstrates that the due process Plaintiff received relative to this violation was different than the due process that is currently provided at the MSOTC. As a result, the causes of action are slightly different between these two actions, and the Court finds that Plaintiff's claims are not barred. Additionally, the Court notes that res judicata is an affirmative defense that "must generally be pled or else [it] may be deemed waived." *Bechtold v. City of Rosemount*, 104 F.3d

1062, 1068 (8th Cir. 1997); Fed. R. Civ. P. 8(c). Defendants failed to plead this affirmative defense in their answer, and it has been waived.

### ii. *Procedural Due Process Claim: Restriction Table*

Plaintiff alleges the violation of his procedural due process rights because rules violations are not reviewed before the Restriction Table punishment is imposed, and no meaningful review is given subsequent to the imposition of the punishment. To evaluate whether Plaintiff's conditions of confinement deprive him of his liberty without due process, the proper inquiry is to first determine whether Plaintiff had a "liberty interest protected by the due process clause of the fourteenth amendment." *Franco v. Moreland*, 805 F.2d 798, 800 (8th Cir. 1986). Only if Plaintiff has a protected liberty interest will the Court "consider what process is due by balancing the specific interest that was affected, the likelihood that the . . . procedures would result in an erroneous deprivation, and the [MSTOC's] interest in providing the process that it did, including the administrative costs and burdens of providing additional process." *Senty-Haugen v. Goodno*, 462 F.3d 876, 886 (8th Cir. 2006).

The liberty interests of the civilly committed are "considerably less than those held by members of free society . . . As compared to a prison inmate, however, [the civilly committed are] entitled to 'more considerate treatment and conditions of confinement." *Id.* Protected liberty interests can arise from the due process clause and state laws. *Id.* However, liberty interests that arise from state laws are "generally limited to freedom from restraint, which, while not exceeding the sentence in such an unexpected manner as to give rise to protection by the Due Process Clause of its own force . . . nonetheless imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Sandin v. Conner*, 515 U.S. 472, 484 (1995).

The Restriction Table "is not itself an atypical and significant hardship unless [Plaintiff] points to some specific difference between his conditions in segregation and the conditions in the general population which amounts to such a hardship." *Johnson v. Hamilton*, 452 F.3d 967, 973 (8th Cir. 2006). Plaintiff has presented the Court with details regarding the conditions at the Restriction Table, but has provided no information as to how this differs from MSOTC general resident conditions. As a result, it is simply not possible for the Court to determine that Plaintiff has satisfied his burden of demonstrating that the conditions at the Restriction Table were both atypical and a substantial hardship compared to "the ordinary incidents of prison life."[5] *Sandin*, 515 U.S. at 484.

Plaintiff has not introduced evidence of how the Restriction Table, differs from MSOTC general resident conditions, and therefore failed to "make a showing sufficient to establish the existence of an element essential to that party's case." *Celotex*, 477 U.S. at 322-23; *see Howard v. Collins*, 1997 WL 710314, at *1 (8th Cir. Nov. 17, 1997) (approving district court's dismissal

---

[5] Even if Plaintiff presented the Court with this information, it is questionable whether his claim would have succeeded. The Eighth Circuit "has consistently held that administrative and disciplinary segregation are not atypical and significant hardships that would trigger due process protections." *McCauley v. Dormire*, 245 F.App'x 565, 567 (8th Cir. 2007). The Eighth Circuit has only found protected liberty interests where inmates were confined to administrative segregation for ten years or longer. *See Williams v. Norris*, 277 F.App'x 647, 648-49 (8th Cir. 2008); *Heron v. Schriro*, 11 F.App'x 659, 661-62 (8th Cir. 2001); *Herron v. Wright*, 116 F.3d 480 (8th Cir. 1997).

The civilly committed are entitled to 'more considerate treatment and conditions of confinement" than prison inmates, but even under this standard, protected liberty interests are rarely found. *Senty-Haugen*, 462 F.3d at 886. One court found a protected liberty interest where a civilly committed individual was kept "in administrative isolation for eight days before he received a hearing." *Holly v. Anderson*, 2008 WL 1773093, at *7-8 (D. Minn. 2008). The Eastern District of Wisconsin found that it was "questionable" whether this standard was met when the Plaintiff lost dayroom privileges and off-unit movement for twenty days, and had two weeks on a reduced status that restricted "his use of the library, personal electronics, other equipment, and group activities, as well as demotion to the lowest pay scale" without due process. *Tran v. Kriz*, 2008 WL 794546, at *5 (E.D. Wis. 2008).

as Plaintiff "did not allege how his eight-month stint in ad seg presented an atypical and significant hardship in relation to the ordinary incidents of prison life at Cummins."). Without this evidence the Court is unable to determine if the Restriction Table imposed an "atypical and significant hardship" on Plaintiff. *Sandin*, 515 U.S. at 484. As a result there is no genuine issue of material fact, and summary judgment is appropriate.

### iii.     *Procedural Due Process Claim:  Grievance Policy for Frivolous Filers*

Plaintiff asserts that the grievance policy for frivolous filers is inadequate. The MSOTC grievance policy states that those who file three grievances in a twelve month period that are determined to be frivolous can no longer use the regular grievance process. Plaintiff filed three grievances that were determined to be frivolous, and is no longer permitted to use the regular grievance process. As a result, his grievances are reviewed by a single person from the treatment team who determines if it is frivolous. If it is found not to be frivolous, it is processed according to the regular grievance procedures. Those grievances that are found to be frivolous are sent once a month to the Facility Grievance Contact and the Resident Rights Review Committee to determine whether it is frivolous.

As discussed above, the first step in evaluating a procedural due process claim is to consider whether Plaintiff had a "liberty interest protected by the due process clause of the fourteenth amendment." *Franco*, 805 F.2d at 800. Plaintiff's claim related to the grievance policy fails because he "is not entitled to grievance procedures under the Constitution." *Wallace v. Hamrick*, 229 F.App'x 827, 829 n.4 (11th Cir. 2007). This is because plaintiffs can only "state a claim under section 1983 . . . [by alleging] the violation of a right secured by the Constitution and the laws of the United States." *Buckley v. Barlow*, 997 F.2d 494, 495 (8th Cir. 1993) (quoting *West v. Atkins*, 487 U.S. 42, 48 (1988)). Grievance procedures, such as the procedure

in place at the MSOTC do not "confer any substantive right . . . it does not give rise to a protected liberty interest requiring the procedural protections envisioned by the fourteenth amendment." *Buckley*, 997 F.2d at 495. Plaintiff's challenge to the grievance procedure on this basis fails.

### iv. *Substantive Due Process Claim: Inadequate Treatment*

Plaintiff alleges that he has received inadequate treatment that constitutes a substantive due process claim through Defendants' use of the Restriction Table and their cancellation of treatment classes. "The Fourteenth Amendment guarantees '[s]ubstantive due process [, which] prevents the government from engaging in conduct that shocks the conscience or interferes with rights implicit in the concept of ordered liberty." *Sheets v. Butera*, 389 F.3d 772, 778 (8th Cir. 2004) (quoting *Moran v. Clarke*, 296 F.3d 638, 643 (8th Cir. 2002)). To determine whether Plaintiff's substantive due process rights have been violated, the Court must:

> balance the liberty of the individual and the demands of an organized society . . . . At the outset, we identify the individual liberty interests at stake and the established demands of an organized society at issue. We then analyze, qualitatively, whether the interests asserted are sufficiently important for substantive due process consideration.

*Moran*, 296 F.3d at 643-44.

While there is some disagreement on whether a civilly committed individual has a sufficiently important liberty interest in adequate treatment,[6] this Court finds that the individual liberty interests at stake in this claim "are sufficiently important for substantive due process

---

[6] The primary goal behind the Missouri SVPA is "to continue the segregation of sexually violent offenders from the public. Treatment with the goal of reintegrating them into society is incidental, at best." *Kansas v. Hendricks*, 521 U.S. 346, 365 (quoting *Matter of Care and Treatment of Hendricks*, 912 P.2d 129, 136 (Kan. 1996)); *Thomas v. State*, 74 S.W.3d 789, 790 (Mo. banc 2002) ("For all relevant purposes, the Kansas and the Missouri sexual predator statutes are the same"). When this is the case, the Supreme Court has indicated that the obligation to provide treatment may be satisfied by committing the individual "to an institution expressly designed to provide psychiatric care and treatment." *Kansas*, 521 U.S. at 368 n.4.

consideration." *Moran*, 296 F.3d at 643-44. The Court agrees that "fundamental fairness requires that the involuntarily civilly committed person receive such individual treatment as will provide him a meaningful chance to improve and win his eventual release." *Hargett v. Baker*, 2002 WL 1732911, at *2 (N.D. Ill. July 26, 2002). States owe a great duty to the civilly committed, and some courts have even found that "the right of a person detained as a sex offender to adequate treatment" is "an interest beyond [the] basic human needs" of "food, clothing, medical care and reasonable efforts to secure personal safety." *Williams v. Nelson*, 398 F. Supp. 2d 977 (W.D. Wis. 2005); *see Youngberg v. Romeo*, 457 U.S. 307 (1982).

As this initial hurdle has been satisfied, the Court must next determine "within this context, . . . whether the government's contested actions are conscience shocking." *Moran*, 296 F.3d at 643-44. The Court must consider that "decisions made by the appropriate professional are entitled to a presumption of correctness." *Youngberg*, 457 U.S. at 324. However, liability may be imposed where "the decision by the professional is such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the person responsible actually did not base the decision on such a judgment." *Id.* at 323. As a result, for Plaintiff's claims to survive, he must introduce evidence from which a jury could find that a treatment decision was "such a substantial departure . . . that the person responsible actually did not base the decision on such a judgment." *Id.*

Plaintiff has introduced evidence that meets this standard relating to Defendant's use of the Restriction Table. The evidence presented to the Court demonstrates that members of the staff recognized that the Restriction Table did not serve a valid clinical purpose and was a substantial departure from valid professional judgment. Defendant Blake described the accumulation of days as "clinically defeating." Defendant Weiler stated that she had "problems

with this 'restriction table'" and that she did not "understand why we must go so far as keeping them at the table in a plastic chair.  It seems to me like we are moving beyond a therapeutic intervention into something else."  She stated in her deposition that it was her "clinical opinion" that the Restriction Table was not needed on her ward.  Members of the MSOTC staff even feared that the Restriction Table may have an effect on the physical health of the residents.  In an email to Defendant Bellew-Smith, Blake, Weiler, Meade, Rosenboom, Semar, and other MSOTC staff, Paula Adams wrote that "I am greatly concerned about his sitting hour on end [his] legs are very edematous and painful . . . He is old/antisocial and ill.  I told the staff please check under the hood, I fear he will be the color of his Navy Blue Sweat suit before anyone notices."

This conclusion is confirmed by the experts retained in this action.  Dr. Main is an expert for Defendants, and even he testified that the Restriction Table "may be devoid of valid professional reasoning if applied without regard for the functioning of the individual to whom they are applied."  This appears to have been the case at the MSOTC as any MSOTC employee could issue a rules violation, and violations were awarded by security guards and other non-treatment staff members.

Dr. Metzner was hired as an expert for the Plaintiff.  He gave his opinion that the Restriction Table was not effective because its limitations were not safety driven, but punitive in nature, and because the Restriction Table was not consistently implemented, was infantilizing, and had no limit on the accumulations of time.  Dr. Metzner found that the Restriction Table was not a "therapeutic-based restrictions because of the long time that could be imposed and the absence of similar restrictions" at other mental health facilities.  He concluded that the Restriction Table was "a substantial departure from the standard of mental health treatment and should not be allowed at MSOTC."

This evidence is sufficient to demonstrate that the treatment decisions made by Defendants related to the Restriction Table was "substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the person responsible actually did not base the decision on such a judgment." *Id.* at 323. The Court finds that "the government's contested actions are conscience shocking." *Moran*, 296 F.3d at 643-44.

Additionally, the Court finds that Plaintiff has introduced evidence that satisfies this "conscience shocking" standard relating to the cancellation of process group and psycho-educational courses. States are required to "provide civilly-committed persons with access to mental health treatment that gives them a realistic opportunity to be cured and released." *Sharp v. Weston*, 233 F.3d 1166, 1172 (9th Cir. 2000) (citing *Ohlinger v. Watson*, 652 F.2d 775, 778 (9th Cir. 1980)).

The combination of process group and psycho-educational courses are important to Plaintiff's treatment because they help those committed under the SVPA:

> to understand their sex offending, understand their offense cycle, understand their triggers, their vulnerable areas, their high risk situations and when you combine that with skills groups, it helps them to learn how, once they're out and they're faced . . . with a high risk situation or trigger or whatever, how to get out of it and what else to do instead of re-offending. So these are very important for treatment.

Defendants were aware that the treatment they were providing was inadequate. On January 30, 2004, Dr. Jay Engelhart wrote an email to Defendant Blake, Defendant Bellew-Smith, and David Schmidt, "[c]urrently we do not have enough staff to provide the level of treatment that we feel is appropriate (or that JCAHO or any other accrediting body would feel is appropriate.)"

After Defendant Bellew-Smith resigned, Defendant Semar became the Clinical Director at MSOTC. She acted as clinical director for six months, from July 2006 to February 2007. In this role, she was responsible for developing the clinical program and supervising clinical staff,

31

including social workers and clinical psychologists, however, she had no education or experience in those fields.

After additional staffing shortages in the summer and fall of 2006 were recognized, a memorandum was sent to all MSOTC residents on September 28, 2006. This memorandum informed residents that treatment groups would be changed as a result of resignations and staff absences due to training requirements. The memorandum outlined the ways in which treatment groups would be changed, including: doubling up group therapists, increasing group sizes to the maximum, and placing some residents on a temporary waiting list for figure group openings. Prior to this change, each group only had one leader, and when that leader was unable to hold class, there was no one who could hold the class for them. The introduction of the co-therapist model required a reduction in the number of process groups, and approximately ten residents were not assigned to any process group because they were full.

Psycho-educational classes have not met at MSTOC since September 2006. Psycho-educational classes are didactic courses that teach coping skills. These classes are important because they "augment the work that is done in process groups" and "offer additional information and education." while giving the resident the opportunity to focus on one particular topic for a given period of time. Prior to cancellation in September 2006, a wide variety of psycho-educational classes were offered.[7] These classes stopped meeting because there were not enough social workers to provide clinical services in both process groups and psycho-educational classes. With the exception of Thinking Errors and Problem Solving, these classes are no longer held at

---

[7] Anger Management I & II, Autobiography I, II, & III, Communication, Conflict Resolution, Cooperation, De-Stressing Sensors; Emotional Well-Being I & II, Leisure Education I & II, Mindfulness, Orientation, Problem Solving, Relapse Prevention I, II, & III, Responsibility Taking, Road to Resilience, Sex Education, Stress Management, Thinking Errors, Victim Empathy, Violence Identification Education Workshop 1 & II, and Wellness.

the MSOTC. Additionally, many self-improvement classes are no longer being held due to staffing issues.[8] Only the AA/NA Support Group and the Computer Basics classes are currently offered.

Even when these classes were offered, they were frequently cancelled. Former MSOTC employee Deanna Wolf wrote Defendant Bellew-Smith an email stating,

> I agree, I feel very sad for the residents as well. I have to believe that someone or some state office will intervene and get things back on track, because MSOTC's existence is necessary for the safety of society. What was difficult for me was that I saw progress in several of the residents and one or two I fear or [sic] going to end up backsliding bad. The only two therapists who rarely if ever cancelled their groups were myself and Anita. Without mentioning names one of the others only met twice during a whole trimester and another cancelled between 60 - 70% of their groups. The guys were upset by it.

The full extent of the cancellations cannot be accurately ascertained as documents containing information on treatment class cancellations were destroyed.

By failing to provide these classes, Defendants have not provided Plaintiff "with access to mental health treatment that gives [him] a realistic opportunity to be cured and released." *Sharp*, 233 F.3d at 1172 (citing *Ohlinger*, 652 F.2d at 778). This failure was an obvious departure from accepted professional judgment. Liability may be imposed where "the decision by the professional is such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the person responsible actually did not base the decision on such a judgment." *Youngberg*, 457 U.S. at 324.

The Court finds that "the government's contested actions are conscience shocking." *Moran*, 296 F.3d at 643-44. It appears that Plaintiff has not received meaningful treatment, but has instead been subjected "to what is essentially a warehousing operation for social misfits."

---

[8] Adult Basic Education (GED), Assertiveness Skills, and How to Deal with Loss classes are not longer available to residents.

*United states. ex rel. Stachulak v. Coughlin*, 520 F.2d 931, 936 (7th Cir. 1975). Plaintiff has introduced evidence on which a jury may find that Defendants actions were a substantial departure from accepted professional judgment. Accordingly, Plaintiff's substantive due process claims relating to the Defendants' failure to provide adequate treatment survive summary judgment. These claims remain against the Individual Defendants in their official capacity.

### v. Substantive Due Process Claim: Personal Property Restrictions

Plaintiff alleges that he has been subjected to personal property restrictions that violate his substantive due process rights. To determine whether a substantive right protected by the Due Process Clause has been violated, the Court must "balance 'the liberty of the individual' and 'the demands of an organized society.'" *Youngberg v. Romeo*, 457 U.S. 307, 320 (quoting *Poe v. Ullman*, 367 U.S. 497, 542 (1961)). In determining this balance, courts weigh "the individual's interest in liberty against the State's asserted reasons for retraining individual liberty." *Youngberg*, 457 U.S. at 320. It is well established that "prison officials may condition or limit the use of personal property without violating the due process clause." *Robinson v. Devenny*, 1992 WL 75201, at *1 (10th Cir. April 13, 1992).

Some items are considered contraband and are not permitted for safety reasons at any level in the treatment program. Additionally, Defendants regulate what possessions residents may have based upon their progress in the treatment program. Plaintiff has provided the Court with evidence that he is not a safety risk and that Defendants' professed rationales for their property restrictions should not apply to him. However, whether or not Plaintiff himself presents a safety risk does not change the fact that the MSOTC houses high-risk residents, and the MSOTC has a legitimate basis for restricting the property possessed by all residents. Plaintiff's evidence does not provide a basis "for concluding that [MSOTC] officials have exaggerated their response to

these serious problems or that this restriction is irrational." *Bell v. Wolfish*, 441 U.S. 520, 555 (1979). The Court's balancing of "'the liberty of the individual' and 'the demands of an organized society'" demonstrate that these property restrictions do not violate Plaintiff's substantive due process rights. *Youngberg*, 457 U.S. at 320 (quoting *Poe*, 367 U.S. at 542).

## 2.     COUNT II:  RLUIPA AND THE FIRST AMENDMENT

Plaintiff asserts that Defendants have infringed upon his beliefs in several ways, including: harassment and discrimination in the exercise of his faith; the denial of access to religious literature; denial of the ability to maintain his religious text; denial of access to his religious circle by denying him the opportunity to maintain the circle; requiring that he express beliefs or participate in treatment contrary to his beliefs; conditioning the right to religious items based upon behavior and treatment progress; denying him the opportunity to purchase religious items on the same terms as members of other religions, denying him opportunities for group worship that are granted to other religions, and withholding religious ceremonial items that other religions are permitted.

Even thought Plaintiff has been civilly committed, he "retain[s] constitutional rights protected by the First Amendment, including the right to free exercise of religion." *Fegans v. Norris*, 537 F.3d 897, 902 (8th Cir. 2008). Additionally, Congress has enacted RLUIPA,[9] which grants "additional protection for religious exercise by institutionalized persons." *Id.* The RLUIPA prohibits the imposition of a "substantial burden" on the exercise of religion, "even if the

---

[9] Before enacting the RLUIPA, Congress enacted the Religious Freedom and Restoration Act (RFRA).  The RFRA was invalidated in *City of Boerne v. Flores*, 521 U.S. 507, 515-16 (1997) because it did not contain a Commerce Clause or Spending Clause limitation.  In response, when Congress enacted the RLUIPA, they specifically invoked federal authority under the Spending and Commerce Clauses. *Cutter v. Wilkinson*, 544 U.S. 709, 715 (2005).  The RLUIPA continued the "compelling governmental interest" and "least restrictive means" standard that was originally set forth in the RFRA. *Id.* at 714-15, 722 -23.

burden results from a rule of general applicability, unless the government demonstrates that the imposition of the burden (1) is in furtherance of a compelling governmental interest, and (2) is the least restrictive means of furthering that compelling governmental interest." *Id*. (quoting 42 U.S.C. § 2000cc-1). When analyzing claims under the First Amendment and the RLUIPA, the principle difference is that RLUIPA provides for the strict scrutiny of a religious infringement, while the First Amendment merely requires a rational basis analysis. *See Cutter v. Wilkinson*, 544 U.S. 709 (2005). The Court will consider Plaintiff's claims under the First Amendment Free Exercise Clause, the RLUIPA and the First Amendment Establishment Clause separately.[10]

### i.    FIRST AMENDMENT:  FREE EXERCISE[11]

A threshold requirement for relief is that the religious belief be sincere. *United States v. Sieger*, 380 U.S. 163, 185 (1964). Defendants have stipulated for the purposes of this Motion that Plaintiff's beliefs are sincere, and accordingly, the Court considers this requirement to be satisfied.

The next step in the analysis is to determine whether "the challenged regulation infringes upon that belief." *Iron Eyes v. Henry*, 907 F.2d 810, 813 (8th Cir. 1990). The burden is on the Plaintiff to demonstrate what is required for him to practice his religion, and this requires more than conclusory allegations. *Bettis v. Delo*, 14 F.3d 22, 23 (8th Cir. 1994). The First

---

[10] The First Amendment to the United States Constitution states that, "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances."

[11] Defendant DMH cannot be sued under 42 U.S.C. § 1983, and the Court will dismiss Plaintiff's First Amendment claims against Defendant DMH. The Court will analyze this claim against the Individual Defendants in their official capacity.

Amendment will only protect religious beliefs and rituals that are "based on a teaching of [one's] religion." *Goff v. Graves*, 362 F.3d 543, 547 (8th Cir. 2004).

A regulation that infringes on a plaintiff's beliefs "is valid if it is reasonably related to legitimate penological interests." *Turner v. Safley*, 482 U.S. 78, 89 (1987). The reasonableness of a restriction is evaluated through the consideration of several factors:

> (1) whether there is a valid, rational connection between the prison regulation and the legitimate governmental interest put forward to justify it; (2) whether there are alternative means of exercising the right that remain open to prison inmates; (3) the impact accommodation of the asserted constitutional right will have on guards and other inmates, and on the allocation of prison resources generally; and (4) the existence or absence of "obvious, easy alternatives . . . that fully accommodate [ ] the prisoner's rights at *de minimis* cost to valid penological interests.

*Roe v. Crawford*, 414 F.3d 789, 794-95 (8th Cir. 2008) (quoting *Turner*, 482 U.S. at 89-91) (internal quotations omitted). Plaintiff brings Free Exercise claims based on many different issues. The Court will consider all of Plaintiff's claims separately to determine if Defendants have infringed upon Plaintiff's sincerely held religious beliefs. *Iron Eyes*, 907 F.2d at 813. If that part of the test is satisfied, the Court will apply the factors listed above.

Plaintiff states that the right to possess certain religious items is conditioned upon behavior and treatment progress, and he also asserts that Defendants have withheld from the Wiccans religious ceremonial items that other religions are permitted to possess. These claims fail to satisfy the first step of the Court's analysis as Plaintiff has not introduced evidence from which a reasonable jury could find that the restriction infringes upon Plaintiff's religious beliefs. *Iron Eyes*, 907 F.2d at 813. Plaintiff has introduced no evidence of any religious items that were actually taken away from him when he dropped levels.[12] Additionally, while the Plaintiff has

---

[12] The Court notes that while a resident can lose religious property by dropping a level, MSOTC policy states that all items that are determined to be instrumental to a resident's religious observance will be considered on an individual basis independent from their treatment level.

presented the Court with a list of items he requested that were denied, he has not stated that any of these items are ceremonial items or that any of these items were necessary to his practice of the Wiccan religion. This evidence is necessary to show which tenet or belief is burdened, so that the Court may determine if the restriction infringes upon that tenet or belief. Without this evidence, these claims cannot survive summary judgment, because Plaintiff has failed to show that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.

Plaintiff states that he has been denied the ability to maintain his religious text, been denied access to the Wiccan circle and that the MSOTC has denied him the ability to maintain his Circle. The burden is on the Plaintiff to demonstrate what is required for him to practice his religion, and this requires more than conclusory allegations. *Bettis v. Delo*, 14 F.3d 22, 23 (8th Cir. 1994). This evidence is necessary to show which tenet or belief is burdened by these denials, so that the Court may determine if the restriction infringes upon that tenet or belief. Without this evidence, these claims cannot survive summary judgment because Plaintiff has failed to show that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.

Plaintiff's assertions of "belittling and harassing" comments also fail to satisfy the first step of the Court's analysis. Most of the comments of which Plaintiff complains were not made to Plaintiff. The only comments that were directed at Plaintiff were made by Linda Sayles, a MSOTC employee. She refused to allow Plaintiff to access his religious text in the day hall, when other religious texts, such as the Christian Bible, are permitted in the day hall. After this denial, Plaintiff made a treatment team request to be allowed access, and access was granted. Linda Sayles again challenged Plaintiff's possession of his Grimore in the day hall, and when shown the request he made to the treatment team, she responded that, "this is a Christian facility, and they're not supposed to allow demon worshipers . . . in here."

Linda Sayles' comment was inappropriate. However, the Court must determine whether "the challenged regulation infringes upon that belief." *Iron Eyes*, 907 F.2d at 813. Plaintiff does not allege that her statement infringed upon a sincerely held religious belief, and Plaintiff also does not allege that the one-time denial of permission to bring his Grimore into the day hall infringed upon a sincerely held religious belief. Plaintiff has not presented evidence that Linda Sayles' impeded his ability to practice his religion, and this claim fails.

Plaintiff claims that he has been denied access to some religious literature.[13] He would like to order Wiccan materials, and take part in a Wiccan correspondence course, however, none of the vendors who sell these items have been approved by the MSOTC. The MSOTC must approve vendors for security reasons. This satisfies the first factor as security is a legitimate governmental interest, and there is a "valid, rational connection between" regulating vendors and MSOTC security. *Roe v. Crawford*, 414 F.3d at 794-95. The second factor also weighs towards Defendants because "alternative means of exercising the right that remain open to" Plaintiff. *Id.* While Plaintiff cannot order books or take the correspondence course offered by these vendors, this does not mean that Plaintiff has no access to Wiccan literature. Wiccan books are available in the MSOTC library and Plaintiff receives "Pen," a Wiccan religious newsletter. Plaintiff is also enrolled in a study course offered by The American Ring of Wisdom, a Wiccan organization, and his family has donated religious items to the Wiccan faith.

---

[13] Plaintiff's Second Amended Complaint alleges that he is denied the opportunity to purchase religious items on the same terms as members of other religions. The Court assumes that Plaintiff is referring to the Access catalog. This catalog sells many items, including clothes, approved electronics and personal hygiene items. The catalog also sells religious items, but not Wiccan religious items. Plaintiff is not prohibited from ordering from the Access catalog.

The remaining factors weigh in favor of Plaintiff. The impact that accommodating these vendors would have on guards, other inmates and prison resources appears to be small. Additionally, it appears to the Court that the MSOTC should be able to accommodate Plaintiff by finding an approved vendor, or approving a vendor from whom Plaintiff can order these items. While Defendants state that they are working on securing approval for these vendors, the length of time it has taken to secure approval suggests a lack of effort by Defendants. However, the first two factors greatly outweigh the application of the second two factors. The MSOTC has a valid interest in regulating MSOTC security, and Plaintiff has alternative sources for Wiccan materials. As a result, this restriction is clearly valid.

Plaintiff asserts that he has been denied opportunities for group worship that are granted to other religions. MSOTC policy is that recognized faith groups, such as Wicca, may meet once a week. Each of these faiths are allowed one hour per week for group worship. MSOTC provides extra staff for supervising all weekly services, and for escorting residents to and from the service. In addition to the weekly group service, each recognized faith group is given an extra hour of service per calendar year in order to mark a special observance to their faith. Secondary group services are allowed if the group has a volunteer religious advisor. The Christian group is the only group that has a volunteer religious advisor, and is the only group that has a second group service.

Plaintiff has demonstrated that the prohibition on a second group service infringes upon a sincerely held religious belief, and the Court must now consider whether this restriction "is reasonably related to legitimate penological interests." *Turner*, 482 U.S. at 89. The first factor asks "whether there is a valid, rational connection between the prison regulation and the legitimate governmental interest put forward to justify it." *Roe*, 414 F.3d at 794-95. Defendants

40

assert that this regulation is necessary for safety reasons. However, the Court agrees with Plaintiff that the facts belie this claim. The MSOTC's denial of a second service is not due to a lack of staffing or resources. Defendants state that they would grant a second service to any group that has an outside voluntary leader, as a result, it appears that MSOTC has the staff and resources to provide this second service. It is true that prison restrictions "on inmate-led religious activity" have been upheld by several courts. *See Anderson v. Angelone*, 123 F.3d 1197, 1198 (9th Cir. 1997) (inmate led religious activity may be used to inflame or exert influence over other inmates, and prison is also concerned that it may be a cover for gang or other unlawful activity); *Tisdale v. Dobbs*, 807 F.2d 734, 738-39 (8th Cir. 1986) (upholding requirement that service be led by outside sponsor); *Hadi v. Horn*, 830 F.2d 779, 784-85 (7th Cir. 1987) (reasonable to cancel services when outside chaplain is unavailable). However, all of these cases are readily distinguishable because these facilities completely barred inmate-led religious activities. The MSOTC has no such policy; the first weekly service for all religious groups is inmate-led. As a result, these cases do not support any argument that an outside voluntary leader is necessary at the MSOTC for security purposes. The second factor asks if there is an "alternative means of exercising the right that remain[s] open." *Roe*, 414 F.3d at 794-95. Defendants respond that Plaintiff can participate in individual prayer in his room or outside at various points in the day, and that the MSOTC already offers one weekly Wiccan service. However, Plaintiff shares a room, and his opportunities to privately meditate in his room are limited. The third factor asks what impact the accommodation will have on the MSOTC. While Defendants assert that a second service would put a strain on their resources, their apparent ability to support a second service if the Wiccans get an outside voluntary leader indicates that the actual effect on prison resources would not be great. Neither party has introduced evidence of an obvious or easy alternative.

The Court finds that this is a close question, but it appears that Plaintiff has introduced sufficient evidence from which a reasonable jury could find that this regulation is not "reasonably related to legitimate penological interests" and could return a verdict for Plaintiff. *Turner v. Safley*, 482 U.S. 78, 89 (1987); *Anderson*, 477 U.S. at 249; *Celotex*, 477 U.S. at 334.

### ii.     RLUIPA[14]

A successful claim under the RLUIPA requires that a plaintiff demonstrate that they suffer a substantial burden on their religious exercise. 42 U.S.C. § 2000cc-1(a). A substantial burden exists where the plaintiff must "choose between following the precepts of [his] religion and forfeiting benefits, on the one hand, and abandoning the precepts of [his] religion . . . on the other hand." *Sherbert v. Verner*, 374 U.S. 398, 404 (1963). The Eighth Circuit has declared that a substantial burden exists where a government policy or regulation:

> significantly inhibit[s] or constrain[s] conduct or expression that mainfests some central tenet of a person's individual religious beliefs; must meaningfully curtail a person's ability to express adherence to his or her faith; or must deny a person reasonable opportunities to engage in those activities that are fundamental to a person's religion.

*Murphy v. Missouri Department of Corrections*, 372 F.3d 979, 988 (8th Cir. 2004).

The requirement that the Plaintiff show that a substantial burden exists is the same burden that Plaintiff had to satisfy with regard to his claims under the Free Exercise Clause of the First Amendment that are discussed above. The Court has already determined that Plaintiff failed to satisfy this standard with regard to his allegations that Defendants: conditioned the possession of religious items based upon behavior and treatment progress; withheld from the Wiccans religious ceremonial items that other religions are permitted; denied him the ability to maintain his religious

---

[14] Defendant DMH is not immune to suit under the RLUIPA, and this claim remains pending against all of the Defendants.

text; denied him access to the Wiccan circle; denied him the ability to maintain his Circle, and; made "belittling and harassing" comments about Plaintiff's religion. As a result, the Court will not discuss these claims under the RLUIPA. However, the Court found that Plaintiff had demonstrated a substantial burden for his claims that Defendants denied him access to religious literature and denied him opportunities for group worship that are granted to other religions. The Court will now analyze these claims under the RLUIPA.

When analyzing claims under the First Amendment and the RLUIPA, the principle difference is that RLUIPA provides for the strict scrutiny of a religious infringement, while the First Amendment merely requires a rational basis analysis. *See Cutter*, 544 U.S. 709. In the previous section, the Court found that Plaintiff's claim for a second group worship opportunity survived rational basis review. As a result, this claim would also satisfy the strict scrutiny required under the RLUIPA, and the Court finds that summary judgment is not appropriate for this claim under RLUIPA. However, the Court found that Plaintiff failed to state a claim under the First Amendment that Defendants denied him access to religious literature, and the Court will now analyze this claim under the strict scrutiny standard imposed by the RLUIPA.

As Plaintiff has presented prima facie evidence that a substantial burden exists, the next analytical step for claims under the RLUIPA shifts the burden to Defendants, who must demonstrate that the restriction furthers a compelling government interest by the least restrictive means. *See* 42 U.S.C. § 2000cc-2(b). Limitations on free exercise rights can "be no greater than necessary to protect the governmental interest involved." *Hamilton v. Schiro*, 74 F.3d 1545, 1554 (8th Cir. 1996). However, MSOTC officials must be given "wide latitude within which to make appropriate limitations on institutional security." *Id.* The MSOTC must approve vendors for security reasons. While Plaintiff is not a prisoner, "his confinement is subject to the same

safety and security concerns as that of a prisoner." *Revels v. Vincenz*, 382 F.3d 870, 874 (8th Cir. 2004). MSOTC regulations barring Plaintiff from ordering from unapproved vendors while the MSOTC works to approve a Wiccan vendor is a restriction that furthers a compelling government interest by the least restrictive means. *See* 42 U.S.C. § 2000cc-2(b). This restriction is valid, and summary judgment is appropriate on this claim.

### iii.    *FIRST AMENDME1NT:  ESTABLISHMENT CLAUSE*[15]

The "Establishment Clause prohibits the government from coercing anyone to participate in religion or its exercise." *Munson v. Norris*, 435 F.3d 877, 880 (8th Cir. 2006) (citing *Lee v. Weisman*, 505 U.S. 577, 587 (1992)). Plaintiff has presented to the Court evidence of coercion. Specifically, in an email to Rick Gowdy regarding religious space at the MSOTC, Defendant Blake referred to the Wiccan religion, saying that it "[s]ounds like my girlfriend in college who wanted to start the Church of the Holy Hippie and give homage to Ra." He also called the Wiccan faith "hippy-dippy." Sherry Buehler, a security aid, has called a Wiccan a "devil worshipper" and said that he would "burn in hell for abandoning God," and that he "never loved Got if he had to practice something that worships the devil." Dr. Jay Englehart, the sole psychiatrist at MSOTC, told a Wiccan that there had been a problematic change in his behavior after his change in religion from Christianity to Wiccan.[16] Linda Sayles refused to allow Plaintiff to access his religious text in the day hall, when other religious texts, such as the Christian Bible, are permitted in the day hall. After this denial, Plaintiff made a treatment team request to be

---

[15] Defendant DMH cannot be sued under 42 U.S.C. § 1983, and the Court will dismiss Plaintiff's First Amendment claims against Defendant DMH. The Court will analyze this claim against the Individual Defendants in their official capacity.

[16] The Court notes that this statement appears to have been made for diagnostic and treatment purposes.

allowed access, and access was granted. Linda Sayles again challenged Plaintiff's possession of his Grimore in the day hall, and when shown the request he made to the treatment team, she responded that, "this is a Christian facility, and they're not supposed to allow demon worshipers . . . in here."

Additionally, Plaintiff states that the Wican circle has been desecrated by MSOTC staff, who have thrown trash in the circle and have burned the grass with chemicals. When Plaintiff first arrived at MSOTC, the staff discarded the cover and the majority of his Grimore. Plaintiff also has introduced evidence that Defendants require Wiccan residents that attend addiction support groups to participate in Christian prayer, and that Residents that fail to do so do not get a grade for group participation.

Most of Plaintiff's claims under the Establishment Clause will not survive summary judgment. The majority of the comments listed above were not directed towards Plaintiff. The only comment that was directed at Plaintiff was made by Linda Sayles when she refused to let Plaintiff have his Grimore in the day hall. "[W]hen a plaintiff claims that the state is coercing him or her to subscribe to religion generally, or to a particular religion, only three points are crucial: first, has the state acted; second, does the action amount to coercion; and third, is the object of the coercion religious or secular?" *Kerr v. Farrey*, 95 F.3d 472, 479 (7th Cir. 1996). The second element of this test is not satisfied because Plaintiff has failed to introduce any evidence that Lisa Sayles' statement amounted to coercion. Plaintiff's claims related to the MSOTC discarding part of his Grimore and desecrating the Wican circle have the same result. These actions did not amount to coercion, and Plaintiff has failed to present evidence "sufficient to establish the existence of an element essential to that party's case." *Celotex*, 477 U.S. at 322-23. Summary judgment is appropriate in this instance.

However, Plaintiff has presented evidence that Defendants violated his rights under the Establishment Clause when they required Plaintiff to participate in Christian prayer at addiction support group meetings. *See Munson*, 435 F.3d at 880-81. Plaintiff introduced evidence that residents that fail to participate in the prayer do not get a grade for group participation, and that group participation is required for advancement through the treatment program, and eventual release.

"[W]hen a plaintiff claims that the state is coercing him or her to subscribe to religion generally, or to a particular religion, only three points are crucial: first, has the state acted; second, does the action amount to coercion; and third, is the object of the coercion religious or secular?" *Kerr v. Farrey*, 95 F.3d 472, 479 (7th Cir. 1996). In this instance, the first two criteria are clearly satisfied. The MSOTC is acting on behalf of the State of Missouri, and Plaintiff is subject to penalties for failing to participate in these programs. As a result, the state's action has a coercive effect. Additionally, the third criteria is satisfied because the prayer requirement "runs afoul of the prohibition against the state's favoring religion in general over non-religion." *Id.* at 480. Plaintiff has presented sufficient evidence that a jury could find that Defendants violated his rights under the Free Establishment Clause of the First Amendment, and summary judgment will not be granted on this claim. *See Celotex*, 477 U.S. at 322-23.

**3.    COUNT III:  CHALLENGING THE SEXUALLY VIOLENT PREDATORS ACT**

Plaintiff asserts that the SVPA is unconstitutional as applied. The first step in the Court's analysis of this claim is to determine whether the SVPA is civil or punitive in nature. *See Seling v. Young*, 531 U.S. 250, 733-34 (2001). Other courts have already considered this issue, and they determined that the Missouri statute is civil and not punitive in nature. *See State ex rel. Nixon v. Kinder*, 129 S.W.3d 5 (Mo. Ct. App. 2003). Where a statute is civil in nature, "as-applied"

challenges may not be brought by a single individual. *Seling*, 531 U.S. at 734. This is because "an 'as-applied' analysis would prove unworkable. Such an analysis would never conclusively resolve whether a particular scheme is punitive and would thereby prevent a final determination of the scheme's validity." *Id.* at 734. Plaintiff has not brought this suit as a class action, and may not challenge the validity of the SVPA. Summary judgment will be granted on Count III of Plaintiff's Complaint.

### 4.  COUNT IV:  RIGHT TO REFUSE TREATMENT[17]

In his Complaint, Plaintiff alleges that his right to refuse treatment has been violated. This right may exist under the First Amendment, the Fifth Amendment or the Fourteenth Amendment. *See Cook v. Gates*, 528 F.3d 42, 49 (1st Cir. 2008); *Hydrick v. Hunter*, 500 F.3d 978, 991 (9th Cir. 2007); *Aruanno v. Spagnuolo*, 2007 WL 3026837, at *1 (D.N.J. Oct. 15, 2007). However, Plaintiff has not introduced any facts or legal arguments to counter Defendants' request for summary judgment on this claim. Pursuant to Federal Rule of Civil Procedure 56(c), a court may grant a motion for summary judgment only if all of the information before the court shows "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). *See Celotex Corp.*, 477 U.S. at 322.

Plaintiff has failed to "make a showing sufficient to establish the existence of an element essential to that party's case." *Celotex*, 477 U.S. at 322-23. Plaintiff may not rest on the allegations in its pleadings, but by affidavit and other evidence must  "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co.*, 475

---

[17] Defendant DMH cannot be sued under 42 U.S.C. § 1983, and the Court will dismiss Plaintiff's right to refuse treatment claim against Defendant DMH. The Court will analyze this claim against the Individual Defendants in their official capacity.

U.S. at 586.  Plaintiff has introduced no evidence that his right to refuse treatment has been violated, and the Court must grant summary judgment on this claim.

**D.      CONCLUSION**

The state law claims that are still pending before the Court are Plaintiff's due process claim under Mo. Const. Art. 1, § 10 and freedom of religion claim under Mo. Const. Art. 1, § 5 against all Defendants.  Plaintiff's claims under 42 U.S.C. § 1983 against the Individual Defendants in their official capacity still remain for Plaintiff's substantive due process claim for failure to provide adequate treatment, Plaintiff's claim under the Establishment Clause of the First Amendment relating to the requirement that Plaintiff participate in Christian prayer at addiction support group meetings, and Plaintiff's claim under the Free Expression Clause of the First Amendment relating to the MSOTC's denial of a second Wiccan group service.  Additionally, Plaintiff's RLUIPA claim against all Defendants for the denial of a second Wiccan group service remains pending before the Court.

Accordingly,

**IT IS HEREBY ORDERED** that Defendants' Motions to Dismiss [doc. #100] is **GRANTED, in part** and **DENIED, in part.**  The Court dismisses, **with prejudice,** all claims against Defendant DMH based upon 42 U.S.C. § 1983.  The Court declines to dismiss the Missouri state law claims against Defendants, and exercises supplemental jurisdiction over these claims.

**IT IS FURTHER ORDERED** that Defendant Bellew-Smith's Motion to Substitute Pursuant to Fed. R. Civ. P. 25(d)(1) [doc. #102] is **GRANTED.**  Defendant Bellew-Smith will be substituted by Defendant Rosenboom.  Plaintiff is given leave to take a videotaped deposition of Martha Bellew-Smith.

**IT IS FURTHER ORDERED** that Defendants' Motion for Summary Judgment [doc. #103] is **GRANTED, in part,** and **DENIED, in part.** Counts III and IV are **DISMISSED, with prejudice.** Under Count I, Plaintiff's due process claim under Mo. Const. Art. 1, § 10 remains against all Defendants. Under Count I, Plaintiff's claim under 42 U.S.C. § 1983 against the Individual Defendants in their official capacity still remains for Plaintiff's substantive due process claim for failure to provide adequate treatment. Under Count II, Plaintiff's freedom of religion claim under Mo. Const. Art. 1, § 5 remains against all Defendants. Under Count II, Plaintiff's claim under 42 U.S.C. § 1983 relating to the requirement that Plaintiff participate in Christian prayer at addiction support group meetings and the denial of a second Wiccan group service remain against the Individual Defendants in their official capacity. Finally, under Count II, Plaintiff's claims against all Defendants remain under RLUIPA relating to the MSOTC's denial of a second Wiccan group service.

**IT IS FURTHER ORDERED** that Defendants' Request for Oral Argument [doc. #132] is **DENIED.**

Dated this <u>29th</u> Day of <u>September</u>, 2008.

E. RICHARD WEBBER
UNITED STATES DISTRICT JUDGE