UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

DENNIS W. STRUTTON,          )
                                  )
       Plaintiff,         )
                                  )
    vs.                   )       Case No. 4:05CV02022 ERW
                                  )
LINDA MEADE, et al.,         )
                                  )
       Defendants.     )

**MEMORANDUM OPINION**

This matter comes before the Court on a Non-Jury Trial to address Plaintiff's claims in his Second Amended Complaint [doc. #53], and on Plaintiff's Post-Trial Brief [doc. #228], Defendants' Post-Trial Brief [doc. #240], Plaintiff's Post-Trial Reply Brief [doc. #245], Plaintiff's Motion for Sanctions [doc. #164], and Defendants' Motion to Dismiss [doc. #191]. A six-day trial of Plaintiff's claims was held before this Court beginning on March 16, 2009.

This case arises out of the unavoidable tension between Missouri's efforts to protect the public from violent sexual predators through passage of the Missouri Sexually Violent Predators Act ("MSVPA"), the state's concomitant obligation to adequately fund this legislatively-created program allowing for indefinite civil commitment of those individuals, and the desire of the involuntarily committed to be provided with treatment and a structured yet fair living environment, with the opportunity to one day be considered for conditional release. Plaintiff Dennis W. Strutton ("Mr. Strutton"), a current resident at the Missouri Sexual Offender Treatment Center ("the MSOTC"), was originally arrested in October 1995, and has been in continuous confinement since that time. In October 1997, he pleaded guilty to first degree child molestation in the Circuit Court of Jackson County, Missouri, and in connection with that plea, he

stipulated to his status as a "sexually violent predator" under the terms of the MSVPA.[1]  Thus, after serving a term of imprisonment, he was transferred in October 2002 to the MSOTC, where he remains committed for an indefinite period.  (Trial Tr. Vol. I P.201 L.13-17; P.203 L.13-25). As the time-frame of these events illustrates, Mr. Strutton's time spent at the MSOTC has eclipsed the length of the entire prison sentence he received as a result of the underlying criminal conviction.

Mr. Strutton contends that his Fourteenth Amendment substantive due process rights have been violated by Defendants' failure to provide him with consistent access to adequate mental health treatment, and by their use of disciplinary measures that serve no recognized therapeutic purpose.  In addition, Mr. Strutton asserts that MSOTC regulations have violated his rights under the Religious Land Use and Institutionalized Prisoners Act ("RLUIPA") and the Free Exercise Clause of the First Amendment, in that Defendants have denied the resident Wicca group the opportunity to hold a second weekly service based on the group's inability to locate an outside volunteer to lead the service.  Mr. Strutton also claims that the MSOTC treatment requirement that he attend Alcoholics Anonymous classes, a faith-based program in which the group recites the "serenity prayer," violates the First Amendment's Establishment Clause.  Defendants are MSOTC personnel Dr. Linda Meade, staff psychologist ("Dr. Meade"); Mary Weiler, licensed clinical social worker ("Ms. Weiler"); Dr. Jonathan Rosenboom, acting Clinical Director ("Dr. Rosenboom"); Rebecca Janine Semar, former Clinical Director and acting Activity Therapy

---

[1] "Sexually violent predator" is defined in Mo. Rev. Stat. § 632.480.5 as "any person who suffers from a mental abnormality which makes the person more likely than not to engage in predatory acts of sexual violence if not confined in a secure facility and who: (a) Has pled guilty or been found guilty, or been found not guilty by reason of mental disease or defect . . . , of a sexually violent offense; or (b) Has been committed as a criminal sexual psychopath . . . ."

Coordinator ("Ms. Semar"); Alan Blake, Chief Operating Officer ("Mr. Blake"); and the Missouri Department of Mental Health ("the Department").

Mr. Strutton seeks declaratory relief finding the challenged practices unconstitutional, and equitable relief requiring Defendants (1) to provide an uninterrupted treatment regimen, the satisfactory completion of which can reasonably be expected to lead to release, (2) to cease use of the Restriction Table, a table at which residents who violate facility rules are segregated for extended periods of time, (3) to allow the Wicca group to hold a second weekly service without an outside volunteer leader, and (4) to end mandatory attendance at Alcoholics Anonymous meetings, which he alleges is a component of his treatment plan. Mr. Strutton also seeks to recover his attorneys' fees and expenses from this litigation.

# I. DUE PROCESS – INADEQUATE MENTAL TREATMENT

## A. *Findings of Fact*

### 1. Treating Sexually Violent Predators – An Overview

Opinions of the respective experts will be reserved for later analysis, but their general observations about violent sexual predators and treatment for them are enlightening in developing the background facts. Plaintiff's expert witness is Jeffrey Metzner, M.D., a 1975 graduate of the University of Maryland Medical School. Thereafter, he completed a four-year psychiatric residency at the University of Colorado Health Sciences Center. In 1981, he was board certified by the American Board of Psychiatry and Neurology, was later certified in the sub-speciality of Forensic Psychiatry by the same Board, and has, "for a long time," been a clinical professor of psychiatry at the University of Colorado School of Medicine. (Trial Tr. Vol. I P.166 L.11-23). His present treatment experience with sex offenders is with adolescent sex offenders. He was director of the adolescent sex offender program at the C. Henry Kemp National Center for

Prevention of Child Abuse and Neglect for over twenty years, until approximately 2007, and he served as co-treatment leader in developing that program.  (Trial Tr. Vol. I P.167 L.1-10).

Dr. Metzner described forensic psychiatry as a sub-specialty of psychiatry "that has to do with medical-legal issues ranging from civil to the criminal area."  His predominant work in forensic psychiatry concerns consultation with judges and special masters around the country in monitoring jail or prisons that have been found to provide constitutionally inadequate mental health care based on class-action litigation, which constitutes sixty to seventy percent of what he does.  He also consults both plaintiffs and defendants in similar cases, and he has a general forensic practice in Denver, Colorado.[2]  (Trial Tr. Vol. I P.167 L.14-P.168 L.4).  In court-monitoring cases, he has been involved in thirty states and has been a monitor in at least a third of them.  His work involves "taking a look at sex offender programs in prison, although the bulk of that work does not involve . . . sex offender treatment programs in prison.  The bulk of that work involves mental health systems in prisons, some of which include sex offender programs."  He has been hired in one case involving a sexually violent predator facility in Illinois.  (Trial Tr. Vol. I P.168 L.5-22).  Dr. Metzner is aware that literature involving treatment of sexually violent predators goes back at least to the 1940s.

Dr. Metzner has good insight into the perils of programs which have strong public support when being planned and implemented, but get less attention once in operation, when more popular programs compete for limited public funds.  He testified on this point as follows:

Q.      Do you have an opinion about the wisdom of these SVP centers?
**** 

---

[2] Dr. Metzner's curriculum vitae is Pl. Exh. 19.

A.     Yes, I have an opinion about that. And I have significant concerns about the legislation that enables such programs. And the concerns include the following, frequently the treatment –

(Objection) (Overruled)

A.     The reasons that I am not in favor of such legislation is frequently the money that pays for this kind of program gets diverted from the mental health system. So there's, there's a finite pie, there's less money for the mental health system. Also, it's not uncommon that the treatment promised is not delivered, and so it comes close in some circumstances to abusive psychiatry, that there certainly is a safety issue for society but it, in my opinion, it shouldn't be done under the guise of not providing treatment. And the third is, it's extremely an expensive back-end measure for safety purposes when there's front-end measures that could be done in a much cheaper fashion.

(Trial Tr. Vol. I P.169 L.22-P.171 L.7).

Dr. Metzner also described some other issues related to treatment of sexually violent predators. He testified that sex offenders are a difficult population to engage in treatment, because the dynamics that contribute to them being able to offend include denial, projection, rationalization, and what are commonly called cognitive distortions, or "thinking errors." He explained that sex offenders commonly exhibit all of these symptoms, and when someone does not think they have a problem, that makes them particularly hard to treat. (Trial Tr. Vol. I P.172 L.21-P.173 L.1; P.177. L.2-12). He testified that to engage sex offenders in treatment "you need to try to establish what people call a therapeutic alliance, establish a rapport." He gave his opinion that one thing that does not work well is to start by trying to solicit a very detailed history of sex offenses when the offender is denying his underlying offense. He said that the more successful method is to try to establish a relationship by focusing on relevant issues which are less emotionally charged, while also building a consistent relationship with a primary therapist for continuity of care, for trust building, and just to meet someone on a predictable regular schedule. (Trial Tr. Vol. I P.177 L.13-P.178 L.8).

Dr. Metzner further testified about sexual assault cycles, explaining that there are common patterns that precede sexually abusive behavior for sex offenders generally, and with a specific offender, there are individualized parts of these cycles. Prior to committing a sexual offense, the offender often experiences some kind of injury to his self-esteem that makes him feel badly about himself, and frequently the response to feel angry, which then leads to acting out and offending. As Dr. Metzner explained, "[t]hat is why anger management is an important part of the treatment, to let people recognize the triggers of what makes them angry as well as the responses to getting angry in [an] attempt to try to change the cycle." (Trial Tr. Vol. I P.182 L.1-17).

Dr. Merrill Main, Defendants' expert witness, is a psychologist licensed in the State of New Jersey who specializes in the treatment of sex offenders. He has been a clinical psychologist for about fifteen years, and has been specializing in the care and treatment of civilly committed sexual offenders for five years. He is the Clinical Director of the New Jersey Sexual Civil Commitment Program, holding that post for three years. As such, he has personally treated sex offenders who have been civilly committed under New Jersey's sexually violent predator law. (Trial Tr. Vol. III P.144 L.16-P.150 L.3).

Dr. Main opined that it is very important to have experience in the direct treatment of civilly committed sexually violent predators when offering opinions regarding their care and treatment. Populations of sexual offenders are quite stratified by various legal processes. He confesses to having limited experience with juveniles. He testified that offenders who are sexually civilly committed are clearly the most dangerous in terms of the probability of recidivism, and that they tend to be more resistant to treatment. He also noted that they are often men who have

served hard time in prison, an experience that tends to be antithetical to treatment and to some degree accounts for their resistance.

Dr. Main also testified about the history of violent sexual predator laws, explaining that they have been in existence, in one form or another, since the 1940s. He believes these laws have "withstood legal challenges because of demonstrable validity, whereas prior to the use of those instruments pure clinical judgment proved unreliable, invalid, relatively speaking." Civil commitment programs have been in existence for about fifteen years, and it is clear that "the sexually committed as a population exhibit quite a bit of anger and treatment resistence, denial, minimization, justification of crimes." The anger, in his judgment, is justifiable in some ways, based on their indefinite confinement by society. He is also convinced that

> as a population in general, some of the characteristics that predate the civil commitment of many of the offenders who find themselves in that situation can be characterized as anger, characterological anger, resistance, oppositionality defiance, that in many ways that also fed into the factors that resulted in the sexual civil commitment.

He states that sexually violent predators represent security and safety concerns, mostly to each other, but certainly also to staff. (Trial Tr. Vol. III P.150 L.10-14; L.16-19; P.151L.6-23; P.153 L.5-9, L.22-24; P.154 L.5-12, L.13-17). He testified that "from the ones who receive noncustodial sentences to the ones who receive prison sentences, to the ones who are sexually civilly committed, the amount of antisocial tendencies, the amount of manipulation and predatory behaviors, will increase with each of those populations." These populations are managed, according to Dr. Main,

> in ways that are, that require some physical interventions, isolating some residents from other residents, putting, confining residents sometimes in rooms for periods of times, separating them into separate areas within a facility to isolate the more vulnerable sexually civilly committed from the more predatory sexually civilly committed. Various types of incentives are offered for good behavior, for appropriate behavior within the institution, and part of the behavior management

that's done in these types of facilities is to remove those rewards or those reinforcements, to withhold their rewards for good behavior when bad behavior is observed.

He recognizes other considerations in the population, e.g. major mental disorder, psychosis, bi-polar disorder; he acknowledges that "the prevalence of these major mental illnesses [is] lower among his population, but not absent." He testified that a sexually violent program facility without restrictions

would become predatory, to an untenable degree. Treatment, of course, wouldn't matter at that point without offering relative safety for the residents by some of the behavioral controls. No treatment would matter, because when an individual can't be reasonably assured of safety, there's no absolute safety but be reasonably assured of safety and stability, then all of the talk of therapy won't really add anything.

(Trial Tr. Vol. III P.156 L.1-7; P.156 L.13-P.157 L.20; P.158 L.2-13). Dr. Main testified that it is not appropriate to compare restrictions in a sexually violent predator facility and other mental health facilities because the latter focus on issues that are much less volitional, much less deliberate. He instructs that the field of care and treatment of sexually violent predators is fairly new, compared to mental health treatment in psychiatric hospitals generally, and he observed that it is very much an evolving field. (Trial Tr. Vol. III P.158 L.14-P.159 L.6).

## 2. Treatment at the MSOTC – Principles and Programs

Mr. Alan Blake has been the chief operating officer at the MSOTC – the administrative head of the facility – since May 16, 2002. He has Masters degrees in clinical psychology and student personnel services and counseling. (Trial Tr. Vol. I P.23 L.17-P.24 L.17). He testified that the mission of MSOTC "is to provide treatment to persons who have been committed as sexually violent predators under the statutes in Missouri." The Center began operations in January, 1999, and it houses individuals committed and awaiting commitment under the Missouri

Sexually Violent Predator Act ("MSVPA").[3] As of the date of trial, there were 142 residents at the MSOTC Center, of which 121 were currently committed. The population grows annually, and the facility's capacity is 158. (Trial Tr. Vol. I P.25 L.14-P.26 L.15). No committed resident has advanced through the treatment program to release, and as of the time of this trial in March 2009, some had been in residence for ten years. (Trial Tr. Vol. I P.26 L.17-22).

Each person detained at the MSOTC undergoes a sexually violent predator evaluation, which is required by statute and is forwarded to the court having jurisdiction over the person committed. This evaluation addresses the entire mental history of the committed person, contains opinions about his status, and provides a baseline for his entry into the facility. As a prerequisite to commitment, certified examiners, by statute, must also provide an opinion as to whether individuals meet the requirements of sexually violent predator classification. Mr. Strutton had such an examination. (Trial Tr. Vol. I P.30 L.13-25; P.31 L.23-P.32 L.4; P.32 L.8-13; p.33 L.3-5, L.21-22) (Pl. Exh. 1). The MSVPA also requires the MSOTC to conduct an annual mental health assessment of each resident, when is then submitted to the relevant court. It includes the progress of the mental status of the individual, statements made by the individual during treatment, and statements of past offenses and past behavior described in group sessions. (Trial Tr. Vol. I P.33 L.23-P.34 L.21).

---

[3] The MSOTC has two buildings for residents, the Blair Building and the Hoctor Building. The Blair building has three stories with wards on the second and third floors. Each ward houses up to 29 residents, but ideal capacity is 24. It has single-occupancy rooms and double rooms with shared bathrooms, and a large, open common day hall area in the center, with a nurses' station, televisions, an ice machine, and microwaves. The Hoctor Building wards hold up to 17 individuals, and is outfitted with a conference room and a similar open day hall area, designed as a solarium, with a nurses' station, televisions, tables, and chairs. A long hallway leads from the day hall area to the bedrooms, bathrooms, and showers. (Trial Tr. Vol. I P.130 L.18-P.131 L.19).

Mr. Blake also identified the Resident Handbook, which provides information for the residents concerning the program, its rules and information about the facility. (Trial Tr. Vol. I P.60 L.6-19) (Pl. Exh. 13). Phase One of the four-phase program, called "Engagement," is the beginning introduction and involves engagement of an individual in the treatment process, initially focusing on understanding the cognitive behavioral process and how one is empowered to begin to change one's thoughts and feelings, and ultimately change behaviors. (Trial Tr. Vol. I P.37 L.15-23). There are common problems with individuals coming into the program, including failure to recognize the value or goals of treatment, failure to take responsibility, and denial of any ongoing offense process or of prior activities or behaviors; sex offenses include "lots of denial." (Trial Tr. Vol. I P.38 L.18-P.39 L.10). According to Mr. Blake, it is challenging to engage someone in treatment "unless they have a reason to believe that they need treatment." (Trial Tr. Vol. I P.40 L.18-20).

Mr. Blake testified that Phase Two of the Program is called cognitive restructuring, where individuals begin to look at their offense cycle – "the way they think." The way an individual thinks leads to behaviors, and by changing the thought process and addressing thinking errors, the individual is empowered to change behaviors and conform to successful adaptations to meet life needs. (Trial Tr. Vol. I P.41 L.7-16). A common problem for individuals in Phase Two, he states, is failure to take responsibility for sexual offenses. (Trial Tr. Vol. I P.41 L.17-P.42 L.3). At the time of trial, there were no residents in Phase Four, but Mr. Blake testified that he believed that some residents were ready to enter that phase. There are twenty to thirty in Phase Three.[4] (Trial Tr. Vol. I P.43 L.24-P.44 L.14). It is Mr. Blake's hope, when someone completes Phase

---

[4] Phase III will be explained later.

Four, to "work to petition the court and have conditional release without discharge." (Trial Tr. Vol. I P.46 L.21-25).

Mr. Blake further testified that the treatment program at the MSOTC involves both process groups, or core groups, and psychoeducational classes, and went on to explain the differences between the two:

> [T]he process groups look at the basic internal psychodynamic and cognitive behavioral processes going on within the individual addressing the thoughts, feelings and behavior leading to offense cycles, how the individual may recognize those and begin to make changes, and how they make choices that add to their level of responsibility and self regulation.

(Trial Tr. Vol. I P.151 L.6-25). He describes psychoeducational classes as ranging from

> simply learning about concepts related to behavior and the way people function, strategies for say managing anger, since anger management was raised as a question, and practicing using techniques and maybe provide education. For instance, one was for some of our mentally ill individuals was a class on mental illness and what are the characteristics of mental illness; that was focused on that sub[-]population. But it was more educational as opposed to trying to figure out their own individual dynamics and how they tick.

(Trial Tr. Vol. I P.152 L.1-11). Mr. Blake acknowledged that part of the purpose of psychoeducational classes is to teach coping skills, that they supplement or assist in dealing with disruptive behavior, and he agreed that "that's one of the things that got suspended when [the MSOTC] had to suspend psychoeducational courses." (Trial Tr. Vol. I P.165 L.12-23).

The process groups are sometimes also referred to as the core groups, because "the core mission is to prevent sex offending, and the core issue is related to the likelihood of repeating [a] sex offense." (Trial Tr. Vol. I P.152 L.25-P.153 L.6). At some point in the process group, Mr. Blake explained, a resident is expected to admit to his sex offense, because unless a person admits they have a problem, it is difficult for them to proceed in treatment: "Before they can move ahead

to deal with the issue of being a sexually violent predator, they have to admit that they have committed sex offenses." (Trial Tr. Vol. I P.153 L.8-16).

Like Dr. Metzner, Mr. Blake also explained "offense cycling" as applying to sexual offenses and their treatment. He said that sex offenders often have other offending kinds of behaviors and may have multiple offense cycles that need to be addressed before they may be able to return successfully to the community. "And by first of all admitting what one's problem is, one then can look and see, how do I go about displaying that problem and what can I do to change that? If one doesn't know one's offense cycle, it becomes difficult to change." (Trial Tr. Vol. I P.153 L.17-P.154 L.6). He explained that a person will not go far in sex offender treatment in the absence of admitting they have committed a sex offense. (Trial Tr. Vol. I P.154 L.11-14). He believes that a person cannot be forced to engage in this type of psychotherapy if he does not want to, and acknowledged that some residents choose not to engage in sex offender treatment altogether. (Trial Tr. Vol. I P.155 L.1-3, 10-13).

Dr. Martha Bellew-Smith served as Clinical Director at the MSOTC beginning February 28, 2001, and remained there until July 14, 2006. (Trial Tr. Vol. II P.52 L.21-P.53 L.11). She testified that she taught extensively, including teaching different training programs, and she assisted Dr. Englehart in writing "The Big Picture," a PowerPoint presentation giving an overview of treatment at the MSOTC that is used in the orientation process. She said that sometimes she went to treatment planning, and that she conducted process groups and psychoeducational courses. She also sat in on interviews when people were hired, and met with residents and their families. She said that she initially did a number of additional tasks, including supervising the clinical staff – the psychologists, social workers, and the activity supervisor. Dr. Bellew-Smith related that eventually a Social Work Director was hired to supervise the

psychology staff, and that she supervised her. When she was at the MSOTC, Mary Weiler was the Social Work Director and Janine Semar was the Activity Director. Dr. Rosenboom was the Director of Psychology. (Trial Tr. Vol. I P.34 L.22-P.35 L.23; Vol. II P.53 L.14-P.54 L.15; L.24-P.55 L.4) (Pl. Exh. 3).

After "The Big Picture" was drafted, Dr. Bellew-Smith acknowledged that "pretty much the entire clinical staff, including Dr. Englehart, and some folks from central office and some folks from Fulton developed the level system" – a system providing for stages of advancement and corresponding privilege increases within each treatment phase. (Trial Tr. Vol. II P.55 L.8-19). According to Dr. Bellew-Smith, "The Big Picture" explained who was being treated, what was being done, where it was being done, and how and why "we're doing it": "It was an explanation as best we could do in 2001of what we were doing right then." (Trial Tr. Vol. II P.56 L.3-P.57 L.1) (Pl. Exh. 3). Dr. Bellew-Smith further explained that each resident has a Master Treatment Plan, which is the result of collaboration with the resident: "[Y]ou sit down with the resident and you discuss with them what the treatment goals are both short term and long term, and you discuss with them what the interventions are, what you're going to be doing with them, hopefully, and talk with them about it. And everybody signs off on it." (Trial Tr. Vol. II P.143 L.15-P.144 L.7) (Pl. Exh. 20).

Dr. Bellew-Smith reiterated the roles of the various Phases, with Phase One being "Engagement," the earliest phase of treatment, where "basically residents are kind of putting their toe in the water and checking out about whether they, you know, want to be involved in treatment at that point." Phase Two, she testified, is the point at which the resident becomes involved in the program and is working on cognitive restructuring; the resident begins working on offense cycles and deviant thought processes in their behaviors. In Phase Three, residents are

more committed and are working at a deeper level to develop healthier fantasies and healthier thought cycles. Phase Four involves community re-integration in contemplation of release from commitment.

Dr. Bellew-Smith testified that re-integration into society is often very difficult for convicted sex offenders, requiring in-depth work in Phase Four to help them develop techniques for living in a community. They are required to register as sex offenders and their mobility is watched very closely. People in the community are generally suspicious and unfriendly. (Trial Tr. Vol. II P.63 L.23-24; P.64 L.1-P.65 L.10). When she departed from the MSOTC in July 2006, an additional program phase for residents in the community on conditional work release programs had not been developed; there were four or five residents in Phase Two, and none had progressed beyond that phase. (Trial Tr. Vol. II P.65 L.11-P.66 L.20).

Dr. Bellew-Smith related that there are a number of problems typically associated with Phase One residents – failure to recognize authority and follow rules, failure to take responsibility for their actions, lying, denial, and "fail[ing] to recognize the value of sex offender treatment." These problems, she explained, are observed in 98-99% of cases, with residents often proclaiming their innocence at this stage. (Trial Tr. Vol. II P.66 L.21-P.67 L.10; P. 68 L.6-19). She said that in Phase One, there is no expectation that residents will come into the group committed to "jump in, yes, you know, I'll do this." They sit back, trying to determine if they can trust other people in the group where they will be sharing, in her words, "some pretty scary secrets." Some take six to ten weeks in Phase One before they begin sharing. She also testified that sex offenders are profoundly difficult individuals with whom to work, and explained that

> many sex offenders have engaged in many sex offenses before they are caught. And they have been reinforced for getting by with it, so why should they admit it now? You know, they can stonewall it and keep on getting by with it. Many,

> many sex offenders are profoundly antisocial and they are very difficult people to
> work with.

(Trial Tr. Vol. II P.68 L.20-P.69 L.7; P.70 L.6-13; P.71 L.1-7).  Dr. Bellew-Smith observed that

slow and gradual engagement with sex offenders is the treatment approach, and there is always a

small group that is very resistant to any kind of treatment, individuals who are "profoundly

antisocial, [and] seem set on not only sabotaging the program but sabotaging their own success."

Dr. Bellew-Smith believes that it is important to gain an alliance or trust with the resident

for whom therapy is being provided.  She explained that in the group dynamic, there may be

someone who is acting out, whom other members cannot trust, such that group members who

have been doing well will "clam up." (Trial Tr. Vol. II P.71 L.8-P.72 L.12).  In any given group,

she acknowledged, there will be some individuals doing incredibly well, some mediocre, and some

lagging behind.  If a new member comes into a group making fun of other members or takes

matters being discussed in the group outside of the group, betraying confidences, that is unruly

conduct.  A new member can discover that the group is a safe place if he sees others openly

talking about their experiences without negative reactions or behaviors from other group

members.  (Trial Tr. Vol. II P.73 L.3-P.74 L.5).

Explaining the different types of treatment offered at the MSOTC, Dr. Bellew-Smith set

forth how the cognitive methods employed at MSOTC are represented in actual treatment groups,

explaining that

> engagement group, cognitive restructuring group, and emotional integration group
> are a part of what I always referred to as process group, but what is now referred
> to as core groups.  And there were also some individuals who got individual
> psychotherapy, which is plain old ordinary individual psychotherapy like any of us
> would get.

(Trial Tr. Vol. II P.86 L.18-P. 87 L.4).  In contrast to these process or core groups, Dr. Bellew-

Smith explained that psychoeducational groups and skill groups, the same thing called by different

names, are "ancillary programs" for sexual offenders.  She said that primary treatment for sex

offenders is the process or core groups.  These psychoeducational groups are offered in addition

> because it never hurts anybody to have a little bit of training in anger management.
> It never hurts anybody to have a little bit of training in enhancing your self-esteem.
> It never hurts anybody to have some training in, in thinking errors.  Most people
> have thinking errors.

 She also related that psychoeducational courses can be valuable in helping residents understand

their "triggers," their "vulnerable areas," and their "high risk situations."  (Trial Tr. Vol. II P.93

L.4-10).  She said these groups are important, but only as ancillary to process groups.  (Trial Tr.

Vol. II P.81 13-P.83 L.8).

Dr. Jay Englehart has been the Medical Director of the Southeast Missouri Mental Health

Center since June 2004.  He began employment at the MSOTC in October 2001, as a half-time

psychiatrist, then became a part-time psychiatrist, or a consulting psychiatrist, when he took his

current position.  He has been Mr. Strutton's treating psychiatrist since his admission.  Dr.

Englehart performed Mr. Strutton's initial psychiatric assessment in October 2002, consisting of a

direct interview supplemented by information from other sources, e.g. the Department of

Corrections, including medical care and information from the Missouri sexual offender program,

and hospital records from previous behavioral mental health treatment.  (Trial Tr. Vol. IV P.20

L.19; P.21 L.15-P.22 L.25) (Def. Exh. I).

Dr. Englehart testified that he is very familiar with the treatment program at MSOTC as it

existed from 2001 to 2004, when "The Big Picture" was created, but less familiar with its current

state due to his part-time position.  As noted above, Dr. Englehart  assisted in developing the

treatment program at MSOTC, and he testified that he essentially wrote "The Big Picture."  When

he started at MSOTC, he had no specialized training in the treatment of sexual offenders.

Although he had attended a number of conferences and had some private patients, he does not

consider himself to be an expert in sexual offender treatment. The concepts behind "The Big Picture" were developed in the late fall and early winter of 2001, in conversations with the rest of the clinical staff; as he explained, with "a number of psychologists, social workers, who had worked at the facility for some time, and Dr. Bellew-Smith, primarily." She had a large role in developing the program. Dr. Englehart explained that he developed the PowerPoint presentation "that was 'The Big Picture' based on my knowledge of what we were doing in our program." He describes his role as "to have something ready that would give a good overall picture of the program, primarily to people who were being trained as new employees. And also a modified version of that that would be done with people who had been newly committed to the program." (Trial Tr. Vol. IV P.7 L.22-P.9 L.4; P.10 L.5-P.11 L.l4; P.11 L.25-P.12 L.21).

### 3. Staffing Shortages and Class Cancellations at the MSOTC

In discussing the difficulties associated with treating sexual predators in a state institution such as the MSOTC, Dr. Bellew-Smith recognized a very fundamental principal of due process: "The residents may have engaged in horrendous crimes, but if they're going to be confined indefinitely after they have served their original prison sentences, they deserve to be confined within the letter of the law." (Trial Tr. Vol. II P.190 L.2-6) (Plaintiff's Exhibit 15). The Court notes that Dr. Bellew-Smith is an impressive witness, and that she testifies with unmistakable truth. She was cast into a difficult role in fashioning a plan and implementing a program for treatment of sexually violent predators, with limited resources, at a time when civil commitment of such individuals was a new legislative mandate in Missouri and a relatively innovative process nationwide. To her credit, she recognized that management of sexually violent predators involves more than permanently warehousing individuals with documented dangerous proclivities; to be allowed to control their freedom of movement, there is a legal responsibility to treat them with the

17

promise that if they satisfactorily complete the treatment program, conditional release can be earned. Dr. Bellew-Smith resigned as MSOTC Clinical Director in July 2006.[5]

Dr. Bellew-Smith also recognized, as supervisor of the clinicians during the early days of the sex offender program, that it was important to know whether those she was supervising were holding their groups, a relatively easy task because "[i]t's a very small place." (Trial Tr. Vol. II P.94 L.15-25; P.95 L.10-22). When someone would be absent, sometimes arrangements could be made for someone to cover, but when a group could not be held, which according to her did not happen very often in her tenure, whoever was in charge of the ward would post a note. There was a chart on every ward where the nurse would write the happenings of the day, stating who called to cancel a group or identifying residents who refused to attend. She does not believe that clinicians kept records of how often they were holding groups. Notes of clinicians went in progress notes, usually on a monthly basis, e.g. "held four groups this month and, you know blah, blah, blah, this is what happened." (Trial Tr. Vol. II P.96 L.2-24; P.97 L.11-P.98 L.13).

She testified that during her time at MSOTC, she also experienced shortages in staffing among clinicians. "It's a state facility, it doesn't pay much, and it's always hard to recruit people. It's also in a very difficult geographic area." The consequence was that it was necessary to "double up on groups. And people would really get tired. The shortage of professional staff was off and on, depending on how many were graduating and how many applied." Nevertheless, she

---

[5] Dr. Bellew-Smith resigned to take a job with Affiliated Psychologists doing work she loves. She acknowledges that at MSOTC "[t]here was politics and game playing that I didn't like. I'm an old woman. I don't like that kind of stuff." She found it "decidedly unpleasant" and "was happy to leave." She said it was "gossipy, political, silly, and she felt like she was in high school. I wanted to go and do the work I am doing now." (Trial Tr. Vol. II P. 115 L.12-P.116 L.17). Mr. Blake described their relationship as a "give and take relationship." He described her as being "a very passionate provider and very passionate about what she does. And at times I would bring to her attention that her, her passion sometimes was difficult for others to be comfortable with." (Trial Tr. Vol. I P.65 L.16-P.66 L.14; P.67 L.17-20).

believed that an appropriate level of treatment was being provided. (Trial Tr. Vol. II P.99 L.5-P.100 L.15). She states in an unmailed letter from approximately eighteen months before Mr. Strutton's admission to the MSOTC, however, that "we have almost no psychologists, social workers, people who go discuss these issues and get these signatures . . . ." (Trial Tr. Vol. II P.112 L.24P.113 L.2) (Pl. Exh. 34).

After her resignation in July 2006, Dr. Bellew-Smith's replacement as Clinical Director was Ms. Semar, former Recreational Director at the MSOTC. (Trial Tr. Vol. I P.68 L.6-20; P.69 L.10-23; L.24-P.70 L.10). The Clinical Director oversees the deployment of clinical services. It is "much more an administrative position," according to Mr. Blake. (Trial Tr. Vol. I P.70 L.11-17). He testified that the clinical director is "not necessarily" responsible for developing clinical staff. "Often that would be the role of the person, but that would not necessarily in, during the time of the facility, always be her role." Although he acknowledged that Ms. Semar had no training or experience as a psychologist or social worker, Mr. Blake disagreed that she was not qualified to be Clinical Director. He testified that she has experience with "this population," and the focus was, "as an interim clinical person while we were in process of recruiting, and the administrative focus of her job." She remained on that job for a few months. During the recruitment period, she was not interested in becoming the permanent director. He wanted to hire someone who really wanted the position, and she did not want it, and he recognized there were advantages of having a psychologist or social worker, in terms of going to court.[6] (Trial Tr. Vol. I P.70 L.22-P.71 L.18; P.72 L.5-P.73 L.18).

---

[6] Mr. Blake eventually hired Dr. Rosenboom, who had a doctorate in psychology, to assume the role of Clinical Director. Mr. Blake said that Dr. Rosenboom had the characteristics he wanted. (Trial Tr. Vol. I P.74 L.20; P.75 L. 10-16).

Ms. Semar's testimony concerning her assumption of the Clinical Director position largely echoed that of Mr. Blake. She also related that when she took the position she was to supervise in matters of personnel, and was more of a liaison to Mr. Blake. The focus of her work in previous employment experiences and at MSOTC has been recreational therapy. (Trial Tr. Vol. III P.61 L.15; P.63 L.3-6). She also acknowledged that psychoeducational classes were cancelled when she was acting Clinical Director. She did not independently make the decision; rather, it was a group decision, including Dr. Rosenboom, Ms. Weiler, and other clinical staff, that at least partially resulted from a large number of vacancies in staff positions in Fall 2006, following Dr. Bellew-Smith's resignation. (Trial Tr. Vol. III P.123 L.24-P.124 L.18; P.126 L.3-13).

On September 28, 2006, Ms. Semar sent a memorandum to residents concerning a temporary waiting list for groups, due to the need to redeploy resources within the facility. The memorandum describes "adaptations" made because of staffing shortages. Group therapists "were doubled up to ensure that scheduled groups occurred despite other priorities." Groups would be cancelled if the therapist was absent and there was no one qualified to lead that particular group. (Trial Tr. Vol. I P.76 L.7-14; P.77 L.2-9; P.78 L.4-8) (Pl. Exh. 11). The frequency with which a therapist offered classes was evaluated, and Mr. Blake explained that there was a quality management issue they began trying to track:

> Our initial performance improvement efforts were not successful, and it took us awhile to get a reasonable system in place . . . . We went through a period of reevaluating, how do we get this done, we weren't doing it. And I will agree with that. And it took a period of time to, to come up with a system that was workable.

Mr. Blake related that it was not until sometime in 2007 or 2008 that staff achieved a workable system for tracking when and how often therapists were conducting group sessions.

A memorandum from that time period also states that group sizes would be increased to the maximum recommended number of residents per group, which Mr. Blake testified was done:

"We loaded up the groups as much as . . . could be managed with two therapists." (Trial Tr. Vol. I P.78 L.9-P79 L.4-21; P.80 L.8-16; P.81 L.18-P.82 L.1). In an e-mail message from Mr. Blake to Dr. Rosenboom, Ms. Semar, Ms. Weiler, and others, he inquired of them regarding the decrease in treatment due to staff vacancies. He testified that he did not know if maximum numbers were ever exceeded. Ms. Weiler responded to the e-mail on December 11, 2006, stating that "this reduced the overall pool of therapists available to run groups and increased the number of residents in each group beyond which is clinically appropriate." (Trial Tr. Vol. I P.82 L.2-5; P.83 L.12-19) (Pl. Exh. 42). Ms. Semar responded to the same e-mail, advising that recreation staff who had previously been leading psychoeducational groups for committed residents could no longer do so because of other needs. (Trial Tr. Vol. I P.84 L1-11) (Pl. Exh. 41).

In pulling together this information, Mr. Blake testified that he was seeking to make a case for more resources with the central office. (Trial Tr. Vol. I P.85 L.24-P.86 L.6). He acknowledged, in seeing Plaintiff's Exhibit 11, that some residents were placed on waiting lists and that "it may have gone until the spring of the following year." (Trial Tr. Vol. I P.87 L.12-P.88 L.3). Mr. Blake recognized Defendants' Exhibit N as weekly process group notes, which include attendance and cancellation records from June 2007 onward. Page 34199 shows that the group was offered up to November 30, 2007, and page 34201 (Pl. Exh. 34) shows that the class was again offered on January 14, 2008. (Trial Tr. Vol. VI P.6 L.24-P.7 L.15).

Turning back to the Fall 2006 through Spring 2007 time-frame, Ms. Semar stated in a "memo" that she "anticipate[d] that some psychoeducational groups may resume beginning with the winter trimester in January 2007." Mr. Blake interpreted that to mean that psychoeducational courses had been suspended completely. (Trial Tr. Vol. I P.89 l.23-P. 90 L.8) (Plaintiff's Exhibit 12). According to Mr. Blake, there may have been a few psychoeducational groups offered but

they were generally suspended from September 2006 through April or May of 2007.  (Trial Tr. Vol. I P.90 L.11-22).

Ms. Semar confirmed that there were periods when "part of treatment" was not available due to staffing shortages.  According to her, psychoeducational courses were cancelled for ten to eleven months, starting in the summer of 2006.  She stated that those courses were still not available as of May 2007.  (Trial Tr. Vol. III P.66 L.20-P.67 L.17; P.68 L.21-23; P.70 L.9-11).  She also reiterated the testimony of other witnesses that there are differences between process groups and psychoeducational courses, and that process groups are the central part of treatment and are typically led by psychologists and social workers.  She stated that process groups were not cancelled; they were only restructured, which did not affect the number of available process groups.  (Trial Tr. Vol. III P.71 L.13-15; P.72 L.2; P.72 L.21-P.74 L.1, L.6-15; P.75 L.15-P.76 L.3).

Ms. Semar did later admit, however, that "for some period," residents on the waiting list were not getting a process group.  (Trial Tr. Vol. III P.76 L.9-P.77 L.4; P.79 L.23-P.80 L.8; P.81 L.2-P.82 L.2) (Pl. Exhs. 11, 12, 42).  She was aware, as Clinical Director, of the basic principal that in order to advance through treatment at the MSOTC, residents must attend a process group.  In an e-mail message from Ms. Semar to Alan Blake, she noted the reduction in psychoeducational courses, an emergency training need for staff, that staff members were unable to complete resident assessments due to increased responsibilities, and overall, that there were reduced programs and classes due to staff shortages.  (Trial Tr. Vol. III P.82 L.3-7; P.84 L.1-4, L.13-15; P.85 L.21-P.86 L.12) (Pl. Exhs. 41, 42).

With respect to specific staffing shortages, Ms. Weiler, a licensed clinical social worker at the MSOTC, testified that the facility lost three social workers by resignation between March and

September 2006.  The first replacement was not hired until December 2006, and the second in January 2007.  The third vacancy remained unfilled until September 2007.  (Trial Tr. Vol. III P.239 L.12-P.240 L.4).  She, like Ms. Semar, believed that psychoeducational classes remained suspended as of May 2007, stating that she did not have a sufficient amount of trained staff to provide such courses.  She further testified that her staff would not have been trained to provide those courses until June 2007, at the earliest.  The size of psychoeducational classes that she had facilitated prior to the staff vacancies was between seven and nine residents.  (Trial Tr. Vol. III P.241 L.16-18; P.242 L.9; P.243 L.4-18; P.244 L.5-14).

Dr. Rosenboom, a psychologist, is acting Director of Behavorial Treatment Services at the MSOTC.  He supervises the clinical discipline of psychology, social service and community rehabilitating skills, and was formerly employed as chief psychologist at the facility.  He taught relapse prevention and character development as psychoeducational courses, two classes that have not been offered since the cancellation of psychoeducation courses in the Summer of 2006, although other psychoeducational courses have resumed.  Dr. Rosenboom also testified to cutbacks in the frequency of process groups.  He testified that as a result of the 2006-07 staffing shorting, process groups were offered twice instead of three time per week, and that the two-week breaks between trimesters were increased to four weeks.  Thus, as a result of the change in length of breaks, residents went from having six weeks per year with no process groups to twelve weeks.  (Trial Tr. Vol. IV P.59 L.22-P.63 L.4).  Ms. Wolf, a former MSOTC psychological resident whose testimony will be explored more thoroughly in upcoming sections, echoed Defendants' testimony that sex offender treatment was never completely stopped at MSOTC, in that process groups, the main component of treatment, continued to be offered regularly.  She

acknowledged, however, that some other therapists did routinely cancel their group sessions. (Trial Tr. Vol. II P.43 L.2-7, 11-21).

From this evidence, the Court concludes that psychoeducational courses were completely suspended from sometime in late Summer 2006 through May 2007. The issue of process group cancellations is more troubling because Defendants failed to keep records of process group sessions during this time period, when it is undisputed that staffing shortages affected their ability to offer groups. Having carefully considered the evidence, the Court finds that from Summer 2006 through May 2007, process or core groups were held less frequently and with increased class sizes, and were often cancelled, but were not cancelled in their entirety. The Court also concludes that no process groups were offered from November 30, 2007 through January 14, 2008, based on Defendants' weekly progress notes from that period that fail to record any sessions held over that time.[7]

### 4. Effects of Cancellations on the Quality of Treatment at the MSOTC

#### i. Staff Observations

Dr. Bellew-Smith testified consistently that so long as residents are able to participate in core groups or process groups, treatment is adequate. She said that psychoeducational classes were ancillary and not absolutely critical, given that MSOTC "had at least two therapists in addition to [her] who were able to incorporate skills into what they now call core." She believes that the process group is critical; "[i]t's where you're dealing with deviant cycles with how the offenses happened, vulnerabilities, risk areas." Dr. Bellew-Smith acknowledged, however, that in

---

[7] Although the Court believes that Defendants' failure to maintain and produce treatment records, including their failure to impose a litigation hold on facility e-mails after Mr. Strutton filed this suit, is very troubling, the Court does not believe that it warrants the sanctions, including adverse inferences and the striking of certain denials, that Mr. Strutton seeks in his Motion for Sanction [doc. #164].

an e-mail she had previously stated that "The Big Picture" is the core of the MSOTC treatment program; that she had attached a list of psychoeducational groups and courses as necessary groups; that she had wanted a group to focus on law/rule breaking behavior; that she wanted to focus on potential contributors to sexual offenses; and that these were all needed psychoeducational groups that she considered to be part of the core program offered in "The Big Picture." (Trial Tr. Vol. II P.193 L.11-P.195 L.22) (Pl. Exh. 57). In spite of these admissions regarding psychoeducational courses, she reiterated her belief that the psychoeducational groups are ancillary to the process groups, although they are not unimportant, and that they could be incorporated into process groups, or just not offered, without rendering the overall treatment inadequate. (Trial Tr. Vol. II P.197 L.21-P.199 L.21).

The Court found the testimony of Ms. Wolf to be evenly presented, without motive to advocate for any position, and very helpful in resolving the issue of how the staffing shortages affected the quality of treatment at the MSOTC. Ms. Wolf worked at MSOTC as a psychological resident from September 2004 until September 2006. She was "clinical lead," conducting process and psychoeducational groups, "individual [therapy] if it was necessary," and administrative work. Clinical leads also held meeting on the wards and handled grievances. (Trial Tr. Vol. I P.204 L.3-20; p.205 L.1-5; 7-16). She testified that with process groups, "you work towards getting past the now and acknowledging their crime, identifying their own cycle, how to break their cycle, what might trigger a cycle or a crime." (Trial Tr. Vol. I P.205 L.20-P.206 L.2). She testified that she also led psychoeducational groups which taught problem-solving, as an example. The purpose of these groups was to help people identify some of their problems and issues and find better ways, more acceptable ways to resolve some issues and problems. (Trial Tr. Vol. I P.206 L.3-13). She believed that holding the groups consistently was important, because residents come

to expect their group times and holding regular classes emphasizes the staff commitment to residents, which in turns fosters resident commitment to the group and trust of clinical staff. (Trial Tr. Vol. I P.210 L.8-P.211 L.2).

Ms. Wolf testified that she always enjoyed the work at MSOTC, but became frustrated, not with the treatment, but with "inter-office politics, personality clashes, . . . [and] disagreements between different groups." Then she said, "[n]ot about groups. I mean between departments, social work and psychology, things that absolutely had no, no impact on the treatment of the residents so it was, some of it was personal issues, even issues involving things going on outside of work." (Trial Tr. Vol. II P.18 L.24-P.19 L.24). She also said that one of the reasons she departed was for financial gain.

Ms. Wolf testified that she knew that there were times when groups were not happening or being held, "primarily because either it would be said a group was cancelled or you would hear residents saying their group was cancelled." (Trial Tr. Vol. II P.24 L.10-20). In an e-mail exchange between Ms. Wolf and Dr. Bellew-Smith on October 31, 2006, Ms. Wolf, who had been gone from MSOTC for about a month, expressed sadness for the residents because when a group is terminated, a therapist is changed, and an adjustment occurs which can affect the progress of individuals in that group. (Trial Tr. Vol. II P.28 L.23-24; P.29 L.23-P.30 L.9-24) (Pl. Exh. 14). She was shown Plaintiff's Exhibit 11, the previously-discussed memo from Ms. Semar indicating that group sizes were going to be increased to the maximum number of residents per group, which occurred while Ms. Wolf was still at MSOTC. She explained that keeping her group together would have been "nice because it was an established group. . . . [T]hey were an established group that had learned to trust each other and they were progressing together. . . . So, does it impact? Of course it does. But there are so many different factors that can impact

26

treatment, even with an established group." (Trial Tr. Vol. II P.31 L.20-P.32 L.22). She testified that consistency is very important, but even with the same therapist, there is still unpredictability in a process group. She stated that when a new member comes into the group, it affects the dynamics and the members have to "reestablish and get comfortable with each other." She explained that doubling the size of a group affects participation time, but that members still continue to learn because a lot of them have similar issues. (Trial Tr. Vol. II P.33 L.4-17; P.34 L.4-11).

Ms. Wolf stated that cancellation and suspension of psychoeducational courses was a personal issue for her, because the best part of her job was the clinical interaction with the residents. When some of that was taken away, she felt strongly about it, but she recognized that "[t]he residents were getting adequate treatment as long as they had their progress groups. That is the core issue for sex offender treatment. That is essential . . . ." (Trial Tr. Vol. II P.41 L.25-P.42 L.14).

### ii. Expert Opinions

Mr. Strutton's expert, Dr. Metzner, cautiously approved of the general treatment philosophies in "The Big Picture" – the overview of the phased treatment program in use at the MSOTC – and testified that it at least demonstrated that staff recognized the need to engage sex offenders in treatment, although he noted that it does not have great details "on, tell me what you did and why you did it." (Trial Tr. Vol. I P.178 L.9-P.179 L.19). He referred to a slide on educational methods, educating the offender in the language of therapy, giving a basic knowledge base to form a theoretical framework for the offender to learn the tools of therapy. He testified that this educational group method creates a more passive stance for the patient, and a more active one for the therapist, which can promote the beginning of an alliance-building relationship.

He described these as basic tenets of mental health treatment. (Trial Tr. Vol. I P.179 L.20-P.180 L.13).

Dr. Metzner offered his expert opinion that suspension of the psychoeducational classes had a negative effect on treatment at the MSOTC:

> Q. (BY MR. HEIDENREICH) What was the impact of cancelling the psychoeducational courses?
>
> A. The impact is that it would -- it negatively impacts treatment effectiveness. This -- these psychoeducational programs, when you read The Big Picture in the resident handbook, gives reasonable theoretical reasons for including that. These are just not makeshift time filling treatments. And when you take them away, you're taking away a significant component of treatment, you are making it much more difficult to establish a relationship, an alliance, and you're going to make it much -- these psychoeducational groups, as I understand them, are really designed to help people get beyond phase one. And if you take them away, it's going to be hard to proceed beyond phase one given the dynamics we have already talked about.

(Trial Tr. Vol. I P.185 L.18-P.186 L.8).

Dr. Metzner also testified concerning the effect of cancelling or suspending psychotherapeutic groups – what MSOTC staff refer to as process or core groups. He said this type of group is much more about intrapsychic dynamics – "talking about what are the factors that allowed you to have these cognitive distortions and what you need to do to change them. This is much closer to what people call psychotherapy as opposed to psychoeducation." In response to a question about the impact of suspending these groups, he testified that "you couldn't successfully do treatment without these groups[,] [s]o if you're not going to have these groups, you don't have much of a chance of completing therapy." (Trial Tr. Vol. I P. 186 L.9-11; P.186 L.1-P.187 L.16). He believes that not attending, or offering, these groups becomes "problematic" if it is unplanned and extends beyond two weeks, and it becomes more problematic if it repetitively happens – where, for example, there is a series of at least two weeks' lapses over a year's time, or

if the lapse is much longer than two weeks.  (Trial Tr. Vol. I P.187 L.13-P.188 L.2).  He further

offered his opinion, with respect to Defendants' failure to track how often process groups were

being held, that any kind of mental health or health care program should have a quality

improvement program designed to systematically examine programs and evaluate how to improve

them.  (Trial Tr. Vol. I P.188 L.3-22).

Dr. Main, Defendants' expert, testified that in his professional judgment, there would be

no substantial departure from professional judgment in only offering process groups, provided

that enough time was spent in those groups to cover certain topics that would otherwise be

addressed in psychoeducational modules.  He explained that there needs to be substantial time

spent in process groups on offending behaviors and how to avert re-offending, in addition to time

spent on related issues such as "current relationships, current functioning here and now, the

functioning within the institution, trauma mediation, social skills, basically any kind of mental

health function that . . . in traditional mental health treatment would be done in a process group in

addition."  He asserted that in order to address these collateral issues, psychoeducational groups

or modules or classes are a common intervention used in sex offender treatment, in order to take

> the more instructional component out of the process group to teach concepts like
> social skills, to teach relapse prevention, which is often seen as a core of sex
> offender treatment.  Again, relapse prevention being a process of looking at the
> cycle or the behavior chain that predisposes one to offend or re-offend, and the
> making of detailed plans to avert re-offending.  Other things like anger
> management often are taught in those psychoeducational groups.  Personal
> victimization or trauma work is often taught in those groups.  Those groups tend
> to be introductory to the construct.

He testified that treatment offered in psychoeducational classes is not as important as that in

process groups, because, ultimately, those constructs that are taught in psychoeducational groups

must be taken into process groups.  A process group is essential to sex offender treatment, he

concludes.  He testified that there is a tradition of providing only process groups and not

psychoeducational modules. He stated that a resident could successfully complete sex offender treatment through process groups alone, but it would be more difficult.

Dr. Main gave his expert opinion that at a minimum, a process group would need to meet once a week for an hour and a half to adequately serve its normal purposes and also cover such additional topics as would be addressed in psychoeducational modules. He stated that if three hours of process group were provided per week per resident – the amount offered at the MSOTC during the staffing shortages of Fall 2006-Summer 2007 – that certainly would be within professional judgment. He was asked if six hours of process group and two hours of psychoeducational therapy would be within professional judgment, and Dr. Main responded, "[c]ertainly . . . that's becoming high in terms of the number of hours provided." (Trial Tr. Vol. III P.168 L.18-P.169 L.1; P.169 L.17-P.170 L.25; P.171 L.11-P.172 L.9; P.174 L.2-6; P.175 L.18-24).

Dr. Main agreed that much, if not most, of sex offender treatment is generic mental health treatment. He acknowledged that the New Jersey Civil Commitment Program, with which he is associated, opened about the same time as the Missouri facility in 1999, and that ten residents have been released from the New Jersey program with "treatment endorsement." He testified that there are twenty-four individuals "now being monitored on conditional release." (Trial Tr. Vol. III P.179 L.7-10; L.11-15; P.180L.13-P.181 L.23).

### 5. Mr. Strutton's Progress in Treatment

Dr. Bellew-Smith testified that when Mr. Strutton was first committed to MSOTC, he was placed in Hoctor 3, the readiness ward, where he attended treatment classes "for a little while." He submitted a grievance concerning the types of classes he was required to attend. (Trial Tr. Vol. II P.223 L.21-25; P.225 L.21-P.226 L.24) (Pl. Exh. 49) (Trial Tr. Vol. II P.165 L.19-23;

P.161 L.1-16). She testified that some individuals are antisocial and do not plan to ever admit that they engaged in behavior, and are not going to accept treatment; it is a choice they make. She stated that there are a high number of antisocial personalities among sex offenders civilly committed to sexually violent predator facilities. Features of antisocial personality include little or no respect for the law, or rules or authority. Individuals are not concerned about the safety of themselves or others and are without remorse whatsoever. They are individuals who are usually manipulative and deceitful, and who continually do things that would be cause for arrest.

During the time that Dr. Bellew-Smith and Mr. Strutton were both at the MSOTC, she testified that he was engaging in behaviors in group that were so disruptive that the other members of the group, who had been doing well, were complaining and threatening to leave the group because of his behaviors. When walking in the ward or talking to another resident, Mr. Strutton "literally was incapable of keeping his hands off of you. The minute you walked through the door, he grabbed you. When you tried to write a note at the nursing station, he would be crawling over the nursing station counter, grabbing things, and attempting to read whatever it was you were writing, whether it was about him or other people. He was constantly instigating in the Day room." He filed "many, many, many, many" grievances, which she personally addressed; as she explained: "He could basically bury us in paper." (Trial Tr. Vol. II P.168 L.14-24; P.169 L.5-10; P.169 L.20-P.170 L.6; P.172 L.11-18; P.173 L.7-19, L.20-21; P.174 L.12-14, L.20-22). When shown Mr. Strutton's Master Treatment Plan from May 2007, she agreed with the assessment in the plan that at his then-rate of progress, it would have taken him twelve years to complete the program, in contrast to the projection under optimal circumstances of eight years. (Trial Tr. Vol. II P.145 L.4-P.146 L.20) (Pl. Exh. 20).

Ms. Wolf testified that each resident at MSOTC also has an Individual Treatment Plan ("ITP") to target areas for improvement, and Mr. Strutton's ITP was admitted into evidence. (Trial Tr. Vol. II P.3 L.17-P.4 L.12) (Pl. Exh. 29). The ITP describes treatment interventions and a resident's progress. The ITP lists Mr. Strutton's treatment interventions as Substance Abuse Group, Psychoeducational Group, and "TBD," which presumably means "to be decided," but Ms. Wolf was unable to say what it meant. The treatment interventions section includes the treatment courses and groups that a resident is attending.

According to a Quarterly Treatment Plan for Mr. Strutton, signed by Ms. Wolf, Mr. Strutton was also supposed to attend Engagement Group. The Quarterly Treatment Plan includes input concerning any services to a resident, including the essential parts of sex offender treatment, plus any other recreational or psychoeducational treatment, and the resident's overall behavior on the ward. (Trial Tr. Vol. II P.4 L.20-P.6 L.15) (Pl. Exh. 29, P.42). Mr. Strutton joined the Engagement Group in January 2006. He was also took and completed the psychoeducational course called Thinking Errors. He was also taking a class, Character Development, and was in an addiction support group. (Trial Tr. Vol. II P.6 L.19-P.7 L.19). Another of the psychoeducational courses in which he was enrolled was Responsibility Taking, which is designed to get residents to take responsibility for their behaviors and actions. Ms. Wolf reiterated that the psychoeducational groups are designed to enhance and reinforce what happens in the core groups. (Trial Tr. Vol. II P.7 L.20-P.9 L.17). Mr. Strutton was also involved in an intervention course called Basic Cognitive Behavior, a course designed to look at one's thoughts, feelings and behaviors – the cognitive processes that are used. Ms. Wolf explained that some residents are not able to identify their own feelings and emotions, which is problematic because one cannot change his behavior if he does not know what he is feeling or how to explain it. By way of illustration, she explained

32

what is typical of such a process: "[i]s it anger, or where is your anger coming from, is important. Okay, anger isn't going to be out of nowhere; there's somewhere that it's starting. So if they can identify the source, which is going back to what triggers them, their flags, which can lead into their offending behaviors. (Trial Tr. Vol. II P.9 L.18-22; P.10 L.5-25; P.11 L.2-7).

Ms. Wolf testified that when Mr. Strutton was in her group, he was making progress because he had made the decision to engage in treatment. Prior to that point, he had been refusing treatment for the majority of his time at the MSOTC. (Trial Tr. Vol. II P. 11 L.8-21). She observed, from reviewing a document she had prepared on June 21, 2006, that Mr. Strutton's participation in the engagement group varied and appeared to correlate with his mood; sometimes actively participating and providing peers with constructive feedback, and sometimes not. Since his introduction to this group, she recounted a marked improvement in regards to his interaction with the group as well as receptiveness to feedback. She had recorded that Mr. Strutton participated more after talking to his lawyer, and that he had submitted homework. (Trial Tr. Vol. II P.12 L.22-P.13 L.23). In another progress note from July 25, 2006, she recorded that Mr. Strutton was making little or fair progress, but noted that she was building some trust with him. (Trial Tr. Vol. II P.14 L.17-25; P.15 L.9-21). She recorded in the September 25, 2006 progress note that she had started to see a change in Mr. Strutton's attitude and that he started to participate more appropriately: "Group started pulling back together. Mr. Strutton increased participation during groups and began being more receptive to feedback as well as providing feedback to peers. At times engaged in impression management." She testified that he had started to function as a member of the group, versus those times in the past when he had been very disruptive and negatively impacted group functioning. (Trial Tr. Vol. II P.15 L.22-25; P.16 L8-10; L.21-P.17 L. 23).

Mr. Strutton also gave testimony concerning his treatment over this period, stating that he left the Readiness Ward in December 2005 and began to attend a process group, consisting of approximately twelve residents, with Deanna Wolf as his leader, and he believes that he also attended a psychoeducational course at that time, which could have been Thinking Errors.[8]  He remembers that the course was taught by Marisa Richardson.  Mr. Strutton testified that he was at some point transferred to a different process group, also led by Marisa Richardson, and that he ultimately quit attending it because he started having problems with his family and conflicts with Ms. Richardson.  (Trial Tr. Vol. III P.3 L.16-P.4 L.11; P.4 L.16-P.5 L.24).  Although it appears to have occurred some years later, Mr. Strutton testified that "I eventually resolved some of my issues that I had with my family and I attempted to go back, yes."  He filed a treatment team request, which he submitted on January 17, 2008.  He followed up with a second team request on March 17, 2008.  (Trial Tr. Vol. III P.6 L.8-18; P.7 L.13-15; P.8 L.8-21)  (Pl. Exhs. 30, 50).  From this evidence, the Court concludes that during the time Mr. Strutton was enrolled in a process group, "Engagement," and several psychoeducational classes – before they were suspended in the Fall of 2006 – he was making, at least, slight progress in treatment at MSOTC with Ms. Wolf.

All of the evidence is persuasive that consistency in treatment of the sexually violent predator population is "very important."  As staff members come and go, as new members come into class, as class sizes are increased, and particularly, when psychoeducational classes are suspended – whether they are ancillary, supportive to the process or core group, an enhancement, or merely beneficial – the effectiveness of treatment, and consequently a resident's opportunity to

---

[8] Ms. Wolf's testimony concerning Mr. Strutton's treatment, discussed above, indicated that it was in fact Thinking Errors.

be conditionally released, are affected. Mr. Strutton was making progress in treatment in mid-2006, and contemporaneously with suspension of psychoeducational classes and increased sizes of process groups, Mr. Strutton's progress in treatment precipitously diminished. What is not so clear is the impact of his behavior and attitude on his treatment, and whether the suspension of psychoeducational classes and frequent cancellation of process groups from Fall 2006 through Spring 2007, and the complete cancellation of process groups from November 30, 2007 to January 14, 2008, actually resulted in an inadequate standard of care for Mr. Strutton. With the exception of Dr. Metzner, all testifying witnesses, including Ms. Wolf, concluded that as long as process groups or core groups were continued, residents were getting adequate treatment.

Mr. Strutton also faced a serious conundrum in simultaneously attempting to proceed through MSOTC and succeed in this litigation. It is undisputed that in order to satisfactorily complete all phases of the treatment program at MSOTC, a resident must admit to the facts of his index offense – his conviction for a sexually-oriented crime. Mr. Strutton has filed collateral *habeas corpus* litigation in the United States District Court for the Western District of Missouri, in which he believes he can obtain a court order for release from civil commitment at MSOTC based on a claim of actual innocence. If Mr. Strutton confesses he committed his sexual offense in classes or groups at the MSOTC, he will likely lose his *habeas corpus* case. If he does not admit the facts of his sexual criminal conviction, he cannot gain conditional release. Mr. Strutton refuses to admit the facts of the criminal case, notwithstanding that he entered a guilty plea in that prosecution. In the other court,[9] in which he is acting pro se, he is also getting advice from a

---

[9] Defendant's Exhibit E is a copy of Mr. Strutton's petition for *habeas* relief, filed in the Eastern District of Missouri and subsequently transferred to the Western District of Missouri. (Trial Tr. Vol. III P.18 L.12-P.19 L.2).

public defender who has advised him not to discuss his index offense or matters related to it.[10]

Mr. Strutton received a letter from attorney Tim Burdick dated October 13, 2008, which records

the legal advice given on this issue.  (Trial Tr. Vol. III P.9 L.5-25; P.12 L.16-P.13 L.13) (Pl. Exh.

51).  Mr. Strutton testified that he has followed the legal advice of Mr. Burdick.

Mr. Strutton admitted that he entered a plea of guilty to the offense of Child Molestation

First Degree.  The next question was, "[d]id you plead guilty to that offense because you were

---

[10] Q.     (BY MR. HEIDENREICH) What, if any, advice has he provided you about
            treatment groups at MSOTC?
     MR. MEYERS: And I'm also going to object to the relevance as to what advice his
            lawyer gave him.
     THE COURT: Well, let's talk about that a little bit.  There -- this matter has been raised
            previously, so someone reviewing this record, an appellate court judge or anyone
            else should know that this matter was extensively briefed and discussed and
            rulings are yet to be made.  I took the matter under advisement, and will be ruling
            it with this case.  The issue is a very interesting one.  The plaintiff has in this case
            sought and is seeking relief on various grounds, and I'll not repeat all of those
            here at this time.  At the same time he is seeking to be released from custody,
            having filed a, filed an action in the Western District of Missouri seeking habeas
            corpus relief.  And in getting relief here, one of the issues is that he has not
            admitted his offense.  He has not confessed in group that he committed the
            offense.  And that has been, continues to be, some impediment to his
            progression through the classes and through all of the various requirements to
            eventually get released from the civil commitment.  At the same time, he is
            claiming actual innocence in his habeas corpus action.  And so there is an
            inconsistency.  If he confesses that he committed this offense for treatment
            purposes, then that would impact his efforts to get habeas corpus relief in his other
            action.  And so there is this natural tension, and I understand the problem and I'm,
            I only make this recitation so that anyone who is looking at the record will
            understand that these are some of the issues that have to be eventually addressed
            by me.  And that's the only purpose of stating that at this time. Now, what was the
            question again.
     MR. HEIDENREICH: I can't remember where we were at. Sorry, Your Honor.
     The REPORTER: Question: "What, if any, advice has he provided you about treatment
            groups at MSOTC?"
     THE COURT: Yeah, okay, and the reason I think it has some relevance is for those
            rather lengthy reasons stated, so I'll overrule the objection at this time.
(Tr. Vol. III P.10 L.18-P.12 L. 19).

actually guilty?" His counsel entered an objection and a fourteen- page legal discussion followed. Defendants' counsel raised many salient points. If Mr. Strutton answers under oath that he was not actually guilty of the child molestation offense, relying on actual innocense to advance his *habeas corpus* petition, then he risks losing this suit. If he answers that he plead guilty because he was guilty, his *habeas corpus* would likely fail. The Court indicated it would not force him to answer that he plead guilty because he was guilty. Because of the possibility of a future perjury prosecution, depending on the way he answered the question, the Court gave Mr. Strutton a *Miranda* warning, whereupon he relied on his rights guaranteed by the Fifth Amendment to the United States Constitution, and Defendants' counsel proceeded with other questions. (Trial Tr. Vol. III P.20 L.23-P.35 L.22).[11]

In answer to the question, "[h]ave you ever refused to attend treatment classes that were a part of your treatment plan?", Mr. Strutton answered, "Yes." He also admits that during his confinement at MSOTC, he has denied that he is a sexual offender, but also testified that when he was in Ms. Wolf's group, he admitted that he was, in fact, a sexual offender, when discussing his juvenile history. However, after being shown his testimony from a deposition, he was asked, "[s]o, in other words, you never discussed your juvenile offense at MSOTC; is that correct?" Mr.

---

[11] Mr. Strutton testified that he filed a motion to set aside his child molestation conviction, which Defendants' counsel represented was in January 2004. Mr. Strutton did not deny the accuracy of that date and confirmed that relief was denied. He was asked if he filed a petition for *habeas corpus* relief, in January 2005, to which he responded, "I filed a couple - - I don't remember all the dates." Mr. Strutton was shown a copy of a *habeas corpus* petition in which he alleged that his plea agreement was violated and that he was not to have sex offender treatment; that he was actually innocent because the victim recanted her testimony in the underlying prosecution; that in 2005, he filed an action challenging the conditions of his confinement at MSOTC in the probate court in Jackson County, Missouri, stipulating that he was a sexually violent predator; and that two months later he filed the action before this Court. In his complaint, he sought 35 hours of treatment per week, yet testified in this action that he sometimes refuses to participate in group sessions. (Trial Tr. Vol. III P.35 L.23-P.42 L.1) (Plaintiff's Exhibit S).

Strutton answered, "[n]ot in detail." He testified that he understood that it is part of his sex offender treatment to discuss the details of his sex offense. (Trial Tr. Vol. III P.42 L.2-21; P.44 L.11-P.46 L.15).

Mr. Strutton filed his second petition for *habeas corpus* relief in February 2007. In that action, he claims that he was innocently convicted. The petition also states that he was not required to attend sex offender treatment under the terms of the original plea agreement. In January 2009, he filed another *habeas corpus* petition on grounds of newly-discovered evidence, claiming that a step-sister had since recanted her victim statement. Under penalty of perjury, he signed that petition, affirming that he had not previously filed a petition in federal court regarding the challenged conviction. When asked at trial if his checked answer "no" was truthful, he did not give a clear answer, and when Defendants' counsel followed up by asking whether the answer was false, Mr. Strutton replied, "[t]hat's a trick question." He then admitted that he had previously filed the February 2007 petition, challenging the same conviction. (Trial Tr. Vol. III P.48 L.4-P.51 L.7; P.51 L.15-P.54 L.11) (Def. Exhs. T, V).

Mr. Strutton testified that he has "sometimes" refused to participate in treatment because it violates his religious beliefs, although he also agreed that admitting his sexual offenses is not a violation of his Wiccan beliefs. (Trial Tr. Vol. III P.57 L.2-11). He testified that in any treatment that requires him to admit the crime, "I won't admit the crime." (Trial Tr. Vol. III P.60 L.16-23).

Mr. Strutton was eventually allowed to go back to group therapy. He submitted a team request to which a response was made by Dr. Rosenboom. As a result of these requests, Mr. Strutton was allowed to return to group therapy and was assigned to a group called Pre-contemplation/Pre-engagement. He has been attending this group since January 2009. (Trial Tr. Vol. III P.14 L.7-8; P.15 L.1-4, L.13-21; P.16 L.3-25) (Pl. Exhs. 52, 53). Mr. Strutton is also

assigned to Anger Management, a psychoeducational class which he is attending as of the time of trial. Eugena Bonte is one of the leaders of this course. She sent Mr. Strutton a memorandum dated December 18, 2008, indicating he would be permitted to attend the class. (Trial Tr. Vol. III P.17 L.1-P.18 L.7) (Pl. Exh. 54).

Mr. Blake testified that MSOTC staff perform regular evaluations of residents, including medical psychiatric assessments, nursing assessments and social work assessments. He presented a medical psychiatric assessment dated September 15, 2005, performed by Dr. David Sternberg, a psychiatrist employed at MSOTC. The assessment states, reporting the statements of Mr. Strutton, "[a]t the same time, he has moved his legal efforts from the focus on the commitment issue to submitting multiple lawsuits claiming prejudice[] against his Wiccan beliefs. He describes an intense sense of pleasure at writing and submitting these suits." (Trial Tr. Vol. IV P.101 L.17; P.102 L.9-13, L.22-P.103 L.2; P.106 L.7-16) (Def. Exh. J).

Mr. Blake testified that there were changes to the treatment program in 2007. He said there was movement toward a behavioral health care model "in which we were putting more staff toward providing groups, increasing the number of process groups, attempting to reach eight hours per client per week . . . for those that would agree to attend treatment." He produced a progress note concerning Mr. Strutton dated June 4, 2007. The note shows that Mr. Strutton attended process group, except that he missed the second half of the group due to medical reasons. The progress note has a narrative section stating that "it should be noted that Mr. Strutton refused to select goals to work on, therefore, goals were selected for him." He explained that selecting goals demonstrates some motivation and some appreciation of the issues that an individual needs to consider to make progress. A progress note dated June 18, 2007, reports, "[t]he expectation of group is to be self-critical, analyzing the behavior and working on their

sexual offending behaviors. However, Mr. Strutton appears to be more comfortable focusing on other issues. He also questioned the group therapist's weekly notes, that he did not agree with this writer, and that [was] the reason he was thinking of quitting group." From the same note, it is recorded, "when group members suggested he focus on his own treatment, he was unreceptive and said he no longer wanted to process the issue." In a progress note dated June 25, 2007, the narrative portion reflects, "[h]e also reported he hasn't learned anything since being in group about sex offender treatment and thinks quitting group will be one less stressor for him." The note goes on to state, however, that "[h]e was fairly receptive to feedback. The group encouraged him to remain in group and to observe if he does not like participating." (Trial Tr. Vol. IV P.106 L.17-P.107 L.2; P.108 L.2-P.109 L.23; P.110 L.8-P.111 L.1; P.111 L.13-P.113 L.2) (Def. Exh. N).

The progress notes of July 2nd and July 5, 2007 indicate that Mr. Strutton refused attendance. The leader was absent on July 3rd and July 6th. There were eight hours of process group the week of July 4, 2007, consisting of four two-hour sessions. The progress notes for July 9, 10, 12, and 13 show that Mr. Strutton refused to attend. From that point to the week of August 27, 2007, Mr. Blake stated that he did "not find any evidence that [Mr. Strutton] attended any of his offered process groups." There were three classes offered during the week of August 27th. The narrative attached to the progress note of August 30, 2007 states:

> Mr. Strutton requested to talk to me after group. He advised he was considering returning to group, but that he was still working on family issues, and was not willing to discuss his family issues in group, so it might be awhile. He indicated he was having difficulty handling issues, but did not want to discuss anything in a group setting. He was advised he could complete a team request to see if he could be provided with individual sessions. He was also advised this may not [be] a possibility since a group setting is - - appears to be - - found to be more beneficial. He indicated he thought [group] to be a bitch session and that he cannot learn anything and continues to have no faith in the program. He was encouraged to

write a group re-entry report should he decide to return to group and he should address what he plans to bring to the group to benefit the group process.

The following progress note for the week of September 3, 2007 shows that Mr. Strutton refused to attend any of the three groups offered that week, but that he intended to return to group either the next day or the next week. (Trial Tr. Vol. IV P.113 L.19-24; P.114 L.3-16; P.115 L.21-P.117 L.24).

For the week of September 10, 2007, Mr. Strutton was offered three groups and attended none. From October 15, 2007 through November 20, 2007, Mr. Strutton again refused to attend all classes. Mr. Blake explained that there is a group of residents at MSOTC, approximately 30% of the committed population, which refuses to attend treatment, and noted that "as a clinically appropriate intervention, the facility found it necessary to develop a line of intervention, and this is a further development of the facility to attempt to address those that may not be participating in treatment, may be denying their sex offenses, or otherwise avoiding treatment." (Trial Tr. Vol. IV P.118 L.19-P.119 L.25; P.122 L.8-19).

Early in 2009, Mr. Strutton started attending a pre-engagement or pre-contemplation group in anger management. This is a transitional group. The progress note states, "Mr. Strutton first stated that it was important to him to follow the tenets of his faith, which does not want him to be badgered about his past." These pre-engagement or pre-contemplation groups are intended "to attempt to bring [non-attending residents] to a readiness to participate in core process groups and again to get progress started toward their eventual discharge." (Trial Tr. Vol. IV P.123 L.3-P.124 L.3; P.125 L.1-16) (Def. Exh. O).

Defendant's Exhibit O is a series of monthly psychoeducational class progress notes concerning Mr. Strutton. The first page runs from August 7, 2008 to August 28, 2008. Mr. Strutton was offered psychoeducational classes, and the records show he refused to attend. In

September 2008, he was offered classes and refused to attend. For October 2008, he was offered four classes and refused to attend. For November 2008, he was offered three classes and refused to attend. In January 2009, he was offered three classes and he attended, being excused for one class for an appointment. This was an anger management class. In anger management class, a resident is not required to discuss his index offenses. (Trial Tr. Vol. V P.3 L.24-P.4 L.18; P.5 L.18-P.6 L.3; P.6 L.22-P.8 L.2; P.11 L.6-21) (Def. Exhs. O, N).

Mr. Blake explained that a therapeutic recreation assessment is a required document to assess the therapeutic recreation needs of individuals and to make recommendations for their treatment plans. Exhibit Q was prepared June 8, 2007, and assesses Mr. Strutton's religious needs and religious accommodations. This exhibit states, "Mr. Strutton was informed of the purpose of the interview, and refused to participate stating, '[i]t doesn't do any good.' He left the area and returned to his room." Defendants' Exhibit R is a nursing assessment which states, "[b]ut if I go to group, it can damage my, my chances of being released." (Trial Tr. Vol. V P.12 L.6-16; P.13 L.17-23; P.14 L.6-14; P.17 L.2-3; ) (Def. Exhs. Q, R).

Defendants' Exhibit X is a progress note dated January 19, 2006, written by a psychiatrist or advanced practice nurse with a speciality in psychiatry. It reports, "[t]hinks he will be able to be released from MSOTC through legal means rather than working through the level system. Nothing here interests me." Defendants' Exhibit CC is a progress note. It states, in part, "[s]pent most of interview discussing his perception of the treatment program, quote, it's not for me, I know the law, close quote." Defendants' Exhibit OO is a progress note quarterly review of individual treatment plan dated December 20, 2006. It states, "[r]esident requested a level 3 which was denied. He may reapply in three months. Resident was argumentative, blaming staff for, quote, using my words against me, close quote, and indicted he was not willing to work the

program and that we would prevent him from meeting his goals. He refused to sign his review and indicated he would no longer try to work in group." "He continued to be argumentative and nonreceptive." (Trial Tr. Vol. V P.19 L.1-2; P.19 L.23-P. 20 L.9; P.23 L.1-17; P.24 L.7-P.25 L.1).

Defendants' Exhibit ZZ is an October 14, 2007 progress note which states, "[t]his resident was asked if he was going to go to class today, he shook his head no and didn't go."[12] Defendants' Exhibit UU is a psychiatry note of August 14, 2007, which records, "[he] stated that he would not talk to us because he felt that we would just, quote, twist his words, close quote, and that we had talked to his lawyer about his perceived inaccuracies in his chart." Defendants' Exhibit EE is a progress note dated December 18, 2007, part of an individual treatment plan review. It states, "[h]e advised he would not be in this writer's progress group. When reading the narrative, he replied, quote, what kind of crap is this? Close quote. He did not agree with the review and refused to sign same. He did not seem receptive to using the thinking errors information indicating he did not believe in applying those skills." A nursing note on the same day states, "Dennis approached this writer stating he signed to agree to treatment in 2005, but he has changed his mind. He asked how he could take back his agreement." (Trial Tr. Vol. V P.26 L.3-20; P.27 L.1-18; P.28 L.3-P.29 L.23).

Defendants' Exhibit JJJ is a monthly progress nursing note of May 2, 2008, which says, "[h]e's been refusing to go to (A group) Richardson" – a reference to Marisa Richardson's process group. A May 12, 2008 psychiatry note states, "Dennis Strutton states quote, I'm mainly anxious. I think my attorney could get me out of here in about six months and I'm scared as

_____

[12] Since it was received without objection, the Court will assume the resident mentioned was Mr. Strutton.

hell." "Discussed that he is not going to groups now because his lawyer told him not to, and he does not like his current process group leader's style and methods." (Trial Tr. Vol. V P.30 L.11- P.32 L.9).

Defendants' Exhibit LLL is a social work note dated June 16, 2008. It states, "[r]esident's ITP review was held this date. Those in attendance were this writer, RN Connie Roberts, and Mr. Strutton. Mr. Strutton participated in the review. He advised he plans to attend the psycho-ed class this semester but will not be attending group because his attorneys have advised him against doing so." (Trial Tr. Vol. V P.32 L.10-P.33 L.8)

Defendants' Exhibit MMM is a psychiatry note:

Patient seen with Martha Smith and Mary Weiler. Chart reviewed prior to seeing patient. He continues to be uncooperative and frequently somatic. He consistently refuses medications, even when they are being used to treat his complaints. Today he talks about how he knows differently from what the doctor is telling him, and states that many meds no longer or never did help. These include at least three meds prescribed for pain, which is his main complaint today. He also refuses much of the routine monitoring we do for weight and vital signs. Has been refusing sex offender treatment stating that his lawyer told him not to go. He has also on at least one previous occasion stated he does not like the style of the leader of the group he has been assigned to attend. States the former again today. States that he did not attend groups before that because he did not like previous leader's answers to his questions. Talks about others, quote, turning around things that I say, close quote. States he also, quote, don't necessarily agree, close quote, with the theories behind the thinking errors. Agrees that he could still benefit from some things in treatment. Argues some things with the cognitive theories being espoused but rather than look at bigger picture of how the groups might help him. Not able to talk much about his offense cycle except in vague terms.

(Trial Tr. Vol. V P.33 .24-P.35 L.7).

Defendants' Exhibit PPP is a progress note dated August 27, 2008, which states, "they're playing games with me and I don't play games, that's why I don't go to their group." (Trial Tr. Vol. V P.55 L.9-17).

Defendants' Exhibit QQQ is described as a "note" dated September 17, 2008, which states, "[h]e has not made any progress with his treatment. He states that, quote, they won't allow me to go to groups because I won't talk about my crimes, close quote. Records indicate that he has not recently attended any treatment-based groups." (Trial Tr. Vol. V P.36 L.9-22).

Defendants' Exhibit CCCC is an MSOTC team request and team response, more commonly known as a team request, for Mr. Strutton dated September 25, 2008, wherein he requests to speak with someone about options for being assigned to a group and restarting group. He wrote, "I cannot be forced to incriminate and sabotage my petition before the courts just to attend treatment." (Trial Tr. Vol. V P.37 L.3-P.38 L.13).

Defendants' Exhibit SSS is a progress note made by a social worker dated October 22, 2008, regarding an individual treatment plan meeting. Present were Marisa Richardson, K. Nicholson, K. White, L. Wallen, S. Yates, R. Wiskus, J. Murphy, McCarron and Mr. Strutton. The following testimony was elicited concerning the note:

A.     Mr. Strutton requested to meet to discuss his options for being assigned to a new group and restarting a group. Mr. Strutton asked to be placed in a different group because of, quote, problems, close quote, with this writer. He advised he does not think he can benefit in the group he has been assigned to. He also advised he does not think he will get a, quote, fair shake, close quote. He reported that his attorney had told him not to discuss his offense cycles. He was questioned what he thought group was for and whether he is a sex offender. He advised he did not know if he--

Q.     That's okay. I'm sorry, go ahead and continue. "He was advised."

A.     He advised he did not know if he was a sex offender. He was advised that part of being a committed resident in sex offender treatment is following group principles and guidelines, presenting a group entry report, discussing his sexual offending in the report and in logs and journals. He was also advised that he was expected to follow the rules regarding identifying and not using thinking errors as a means to justify, minimize, and rationalize his behavior. He advised he did not agree with this. He also advised he would not discuss sex offenses and that he does not agree with sex offender treatment. He blamed this writer for not explaining issues in group and having other group members answer his questions.

He was reminded that the purpose of process group was a group process, not to focus on the leader, and that this information was in his group paperwork under Group Principles and Guidelines, if he would review it."

* * *

A.      He was questioned if he would be willing to return to group. He advised he would not attend group with this writer as the leader.  When asked if he would be willing to discuss issues related to sexual offending in a different group, he stated he would not discuss these issues.

* * *

A.      It should also be noted immediately upon leaving the meeting, he called his attorney.

(Trial Tr. Vol. V P.40 L.2-P.41 L.19).

Defendants' Exhibit TTT , dated November 24, 2008, is a progress note which states, "Mr. Strutton does not appear to be progressing with treatment as evidenced by his refusal to comply with group principles and stating, quote, they won't let me go to group, close quote." (Trial Tr. Vol. V P.42 L.4-16).

Defendants' Exhibit WWW is an individual treatment plan note which states "[r]esident refused to attend."  (Trial Tr. Vol. V P.42 L.17-25).

Defendants' Exhibit FFFF is the resident handbook revised September 2008, which is the current copy of the resident handbook for MSOTC residents.  Testimony revealed that Page 18 states:

A.      Each committed resident will be assigned to a core process group. Core process groups are the principal therapeutic medium of sex offender treatment program as it is in these groups that residents reveal, explore, and learn to deal with their deviant sexual behavior and to identify their sexual offense cycles."

* * *

A.      Residents are involved in a core process group throughout their stay at MSOTC.

* * *

A.      They are assisted in identifying and modifying longstanding maladaptive patterns of thinking, feelings and behaving.  Residents are expected to discuss their past and present deviant sexual thoughts, feelings and behaviors.

(Trial Tr. Vol. V P.43 L.19-P.44 L.10).

Page 19 appears to discuss or present the treatment phases:

> A. Treatment phase one, pre-engagement and engagement: The resident is introduced to the sex offender treatment protocol including the expected attitudes and behaviors in order to effectively participate in the group-based treatment program. In addition, in phase one the resident works to overcome any attitudes, beliefs, or behaviors that interfere with his successful participation in treatment.
>
> * * *
>
> A. Criteria to move to the next level of treatment is based on making that commitment as demonstrated through behavioral evidence such as meeting phase one goals, (following rules, take responsibility, et cetera) and admitting to current behavior and to sexual offending --
>
> * * *
>
> A. -- rather than blaming others or completely denying the behavior.

(Trial Tr. Vol. V P.43 L.11-P.45 L.11). Mr. Blake explained that treatment phase two is called cognitive restructuring. The Handbook states, in part, "[d]uring treatment phase two (cognitive restructuring) the resident unearths and examines his sexual offending episodes and summarizes one or more general cycles of offending behavior." (Trial Tr. Vol. V P.45 L.12-25). Mr. Blake testified that it is not possible to complete the sex offender treatment program at MSOTC without a resident admitting his index offense, i.e. the crime or crimes that he committed that led to his referral for commitment at MSOTC. (Trial Tr. Vol. V P.47 L.1-16). Mr. Blake stated that, concerning process groups at MSOTC, a decision was reached that there would be two and one-half hours of groups per week "at the absolute minimum." (Trial Tr. Vol. V P.48 L.1-14).

Defendants' Exhibit KKKK is a letter written to Mr. Strutton dated January 5, 2006. It states:

> You may use the time you already have between scheduled activities to meditate as is currently the practice. MSOTC will not set up specific time for you to practice your meditation. Instead, you can find that time for yourself around your scheduled activities. We recognize that you may share your room. In which case, you may need to ask your roommates if you can have some private time in order to practice your meditation. Also, MSOTC staff must always be aware of where you are and have access to you. If they check on you during your meditation, please

kindly inform them that you are meditating. MSOTC recognizes the importance of you having time to practice your faith beliefs.

(Trial Tr. Vol. V P.49 L.8-P.50 L.22).

Mr. Blake read a treatment group progress note dated May 7, 2007:

A.     They were also advised that all committed residents would be assigned to a group and that group would meet four days per week on Monday, Tuesday, Thursday and Friday, for two hours each day for a total of eight hours of progress group per week. They were additionally informed that they were changing from a trimester to a semester system.

* * *

A.     On 5/17 -- okay, on May 17, 2007, residents were advised this was the last session and core process groups would resume on June 4, 2007.

(Trial Tr. Vol. V P.57 L.2-P.58 L.15) (Plaintiff's Exhibit 38). The Court concludes from this testimony that there were no process groups offered between May 17, 2007 and June 4, 2007.

Mr. Blake admitted that there are no records concerning attendance of psychoeducational classes before August 7, 2007. It is undisputed that psychoeducational classes were suspended in the Fall of 2006, and Mr. Blake does not know if Mr. Strutton was attending those classes when they were suspended. A progress note, Plaintiff's Exhibit 29 (Page 3445), which covers the period January 2002 through April 2002, concerning the psychoeducational class on thinking errors, has a block dealing with attendance. An MSOTC employee checked "always" where there was a question about whether Mr. Strutton attended that class. On the same Exhibit, page 3442, a quarterly treatment plan for Mr. Strutton, dated June 21, 2006, shows various treatment interventions for him, which includes "engagement group" and two psychoeducational classes, Thinking Errors and Character Development. It shows that he completed the Thinking Errors course. The record shows that Mr. Strutton was supposed to start two more psychoeducational classes, Responsibility Taking and Basic Cognitive Behavorial on June 5, 2006. Mr. Blake acknowledges that he has not seen any records at MSOTC offering Mr. Strutton

psychoeducational classes between the time of suspension of psychoeducational classes and August 2008. (Trial Tr. Vol. VI P.3 L.12-P6. L.23) (Def. Exh. O).

Mr. Blake agreed that Defendants' Exhibit J, a medical psychiatric assessment dated September 15, 2005, concerning an examination conducted on September 12, 2005, reports that "[a]ccording to staff and records, Mr. Strutton has been more cooperative and engaged since being committed to MSOTC." (Trial Tr. Vol. VI P.7 L.21-P.8 L.16). A portion of Mr. Strutton's progress note, Defendants' Exhibit JJJ, indicates that Mr. Strutton "stated that he felt he started, quote, going downhill, end quote, former process group leader left." (Trial Tr. Vol. VI P.8 L.17-P.9 L.8) (Def. Exh. M). Also, Plaintiff's Exhibit 46, a mental health assessment of Mr. Strutton dated August 9, 2008, states, in part, after he was asked if he thought the treatment program had been helpful, "I would like to tell you no, but in a previous therapist's group, it was. At first I couldn't stand her but I began to actually learn things. The therapist cared quite a bit. She taught me about thinking errors and how they work." (Trial Tr. Vol. VI P.9 L.9-25). Mr. Blake also identified Defendants' Exhibit EEEE, a memorandum sent to Mr. Strutton asking him to attend a January to May 2009 group where "we will not discuss sex offending; you will not be asked to write a group entry report; the group will meet only one time each week." (Trial Tr. Vol. VI P.11 L.1-P.12 L.1).

Defendants' counsel read deposition designations and Plaintiff's counsel read counter designations as follows:

Q.    And so, then other than these religious objections to the treatment program, do you have anything to add as to why you believe the treatment program currently offered is inadequate?

A.    Yes.

Q.    What?

A.     The fact that most of the time people who, well, let me see how I can phrase this. The only people that I've noticed who are moving through the program are the ones who are willing to bend completely over and I can't do that. And I'm saying that in referring to groups and doing all this stuff that I won't do. I'm not allowed to advance through the system based on my behavior. I have to do all that stuff in order to move up the level system and I can't do that.

Q.     Why can't you?

A.     I have explained that to you. My beliefs don't permit that.

MR. MEYERS:   Page 107, line 22, to page 109, line 18. (Reading designation.)

Q.     Is there anything else that you cannot do?

A.     I'm not going to admit to things that ain't happened. And where my records are inaccurate for things being screwed up in my past, I'm going to try to correct that. And if they want to tell me that that's wrong, I can't do that.

Q.     And I guess the things that are inaccurate in the past that you can't admit to, do any of those things  involve conversations in reference to charges you pled guilty to?

A.     Directly, no.

Q.     Well, indirectly, is there anything in that record that you feel is inaccurate?

A.     Yes.

Q.     What?

A.     The stuff they pulled up from when I was a juvenile in different facilities for behavioral problems and things like that, and instances of that stuff.

Q.     What was inaccurate about it?

A.     The stuff that they had about the use of alcohol and other stuff like that.

Q.     Quote, other stuff like that, end quote, are there previous incidents of sexual abuse that are alleged there?

A.     I can't discuss that.

Q.     Why not?

A.     I am still on probation in Virginia for a juvenile crime.  But you guys have my records and you can find out what these people know, but I can't tell you that.

Q.     Because your denial of facts regarding that offense may result in a revocation of your probation?

A.     No -- well, not exactly that. I was told by my PO --

MR. HEIDENREICH: I'm sorry, by your PO meaning?

THE WITNESS: Parole officer.

MR. HEIDENREICH: Okay.

A.     From Virginia, that I am not to discuss anything to do with that case.

Q.     (BY MR. MEYERS) And your treatment here at MSOTC?

A.     Anything to do with it. That's what they gave me, and they haven't told me otherwise.

MR. MEYERS: Page 110, line 6, to page 110, line 10. (Reading designation.)

Q.     You are not supposed to discuss the underlying offense?

A.     None of it.

Q.     And who told you this?

A.     I just told you, my PO.

MR. MEYERS: Page 112, line 1, through page 112, line 11. (Reading designation.)

Q.     All right.  Did he specifically say you could not discuss it in subsequent sex offender treatment?

A.     That issue was not brought up. I asked, quote, under any circumstance am I to discuss it, end quote, and I was told, quote, no, end quote.

Q.     Did you receive sex offender treatment as a result of that juvenile offense?

A.     Specifically, I don't remember. I do remember that they had me in a treatment program.  I don't know what it was for.

(Trial Tr. Vol. VI P.13 L.20-P.17 L.2).

According to Mr. Blake, Mr. Strutton has refused to attend sex-offender-specific treatment, i.e. treatment with explicit discussions of sex offenses. (Trial Tr. Vol. I P.48 L.7-15). Mr. Strutton is currently participating in a pre-engagement class. It is expected that he will be assigned to "a new pre-engagement, pre-contemplation [class] next semester." (Trial Tr. Vol. I P.48 L.18-19; P.50 L.20-25). Mr. Blake testified:

> This group includes residents who have expressed their reluctance to attend our traditional core process groups. They have expressed their reluctance sometimes verbally and sometimes only through their refusal to attend their assigned core group. The pre-engagement, pre-contemplation group will be more open-ended than the program's current core process group treatment protocol and attempt to increase the resident's readiness to be returned to a core progress group. The core progress group and contemplation of treatment goals and objectives codified in the grid remain the only avenue for residents to earn their recommendation for conditional release.

(Trial Tr. Vol. I P.51 L.3-14). Mr. Blake stated that regardless of the resident and his situation, a way will be found to offer successful treatment. (Trial Tr. Vol. I P.51 L.20-25).

Dr. Englehart was recalled and examined by Defendants' counsel on direct. Most of his work with the MSOTC is currently administrative, working eight to ten weeks per year, doing overnight calls where he needs to do assessments. He testified that in making patient assessments, he finds that patients are unreliable because they frequently lie because of secondary gain or they are unable to tell the truth because of psychiatric illness. To determine if there is a credibility issue, review of old records is a good resource. It is important to know if a patient is malingering, because you do not want to provide treatment to someone who does not have a psychiatric illness. In his assessment of Mr. Strutton, Dr. Englehart attempted to determine the extent of his drug use due to conflicting reports, as it can be a confounding factor in sex offender treatment. Dr. Englehart read from the assessment, "[h]e states today that his attorney told him to tell the people evaluating him for competency to proceed in 1996-97, that he had an extensive drug use

history, which he denies today." (Trial Tr. Vol. IV P.91 L.15-19; P.92 L.18-P.93 L.25; P.95 L.7-22) (Def. Exh. I).

Dr. Englehart produced a progress note dated August 14, 2007 concerning Mr. Strutton, where it is recorded that Mr. Strutton said that he did not want to talk to us, that he knew we would twist his words in the progress notes, that he had talked to his lawyer about his perceived inaccuracies in his chart, and after giving him an opportunity to discuss his concerns, he refused. He refused to talk about his medications. Dr. Englehart testified that he asked Mr. Strutton if they could talk about his refusal of treatment groups and Mr. Strutton responded that he had already told staff why he quit them, and Mr. Strutton indicated that he did not want to tell Dr. Englehart because it was the staff's responsibility to communicate that. Dr. Englehart said that did not make sense because he had just stated that he did not trust progress notes and felt that some were falsified. Dr. Englehart told him it was his responsibility to take care of his own life problems, and Mr. Strutton said, "I have no life," and left. (Trial Tr. Vol. IV P.98 L.10; P.98 L.21-P.99 L.7; P.99 L.14-P.101 L.3) (Def. Exh. UU).

### B.    Standing

Defendants contend that Mr. Strutton lacks standing to assert his claims of inadequate mental health treatment because he must admit to his index offense in order to establish (1) that he has suffered an "injury in fact" and (2) that any injury he might have suffered is redressable through court-ordered relief. Mr. Strutton argues that his refusals to participate in treatment are irrelevant to these substantive due process claims, as the injury lies in the lack of access to treatment.

The United States Constitution, art. III, § 2, cl. 1, limits the subject matter jurisdiction of federal courts to actual cases and controversies, and out of that limitation arises the threshold

question in every federal case of whether the plaintiff's position with respect to his claim presents such a case or controversy – that is, whether the plaintiff has standing. *See McClain v. Am. Econ. Ins. Co.*, 424 F.3d 728, 731 (8th Cir. 2005) (internal citation omitted). "To satisfy Article III's standing requirement, (1) there must be "injury in fact" or the threat of "injury in fact" that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury must be fairly traceable to [the] defendant's challenged action; and (3) it must be likely (as opposed to merely speculative) that a favorable judicial decision will prevent or redress the injury." *Gray v. City of Valley Park, Mo.*, 567 F.3d 976, 984 (8th Cir. 2009) (citing *Summers v. Earth Island Inst.*, 129 S. Ct. 1142, 1149 (2009); *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 180-81 (2000)); *see also City of L.A. v. Lyons*, 461 U.S. 95, 101-02 (1983) ("Abstract injury is not enough. The plaintiff must show that he has sustained or is immediately in danger of sustaining some direct injury as the result of the challenged official conduct[,] and the injury or threat of injury must be both real and immediate, not conjectural or hypothetical.") (internal citations and quotations omitted).

As indicated in the Court's findings of fact above, a significant amount of evidence was introduced at trial indicating that Mr. Strutton has refused to admit to the actions for which he plead guilty to first degree child molestation. That evidence notwithstanding, there was also consistent, undisputed testimony from Defendants, other MSOTC staff, and both parties' experts, that unwillingness to admit to, or take responsibility for, one's crimes is an extremely common attribute of sex offenders, and is perhaps the prime obstacle that the early stages of sex offender treatment are designed to overcome. Dr. Bellew-Smith testified that these characteristics are present in 98-99% of committed sex offenders, and that there is no expectation in Phase One of treatment that residents will be willing to share their history of sexual offenses. Mr. Strutton's

expert, Dr. Metzner, echoed that sentiment, noting that sex offenders exhibit denial, projection, and rationalization in virtually all cases. Dr. Main, Defendants' expert, likewise testified that treatment resistance is especially common among the sexually civilly committed, especially among those who, like Mr. Strutton, have served time in prison prior to commitment. For the Court to list all testimony supporting this point would be redundant; it suffices to say that the testimony at trial was convincing that resistance to mental health treatment is an expected characteristic of persons involuntarily committed as sexual predators.

The evidence was also consistently persuasive that, for this very reason, bringing a resident to the point at which he is able to admit his crimes is a necessary aspect of treating sexual predators – that is, that treatment itself begins well before the offender admits his index offense. As Dr. Bellew-Smith stated, there is no expectation in Phase One of treatment that residents will be willing to share their history of sexual offenses; instead, that is part of the *goal* of Phase One. Mr. Blake, the MSOTC's Chief Operating Officer, supported that assertion, acknowledging that residents are expected, at some point in Phase One with their process groups, to admit to their index offenses. Both parties' experts supported this testimony, noting that overcoming treatment resistance is a significant component of sex offender treatment.

Thus, Mr. Strutton's failure to thus far admit to his underlying offense does not mean that he has not suffered a cognizable, redressable injury for Article III purposes, because the evidence at trial was clear that residents are engaged in treatment at the MSOTC well before they admit to their index offenses. Defendants have, to some extent, made mental health treatment unavailable through the cancellation of process groups and psychoeducational courses, and in doing so have inflicted a concrete, actual injury on Mr. Strutton in terms of his ability to obtain treatment. His injury is likewise redressable, in that ordering Defendants to make treatment available would cure

the claimed injury.  The Court's conclusion here would likely be different were Mr. Strutton asking the Court to find that he does not need any treatment, or to order that he be moved to a different stage in the phased treatment program; he only requests, however, that he be provided access to adequate treatment.  In demonstrating that treatment includes admitting the index offense, and in alleging that Defendants have not consistently made such treatment available, Mr. Strutton has established that he has an actual, redressable injury that is traceable to Defendants' conduct, and accordingly he has standing to pursue these claims.

### C.    Analysis

Mr. Strutton contends that the Due Process Clause of the Fourteenth Amendment affords him a fundamental right to adequate mental health treatment, a right that Defendants violated by failing to provide him with consistent access to treatment.  Defendants argue that the evidence at trial demonstrated that treatment at the MSOTC was at all times constitutionally adequate.

The Fourteenth Amendment to the United States Constitution, § 1, guarantees that "[n]o State shall . . . deprive any person of life, liberty, or property, without due process of law."  This due process guarantee has been interpreted to have both procedural and substantive components, the latter which protects fundamental rights that are so "implicit in the concept of ordered liberty" that "neither liberty nor justice would exist if they were sacrificed."  *Palko v. Conn.*, 302 U.S. 319, 325, 326 (1937).  These fundamental rights include those guaranteed by the Bill of Rights, in addition to certain liberty and privacy interests implicitly protected by the Due Process Clause, such as the rights to marry, to have children, to direct the upbringing of those children, to marital privacy, to use contraception, to bodily integrity, and to abortion.  *Wash. v. Glucksberg*, 521 U.S. 702, 720 (1997).  Substantive due process also protects against government conduct that is so

egregious that is shocks the conscience, even where the conduct does not implicate any specific fundamental right. *See United States v. Salerno*, 481 U.S. 739, 746 (1987).

Laws burdening fundamental rights receive strict scrutiny and will only be upheld if they are "narrowly tailored to serve a compelling state interest," *Reno v. Flores*, 507 U.S. 292, 302 (1993), whereas regulations not implicating fundamental rights – those attacking particularly egregious or arbitrary government actions – are analyzed under the deferential standard typically described as rational basis review. *See Glucksberg*, 521 U.S. at 728. As suggested above, these latter claims will generally only succeed if the government action shocks the conscience. *See Moran v. Clarke*, 296 F.3d 638, 643 (8th Cir. 2002).

The Supreme Court's decision in *Youngberg v. Romeo*, 457 U.S. 307 (1982), provides the starting point for analyzing whether Mr. Strutton has asserted a fundamental right for substantive due process purposes. In *Youngberg*, the plaintiff, a "profoundly" mentally retarded adult, brought suit under 42 U.S.C. § 1983 against the officials of the institution in which he was committed, alleging that he had a substantive due process right to "minimally adequate habilitation" – self-care treatment or training to reduce the need for him to be physically restrained to prevent him from harming himself and others. *Id.* at 316-18. The Court found the plaintiff's claimed right to training or habilitation to be "troubling," but ultimately concluded that he did have such a fundamental right, to the extent necessary to protect his recognized fundamental rights to safety and freedom from physical restraints. *Id.* at 316, 319.

Where a fundamental right is at issue, the court must balance of "the liberty of the individual and the demands of an organized society" in determining whether it has been violated. *Id.* at 320 (citing *Poe v. Ullman*, 367 U.S. 497, 542 (1961) (Harlan, J., dissenting)). Although restrictions burdening a fundamental right generally receive strict scrutiny, in *Youngberg*, the

Supreme Court found that this sort of rigorous analysis would unduly burden the ability of states, specifically their professional employees, to administer mental health institutions. *Id.* at 322. The Court therefore concluded that "the Constitution only requires that the courts make certain that professional judgment was in fact exercised," because "[i]t is not appropriate for the courts to specify which of several professionally acceptable choices should have been made." *Id.* at 321 (internal quotation and citation omitted). Thus, a decision, "if made by a professional, is presumptively valid; liability may be imposed only when the decision by the professional is such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the person responsible actually did not base the decision on such judgment." *Id.* at 323.

In *Bailey v. Gardebring*, the Eighth Circuit considered whether this fundamental right to "minimally adequate or reasonable training" applied to the claims of the plaintiff sex offender who was involuntarily committed as a "dangerous psychopath," at a time when states had not yet begun to enact legislation specifically targeting sexually violent predators. 940 F.2d 1150 (8th Cir. 1991). The court noted that *Youngberg* did not establish a right for the civilly committed to treatment *per se*; the Supreme Court only "held that the Constitution required only such 'minimally adequate training . . . *as may be reasonable in light of [the] liberty interest[] in safety and freedom from unreasonable restraints.*'" *Id.* at 1154 (quoting *Youngberg*, 457 U.S. at 322) (emphasis added). The Eighth Circuit therefore concluded that the plaintiff had no right to "psychiatric treatment to overcome a 'sexual offender condition'" because he "was neither in danger during his civil commitment nor was he subject to any restraints beyond the ordinary incidents of any involuntary confinement." *Id.* at 1153, 1154. Citing *Bailey*, district courts in this circuit have since concluded that civilly committed sexual predators have no substantive due

process right to mental health treatment, adequate or otherwise. *See Semler v. Ludeman*, 2010 WL 145275, at *26 (D. Minn. 2010) ("Because this Court has not recognized a constitutional right to effective 'treatment' in the context of civilly committed sex offenders, Plaintiffs [alleging substantive due process violations through ineffective treatment] have failed to allege a due process claim . . . .") (citing *Nicolaison v. Ludeman*, 2008 WL 508549, at *8 (D. Minn. 2008) (finding, in ultimately concluding that involuntarily committed sex offender's right to treatment is not "clearly established" for purposes of 28 U.S.C. § 2254(d)(1), that *Youngberg* "only recognized a right to 'minimally adequate' treatment that reduces the need for restraints," and not a "comparable right to treatment that facilitates release")).

The Supreme Court, moreover, in entertaining a constitutional challenge to the commitment requirements in the identical Kansas SVP Act, held that substantive due process is satisfied so long as a state conditions the involuntary commitment on a finding of dangerousness and a mental abnormality that makes it unlikely that the individual will be able to control his dangerous behavior, regardless of the availability or effectiveness of treatment. *See Kan. v. Hendricks*, 521 U.S. 346, 358-60 (1997). Indeed, in ruling on the substantive due process issue in *Hendricks*, the Court did not consider the plaintiff's prospects for treatment. *See id.*; *see also id.* at 378 (Breyer, J., dissenting) (arguing that the substantive due process question should have been – but was not – whether the Due Process Clause "requires Kansas to provide treatment that it concedes is potentially availably to a person whom it concedes is treatable").

Thus, if Mr. Strutton does indeed have a constitutionally-protected right to treatment during his commitment, apart from that recognized in *Youngberg* to prevent the violation of his recognized fundamental rights to safety and freedom from physical restraints, it is an outgrowth of the provisions of the MSVPA that explicitly recognize Missouri's obligation to provide such

treatment. *See* Mo. Rev. Stat. § 632.495.2 ("If the court or jury determines that the person is a sexually violent predator, the person shall be committed to the custody of the director of the department of mental health for control, care *and treatment* until such time as the person's mental abnormality has so changed that the person is safe to be at large.") (emphasis added); Mo. Rev. Stat. § 632.492 ("If the trial is held before a jury, the judge shall instruct the jury that if it finds that the person is a sexually violent predator, the person shall be committed to the custody of the director of the department of mental health for control, care *and treatment*."); *see also Hendricks*, 521 U.S. at 367 (concluding from identically-worded provisions of Kansas SVP Act that "the State has a statutory obligation to provide 'care and treatment for [persons adjudged sexually dangerous] designed to effect recovery . . . .'") (alterations in original) (internal citations omitted). While such statutory rights may give rise to a protected liberty interest for procedural due process purposes, the substantive due process component of the Fourteenth Amendment generally does not protect against violations of state law that do not otherwise implicate constitutional concerns. *See Bagley v. Rogerson*, 5 F.3d 325, 328 (8th Cir. 1993) (citing *Meis v. Gunter*, 906 F.2d 364, 369 (8th Cir. 1990)).

Because no fundamental right is at issue, the proper standard for analyzing Mr. Strutton's claims of unconstitutionally inadequate mental health treatment is not the *Youngberg* professional judgment standard, but instead is the rational basis review applied to substantive due process claims not implicating fundamental rights.[13] *See United States v. Salerno*, 481 U.S. 739, 746 (1987) ("[T]he Due Process Clause protects individuals against two types of government action. So-called 'substantive due process' prevents the government from engaging in conduct that

---

[13] To the extent the Court suggested that a different constitutional standard applies to this claim in its Revised Memorandum and Order dated September 30, 2008, the Court was in error.

'shocks the conscience,' or interferes with rights 'implicit in the concept of ordered liberty.'")

(internal citations omitted); *see also Washington v. Glucksberg*, 521 U.S. 702, 721 (1997).

Under this standard, Defendants' actions in denying him his statutory right to treatment will be

found unconstitutional under the Fourteenth Amendment if they were so arbitrary or egregious as

to shock the conscience. *See Leamer v. Fauver*, 288 F.3d 532, 546-47 (3d Cir. 2002)

(substantive due process claim alleging inadequate treatment for committed sex offender "must

focus on the challenged abuse of power by officials in denying [the plaintiff] the treatment

regimen that was statutorily mandated and was necessary in order for his condition to improve,

and thus for him to advance toward release").[14]

 If Missouri had passed the MSVPA, providing for the involuntary commitment of sexually

violent predators and establishing the MSOTC for their custody and treatment, with the promise

that those individuals who demonstrate that they are no longer dangerous will be released, and

Defendants had then categorically declined to provide any mental health treatment to MSOTC

residents, the Court would readily conclude that Defendants' actions were conscience-shocking

and in violation of Mr. Strutton's substantive due process rights. That is not what occurred,

however; Defendants provided treatment, but due to budget shortfalls and staffing shortages the

treatment was, at least for a period of time, provided inconsistently. Thus, the question for the

Court is not whether a complete lack of treatment shocks the conscience – which, in this Court's

view, it surely would – but rather how little treatment Defendants can provide before their

behavior becomes conscience-shocking and therefore unconstitutional.

---

 [14] The Supreme Court has also recognized the unconstitutionality of conditions of civil confinement that amount to punishment, *see Bell v. Wolfish*, 441 U.S. 520, 535-538 (1979), but Mr. Strutton has neither alleged nor demonstrated that Defendants' alleged failure to provide adequate treatment constituted punishment.

Mr. Strutton established at trial that Defendants completely suspended all psychoeducational courses – those skills courses intended to assist residents in accomplishing the goals of the psychotherapeutic core of their treatment – from sometime in late Summer 2006 through August 2008. Although both experts testified that it would be difficult to complete treatment without such courses – Dr. Metzner much more emphatically, stating that it would be difficult to proceed beyond Phase One – there was no evidence suggesting that the failure to offer psychoeducational courses would constitute an egregious abuse of authority, and both agreed that the process groups are the most important component of treatment. Dr. Bellew-Smith, who was, as the Court noted above, a very persuasive witness, testified that treatment would be professionally adequate so long as the core or process groups were available. Likewise, Ms. Wolf, who was candid in her assessment of how cancellations negatively impact treatment, stated that "[t]he residents were getting adequate treatment as long as they had their process groups." Based on the evidence at trial, the Court finds that the suspension of psychoeducational classes, if not ideal from a treatment perspective, was professionally defensible, and as such a far cry from conscience-shocking.

The repeated interruption of process groups presents a more troubling issue, one that is complicated by Defendants' failure to keep records of what group sessions were conducted from 2005 through May of 2007. The evidence at trial conclusively established that during the period from approximately Fall 2006 through Summer 2007, some residents were placed on waiting lists for process groups for a period of at least a few weeks, during which time they were not meeting with groups at all; Defendants increased trimester breaks – i.e., the three annual breaks during which no treatment was conducted at the MSOTC – from two to four weeks; and that Defendants reduced the total hours of process group time per week to three, while at the same

time increasing group sizes and tasking an additional therapist to each session. Evidence also demonstrated that process groups were not held at all from November 30, 2007 through January 14, 2008. Dr. Metzner persuasively testified that such frequent – in the case of group cancellations – or lengthy – in the case of increasing trimester breaks – interruptions in meeting with process groups can be detrimental to treatment:

> I think it becomes problematic if it's unplanned and it last for more than two weeks. What becomes more problematic is if . . . that repetitively happens, meaning you have a series of at least two weeks' lapses over a year's time or if that two weeks is much longer than two weeks and you are now talking about months.

The Court also found Dr. Metzner's testimony convincing that such a facility should, as a matter of course, be tracking what group sessions are held and their content, in order to determine which programs are working and which can be improved – something that it is undisputed that Defendants were not doing until sometime in 2007.

Based on this evidence, the Court concludes that the treatment available at the MSOTC during this period was in fact below an acceptable professional standard, but Defendants' actions were not egregious as to be conscience-shocking. Undisputed testimony from Defendants and other MSOTC staff indicated that all of these changes were brought about by staffing shortages at least partially caused by budget concerns, and that by June of 2007, residents were once again receiving eight hours of process group time per week – an amount well above the one and a half hours per week that Dr. Main opined would be the minimum adequate amount. The cancellation of process groups for approximately six weeks in December 2007-January 2008 is more troubling, but it appears that this was a one-time event and has not occurred since. The Court emphasizes its firm belief that the MSVPA does confer on Defendants a statutory obligation to provide adequate mental health treatment to MSOTC residents, an obligation that should be recognized by

the legislature responsible for funding the facility, but the Court nevertheless concludes that the process group cancellations were not so egregious as to render MSOTC mental treatment conscience-shockingly deficient.

## II. DUE PROCESS – THE RESTRICTION TABLE

### A. *Findings of Fact*

#### 1. The Rules Violation System at the MSOTC

Dr. Bellew-Smith explained that the treatment program at the MSOTC necessarily required the creation of facility rules and corresponding mechanisms for enforcement. She explained that such a rules violation system was necessary because the residents engaged in a variety of unwanted behaviors that were quite serious, such as hitting each other, "setting fire to the place and what not . . . some of which had to do with sex offending" – behaviors which needed to be regulated in order to provide effective treatment and to ensure the security of residents and staff. She also identified the list of violations – categorized as minor, major, and intolerable – and their definitions. (Trial Tr. Vol. II P.132 L.15-17; P.133 L.23-P.134 L.20; P.135 L.1-4) (Pl. Exh. 23).

Mr. Blake provided additional testimony about the level system in use at the MSOTC in 2006 and 2007, whereby residents progressed through level stages within each treatment phase, with levels corresponding to increased privileges that residents could obtain, such as increased access to a telephone or to the facility canteen. (Tr. Vol. I P.102 L.9-P.103 L.4). A record was kept of each resident's violations and level changes. Plaintiff's Exhibit 5 is a record of Mr. Strutton's violations from November 2002 through November 15, 2006, and it indicates his corresponding level adjustments. At that time, but not any longer, progress through the four-

phase treatment program was directly affected by rules violations. (Trial Tr. Vol. I P.109 L.1-18; P.110 L.3-7).

Dr. Bellew-Smith explained that a rules violation led to residents dropping down in the level system for a certain number of days, and that the days of the level drop depended on the category of the violation, e.g. two days of level drop for a minor rules violation, seven for a major violation, and fourteen for an intolerable violation. The person who observed the violation was supposed to immediately write it up on a violation form and issue it to the violator, and the treatment team would then review the past week's violations at its weekly meeting. Staff members were trained on rules violations procedures; "The Big Picture" references violations of rules and states that "you are always to assume the worst." According to Dr. Bellew-Smith, that is because behavior that appears trivial and meaningless may in fact be the opposite; for example, a resident could be offering potato chips to another as a friendly gesture, or for purposes of seduction. Staff members were therefore instructed to write violations without interpreting the rules, and were directed to issue a violation even if they thought that enforcement of a rule in a given situation would be silly or picky. (Trial Tr. Vol. II P.135 L.7-14; P.136 L.25; P.137 L.2-17, L.25-P.7; P.138 L.23-P.139 L.1-11).

Dr. Bellew-Smith explained that once a violation was recorded in writing, the Level Board – a white board with the resident's name and current level classification – was supposed to be changed immediately. After a violation, the level was erased and changed, "so that everybody, or so that all the staff on the ward would - - it was a communication device. All the staff on the ward would understand that this person is no longer on a level three or level four; they were now a level one." Every recipient of a violation, regardless of whether it was minor, major, or intolerable, went back to level one. With a minor violation, the level where the person was before

the violation was restored after two days. With an intolerable violation, Dr. Bellew-Smith believed it had to be reviewed before the resident's prior level status would be restored. (Trial Tr. Vol. II P.140 L.10-P.141 L.23).

Ms. Weiler gave additional testimony concerning rules violations and their relationship to the privilege levels and treatment phases. Ms. Weiler began her term of employment at MSOTC in August 2003, as a licensed clinical social worker, and became the Clinical Social Work Supervisor on June 1, 2005. She originally facilitated process groups as part of her employment, but has not been doing so since January 2008. For a rules violation, she explained, no matter if it was minor, major or intolerable, the resident did not drop back on any treatment phase level, only back to privilege level one within that phase. A resident could request that a violation be expunged through a written team request; she acknowledged, however, that it was possible that the entire restriction time would be served before the treatment team would review the request. Three minor violations in thirty days could be considered an intolerable violation.

Dr. Rosenboom testified that some of the rules at MSOTC have at times been ambiguous, allowing for too much discretion and too much variability in the way they are implemented. For example, he explained, some residents received violations for having post-it notes on their written materials and for bringing condiments from the dining room back to the day hall. He believes that people issuing rules violations should not have any discretion and should issue the violation as it is observed. His training was that staff, in implementing the rule violation system, should assume the worst about the residents. (Trial Tr. Vol. III P.202 L.19-25; P.205 L.7-P.206 L.3L.20-24; P.208 L.6-9).

## 2. Use of the Restriction Table at the MSOTC

The Restriction Table treatment intervention was adopted during the tenure of Mr. Blake. It was discussed with others before it was adopted, in order to address some behavioral interventions in a clinically appropriate manner, and it has qualities similar to what is commonly known as a "time out." Mr. Blake testified that a time-out area is where people can get away from the environment, and the MSOTC has a place called a quiet room for this purpose. (Trial Tr. Vol. I P.91 L.1-22; P.92 L.14-17; P.94 L.1-2, L.6-12). He asserted that people were at the Restriction Table because of rules violations; it was because of an exercise of free will that they were there. (Trial Tr. Vol. I P.95 L.23). He believed that use of the Restriction Table also allowed persons there to be more closely observed. (Trial Tr. Vol. I P.95 L.24-P.96 L.2). The Supervisory Treatment Staff[15] at MSOTC could initiate a procedure to decide whether someone should go to the Restriction Table. (Trial Tr. Vol. I P.96 L.3-10). The length of time a person would serve at the Restriction Table would be based on the type of infraction or violation. (Trial Tr. Vol. I P.99 L.25). At his deposition, Mr. Blake said the time varied depending on the person.

Limitations on movement at the Restriction Table required residents to receive permission to go to the restroom, to get something from the residents room, to attend classes to which they were assigned, and to leave for meals. (Trial Tr. Vol. I P.100 L.20-P.101 L.9). Residents were never physically restrained at the Restriction Table; they could get up and stretch, and it was only necessary to get permission if a person wanted to move away from the Restriction Table. While there, residents could work on group activities, treatment groups, play cards if another person was there, write letters, work on legal issues, and engage in other activities available on the ward.

---

[15] Treatment Staff at MSOTC consisted of security aides, nurses, psychologists, social workers. and people on the treatment team. (Trial Tr. Vol. I P.96 L.16-18).

They were permitted to converse with other residents at the Restriction Table. (Trial Tr. Vol. I P.128 L.22-P.129 L.23).

Mr. Blake explained that the rationale behind the Restriction Table was that it operated as a behavioral management or intervention mechanism. He testified that it was used to promote improved behavior, to deal with impulse control, to provide an opportunity to move a person away from a stimulus area, to allow closer staff observation, and to allow residents to "focus on groups or at least consider the situation that developed that caused the violation." (Trial Tr. Vol. I P.134 L.23-P.135 L.9). Mr. Blake described such an outlet as necessary because the resident population at the MSOTC consists of

> impulse people who have difficulty following rules in the norms of society, who tend to be very self-centered, self-focused, and not considerate of the impact of their behavior on others. A lot of people that, at least the clinicians would say, have a, what, personality disorder, which are, is a cluster of maladaptive traits that tend to result in people being in trouble with society.

He said that would include antisocial personality disorders and borderline personality disorders. (Trial Tr. Vol. I P.135 L.17-P.136 L.7). He also related that the majority of the residents have paraphilias – conditions defined by sexual arousal to stimuli not associated with sexual stimulation among the general population – that cause them to act out sexually, although only a low number of residents have been diagnosed with major mental disorders. (Trial Tr. Vol. I P.138 L.6-10; P.139 L.8-12). He did state, however, that a majority of individuals at MSOTC have some type of personality disorder. (Trial Tr. Vol. I P.142 L.2-6). Mr. Blake described intervention for individuals with personality disorders, but without major mental illnesses, as including trying to redirect them:

> Try to help them think through the situation, calm themselves. Often people are very either angry or upset or certainly motivated to act out in ways that may be dangerous to self or others; if it's one of the more extreme situations, become loud, argumentative. And so the first line is to begin to redirect them, try to assist

them in seeing alternatives to, on how to cope and deal with the particular situation. That may include trying to remove them from the stimulus area so that they have an opportunity to calm down. As they're progressing through treatment, they may have developed some strategies that they can employ, and we encourage them to use those strategies and support them in using those strategies.

(Trial Tr. Vol. I P.142 L.23-P.143 L.17). He said that when someone is being disruptive or verbally abusive, the most extreme intervention would be to subdue the individual and put them in restraints when they have "become physically combative in trying to harm other people or they are trying to harm themselves." He testified that they try to refrain from restraining people. (Trial Tr. Vol. I P.143 L.18-25). Another option he described as likewise to be avoided is seclusion, where someone is locked in a ward. That is used only when there is no other way to avoid harm to the resident or others. He described how efforts are instead made to take residents to an area where they can calm down away from whatever is causing them to be upset. He said there is a room that doubles as a seclusion room and a restraint room. Ideally, a resident will be taken there with the door allowed to remain open, so that he can stay as long as he chooses in order to get away from the noise and "hubbub" of the ward. (Trial Tr. Vol. I P.144 L.2-25).

Mr. Blake testified that the Restriction Table was used when a person was maintaining poor impulse control. It would put them in a place where they could calm down; they could be reflective; it took them from a high stimulus area; it provided them time to consider what they had done – i.e. the ramifications or impact of it, and how they might take responsibility and control their behavior so it would not reoccur. (Trial Tr. Vol. I P.145 L.19-P.146 L.7).

Mr. Blake related that establishing rules at MSOTC was important to provide structure, to provide feedback to residents about maladaptive behaviors, to provide information to groups about offense cycles, and also to ensure safety and security. (Trial Tr. Vol. I P.146 L.13-21). He testified that all treatment is a work in progress, with the goal of continually doing better in an

evolving field.  (Trial Tr. Vol. I P.146 L.25-P.147 L.12).  Since termination of use of the

Restriction Table, residents on restriction remain in the day hall area.  Defendants' Exhibit HHHH

is a photograph of the day hall area in the Hoctor Building.  (Trial Tr. Vol. I P. 149 L.6-22).

Defendants' Exhibit IIII is a photograph of a Restriction Table.  (Trial Tr. Vol. I P.149 L.23-

P.150 L.1).

      Mr. Blake testified about measures used to ensure clinically appropriate use of the

Restriction Table:

> Q.    Now, what did you do to ensure that the use of the restriction table was
> clinically appropriate?
>
> A.    The question of clinical appropriateness was whether it followed principles
> of clinical practice in that it's, was very similar to, or followed the ideas of
> behavior management. It removed an individual from the stimulus of an
> environment where disruption or difficulty might be taking place.  It provided
> additional staff attention.  It hopefully refocused the individual on the difficulties
> that led to the violation and provided opportunity for them to, to work on
> homework and kinds of things that they might process in group.

(Trial Tr. Vol. I P.110 L.8-19).  He testified that there were ongoing discussions with clinicians as

to the appropriate use of the Restriction Table, and Mr. Blake testified that he questioned its use.

(Trial Tr. Vol. I P.112 L.5-14).  In January 2006, he learned through e-mail messages that some

residents had accumulated months of time at the Restriction Table due to large numbers of

violations, and he was concerned about its effectiveness because "there was no light at the end of

the tunnel."  Mr. Blake thought it appeared to be punitive, and he wanted an examination to find a

more effective alternative.  He ultimately concluded that the Restriction Table was "clinically

defeating."  (Trial Tr. Vol. I P.112 L.15-P.113 L.24; P.115 L.5-8, L.13-23) (Pl. Exh. 7).  Mr.

Blake testified that he had discussions in March 2006 with Ms. Weiler about problems with the

Restriction Table, and that he had wanted "targeted interventions to address the maladaptive

behaviors."  (Trial Tr. Vol. I P.123 L.6-P.124 L.9) (Pl. Exh. 9).  He believed that the Restriction

Table worked for some individuals, but not for all. He was looking for something with a broader range of alternatives. (Trial Tr. Vol. I P.124 L.7-24). On August 23, 2007, Dr. Rosenboom wrote a memorandum to Mr. Blake recommending that the policy of using the Restriction Table should be changed to using a Restriction Area. (Trial Tr. Vol. III P.210 L.19-P.211 L.13). Use of the Restriction Table was ultimately terminated sometime that month, about twenty months after the discussions of its appropriateness began. (Trial Tr. Vol. I P.125 L.18-P.126 L.10) (Pl. Exh. 56).

Ms. Weiler, Clinical Social Work Supervisor at the MSOTC, also testified about how MSOTC staff used the Restriction Table. Upon a rules violation, the resident was expected to remain at the Restriction Table, and if he failed to comply, that could be another rule violation. Ms. Weiler initially did not use the Restriction Table in Blair 3, her ward, because she thought that clinicians should make such decisions about how to manage their wards, and she did not feel that it served a purpose. Irrespective of that view, she was instructed to use it by Dr. Bellew-Smith. By March 15, 2006, Ms. Weiler had informed Dr. Bellew-Smith that she had problems with the Restriction Table. She did not understand why the facility "needed to go so far as keeping residents at a table and a plastic chair." She thought a different clinical method should be used. (Trial Tr. Vol. III P.223 L.18; P.224 L8-25; P.225 L.11-21; P.226 L.3-25; P.227 L.2-11; P.228 L.25-P.229 L.17, L.19-25; P.230 L.1-4; P.230 L.5-18; P.236 L.12-P.238 L.20) (Pl. Exh. 9).

Dr. Bellew-Smith admitted that there is nothing in "The Big Picture" concerning the Restriction Table. The Restriction Table started in the day room and was moved to the nurses' station. There was a major problem with "stimuli in that day room, and people poking at each other and people saying things to each other and agitating and what not," so it was moved to a

quieter, safer place. (Trial Tr. Vol. II P.148 L.1-14; L.25-P.149 L.16; P.150 L.5-18). She further testified that every year, the Level System and the Rules were redone with input from the residents. She had concern about some of the minor violations, and so she re-wrote the rules and sent them to staff in an e-mail message. One of her concerns was what she described as "unauthorized use" of the rules when a resident received a violation for writing a poem on a napkin.[16] Another minor violation to which she objected was the wearing of white t-shirts for sleeping and colored t-shirts during the day. Work was ongoing on changing rules and enforcement procedures when she departed. (Trial Tr. Vol. II P.153 L.23-25; P.154 L.2-21; P.155 L.15-21; L.24-P.156 L.10; P.157 L.13-P158 L.8; P.159 L.12-25) (Plaintiff's Exhibit 6). She later clarified in her testimony that the e-mail was not an edict; she was merely putting out her concerns, and the e-mail was a working document setting out some issues she wanted to take up with staff. (Trial Tr. Vol. II P.177 L.1-13; P.179 L.7-16).

Ms. Semar was familiar with the length of time some residents accumulated on the Restriction Table. She testified that she did not subscribe to the mentality of always assuming the worst in judging resident behavior and issuing violations. She acknowledged training in that vein in early leadership, but stated that that leadership has since left the MSOTC. Part of the training she received in the beginning was from "The Big Picture," which instructed to always assume the worst and report it. (Trial Tr. Vol. III P.100 L.13-21; P.101 L.5-13). Treatment teams formerly met once a week to review residents' charged violations, but as of March 2009 met two times weekly. Under the old system, Ms. Semar related, a resident could spend six days in restriction

---

[16] Dr. Bellew-Smith refers to this as a poem and also a song, and says that it was written on a napkin or a paper towel. "I personally felt like, that writing somebody up because they wrote a song of a poem - - I can't remember now what it was - - on this, I think it - - I think it was a paper towel, actually, I just thought it was silly." (Trial Tr. Vol. II P.178 L.4-15).

before the claimed violation could be reviewed. She acknowledged that she was one of many addressees of an e-mail from Mr. Blake dated January 3, 2006, in which he stated, "it has come to my attention that some residents have accumulated months upon months of restriction due to large numbers of violations." She also confirmed that even if she had not received Mr. Blake's e-mail, she would have been aware that some residents spent lengthy times at the Restriction Table. (Trial Tr. Vol. III P.102 L.8-10, L.16-24; P.105 L.14-25; P.107 L.11-15) (Pl. Exh. 7).

Mr. Strutton also gave testimony concerning his experiences with the Restriction Table. According to him, the longest continuous amount of time he spent on restriction was sixty days, from December 9th through February 16th of 2009. He was on Blair 3 when he received the "first few violations," which resulted in a level drop and a move to Hoctor 3. With respect to the termination of use of the Restriction Table, Mr. Strutton explained that "they're calling the restriction table the restriction area now, and they moved the table into the day hall. And . . . they expected me to stay in there." (Trial Tr. Vol. II P.218 L.2-25). Prior to his sixty days in restriction, the longest he had spent at the Restriction Table was a month, spending that time "[i]n one of the small tables in a corner." (Trial Tr. Vol. II P. 219 L.3-8). As to the sixty-day period, he testified that he submitted three team requests asking to be removed from restriction, and those requests were admitted into evidence with dates of December 15, 2008, December 17, 2008, and January 16, 2009. (Trial Tr. Vol. II P.219 L.24-P.223 L.20) (Pl. Exhs. 43, 44, 45).

### 3. Expert Opinions on the Restriction Table

Dr. Metzner reviewed the use of the Restriction Table at the MSOTC, first describing what he saw as a "small table with a plastic, plastic-like chair right next to the nurses' station." (Trial Tr. Vol. I P.189 L.10-17). He based his analysis on a visit to the MSOTC in October 2006, along with a review of "a host of relevant documents," including "The Big Picture," the handbook

for resident offenders which describes the treatment program, various excerpts of Mr. Strutton's medical and psychiatric records, and certain institutional policies and procedures made available to him. He testified that he also considered the depositions of Dr. Bellew-Smith, Dr. Englehart, Mr. Blake, Dr. Rosenboom, Mary Weiler, John Cannaberry, Linda Meade, and Janine Semar. (Trial Tr. Vol. I P.171 L.21-P.172 L.20). In doing so, he learned that key personnel had significant concerns about the Restriction Table and its effectiveness, and that certain practices related to the Restriction Table varied from unit to unit. He thought the inconsistency was significant, because treatment involves trying to change behavioral concepts, and when you try to change behavior using behavioral concepts, one rule is to be consistent. He also saw no over-arching policy or procedure. (Trial Tr. Vol. I P.189 L.10-P.190 L.25).

Dr. Metzner further testified that he had not seen a Restriction Table at use in any other facility. He did not believe that the Restriction Table is necessary for therapeutic or safety purposes, but that instead it was being used as a punitive measure. As he explained, "whatever the original underlying reasons for using it have morphed into something, that's just, doesn't make therapeutic sense to me." He testified that negative reinforcement is the least effective means of treatment, and that the Restriction Table typifies negative reinforcement. When someone is at the table for days or weeks, he believes, it loses any value in changing behavior because the resident becomes hopeless and ceases to see the "light at the end of the tunnel." He therefore concluded that use of the Restriction Table was a substantial departure from the sound exercise of professional judgment. (Trial Tr. Vol. I P.191 L.2-5, P.191 L.16-P.192 L.25; P.193 L.16-22).

On cross-examination, Dr. Metzner acknowledged that he had never worked in a facility that was dedicated to the treatment of civilly committed violent predators. He also testified that

he has never published anything on sexually violent predators, and admitted in his deposition testimony that he did not refer to any specific standard of care he recognized pertaining to the Restriction Table. (Trial Tr. Vol. I P.195 L.9-12; P.196 L.5-11; P.199 L.3-12; P.200 L.1-13). He admitted that he did not know if a Restriction Table was used at any other adult mental health treatment program or any other sexually violent predator facility, and agreed that its use could be defensible or reasonable in theory, depending on how it was applied. He further agreed that sometimes reducing privileges in a punitive manner is an acceptable component of mental health treatment. (Trial Tr. Vol. I P.200 L.21-P.201 L.18; 19-P.201 L.17).

Dr. Main, Defendants' expert, also based his opinion on the Restriction Table on a wide variety of sources, including a visit the MSOTC, discussions with Dr. Meade, Dr. Rosenboom, various therapeutic and recreational staff members, and the librarian, and a review of some 4,000 pages of documents. He also observed the areas where these interventions were used: the restriction table, the readiness ward, and the "IIU." His expert opinion was that

> reasonable clinical judgment was used. The intervention was akin to the kinds of free, restrictions of free motion throughout a facility that's often used in these settings. More than that, the restriction table, at least the, the clinical underpinnings[17] of it, I am not convinced that they were particularly effective, but the clinical underpinnings were to remove the individual from stimulating environment, much like time-out would be used for children. And also, to remove them from the reinforcement of antisocial personalities, specifically to prevent them from going back and getting reinforcement in the form of praise from other residents when they had engaged in behavior such as threatening a staff member or some kind of behavior like that.

---

[17] Dr. Main described the "clinical underpinnings" as removing the individual from the stimulating environment, or what is often seen as reinforcement. A primary one is to remove the antisocial reinforcements for behavior. "And not uncommon that in subculture of the antisocial personalities that one finds one's popularity, one's status, one's standing to be enhanced by oppositional, defiant, antisocial behaviors. Sometimes the easiest way to increase one's status in these populations is to assault another individual, especially an authority figure."

He did not find use of the Restriction Table to be a substantial departure from professional judgment. He believed that the Restriction Table was an effort to counteract the reinforcing affect of relationships. He also believes that "it didn't isolate to a degree that was desirable; that it wasn't very impactful intervention." When he visited the facility in September 2007, the Restriction Table was not being used. He learned that there was no formal or written policy concerning use of the Restriction Table, and that use of the Restriction Table had been modified, "seemingly because the therapist thought that a staff member had overreached." (Trial Tr. Vol. III P.159 L.25-P.160 L.12; L.13-P.161 L.20; P.162 L.12-17; P.164 L.24-P.165 L.7; P.190 L.2-19).

### B.    Analysis

Mr. Strutton argues that use of the Restriction Table violated his substantive due process right to freedom from physical restraints, in that the evidence at trial demonstrated that it served no clinical purpose. Defendants contend that although it may have at some point ceased to be effective, it was not such a substantial departure from professional judgment as to raise constitutional concerns.

Freedom from physical restraints is a fundamental right of the civilly committed, protected from unwarranted infringement as a matter of Fourteenth Amendment substantive due process. *See Youngberg v. Romeo*, 457 U.S. 307, 315-16 (1982). In *Youngberg*, the plaintiff, mentally retarded adult, alleged that institutional employees had violated his constitutional rights by physically restraining him "for prolonged periods on a routine basis." *Id.* at 311. The Court agreed that the plaintiff had a substantive due process right to freedom from such restraints, noting that this right "always has been recognized as the core of the liberty protected by the Due Process Clause," and that it must exist in the involuntary commitment context given that it applies

to the criminally convicted and incarcerated. *Id.* at 316. As discussed above in the context of Mr. Strutton's other substantive due process claims, however, the *Youngberg* Court found that strict scrutiny was not appropriate in analyzing the actions of mental health professionals; instead, the inquiry is limited to determining whether "the decision by the professional is such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the person responsible actually did not base the decision on such judgment." *Id.* at 323.; *see also Semler v. Ludeman*, 2010 WL 145275, at *26 (D. Minn. 2010) (*Youngberg* principles concerning substantive due process right to freedom from bodily restraint apply to involuntarily committed sex offenders).[18]

The existence of such a fundamental right notwithstanding, Mr. Strutton's allegations concerning the Restriction Table do not implicate it and its corresponding professional judgment standard. In contrast to Mr. Youngberg, who asserted that he was routinely restrained to a bed or chair with straps or "shackles" for lengthy periods, 457 U.S. at 310-11, residents assigned to the Restriction Table enjoy a comparatively free range of movement and activities. They are permitted to get up and stretch, to leave to attend groups sessions and meeting, to converse with other residents, to work on homework or legal issues, and to play cards, among other things. There was no evidence of any actual physical restraints comparable to those at issue in *Youngberg*. While the Court recognizes, and indeed credits, the plentiful and consistent testimony at trial, indicating that Defendants' use of the Restriction Table or Area had ceased to serve any clinical purpose, the Court does not believe that requiring an involuntarily committed resident –

---

[18] Mr. Strutton stipulated to his sexual predator status and commitment under the SVP Act in connection with his plea of guilty to his underlying offense, but the scope of a committed individual's rights are not affected by whether he submitted voluntarily or involuntarily to the custody of the state. *See Ass'n for Retarded Citizens of N.D. v. Olson*, 561 F. Supp. 473, 484-85 (D.N.D. 1982), *aff'd in part*, 713 F.2d 1384, 1393 (8th Cir. 1983).

the propriety of whose commitment is not at issue – to spend significant amounts of time sitting at a table, with the freedom to stand up and stretch and engage in a variety of activities, implicates any fundamental right protected by the substantive due process component of the Fourteenth Amendment.

For the same reasons that Mr. Strutton's right to freedom from physical restraints is not implicated by use of the Restriction Table, the Court also concludes that Defendants' use of it did not "shock the conscience," the general standard for substantive due process challenges not involving fundamental rights. *See County of Sacramento v. Lewis*, 523 U.S. 833, 846-47, 847 n.8 (1998). As noted above, Mr. Strutton does not challenge – at least in this suit – the legitimacy of his involuntary commitment at the MSOTC. It seems clear that there are sounder, more productive ways of administering treatment and regulating the behavior of committed sexually violent predators than making them sit at a table for extended periods when they violate facility rules, but that is not the issue before the Court. The issue is whether Defendants' use of the Restriction Table shocks the conscience to the point of raising constitutional concerns, and the Court finds that it does not, especially given the undisputed evidence about the limited physical nature of the restraint.

In short, the Court concludes that the evidence introduced at trial convincingly demonstrated that Defendants' use of the Restriction Table at the MSOTC did not implicate or violate Mr. Strutton's substantive due process right to freedom from physical restraints, and accordingly, Defendants are entitled to judgment in their favor on these claims.

## III.    RLUIPA & FREE EXERCISE CLAUSE CLAIMS

### A.    *Findings of Fact*

Mr. Strutton gives the best explanation of his core Wiccan religious beliefs.  He explained his beliefs to the Court, stating "that everything is a deity but that everything has a force or an essence about it," and that "nature is the reverence in which we follow."  Mr. Strutton says this belief system stems from the concept of a duality rather than a singularity; a belief that there is not only "a" God, but also a feminine principle known as the mother or the goddess.  On paper, there are three circles, one being the ultimate creative force, sometimes called the collective unconscious, the divine, ultimately referring to God, the one high, the ultimate creator.  His religion is practiced in a circle, representing a barrier for individuals inside the circle, "not allowing negative energy and things like that in there."  According to Mr. Strutton, Wiccans are of the Earth, and the circle represents the Earth, "our church."  As of trial in March 2009, the Wiccan group at the MSOTC was permitted to conduct a resident-led service one time each week, on Saturdays from 1:30 p.m. until 2:30 p.m.  Mr. Strutton testified that they do not always get a full hour because "they start at different times . . . they start it either when they open the cabinet -- and sometimes we have delays on the way out or things like that, or whatever the case may be," and he also related that the group is not permitted to hold the service if the weather is either too hot or too cold.  (Trial Tr. Vol. II P.204 L.4-P.206 L.25).

Janine Semar, Activity Therapy Coordinator at the MSOTC, also provided some testimony concerning religious exercise at the center.  At the time of her testimony, she had been employed at the facility for eight years, and the focus of her work in previous employment experiences and at the MSOTC has been recreational therapy.  (Trial Tr. Vol. III P.61 L.15; P.63 L.3-6).  When serving as Recreational Director, her staff provided security during religious

service time, and she is on the Spirituality Committee, which was formed to help expedite team requests from residents regarding their religious accommodations. Ms. Semar is certified by the National Council on Therapeutic Recreation, and she has been employed by the State of Missouri for sixteen years as a supervisor in various roles. She supervises eight employees in the Therapeutic Recreation Department: two therapists, two recreation therapists, six activity aides, the academic teacher, vocational and work therapy specialists, and the substance abuse counselor. She is also the part-time supervisor of the pastoral counselor. (Trial Tr. Vol. III P.122 L.24-P.123 L.23).

Ms. Semar is familiar with the Religious Accommodations Policy furnished to each resident. (Trial Tr. Vol. III P.113 L2-15; P.114 L.12-P.115. L.2) (Def. Exh. JJJJ). Currently, there are religious services at the center for individuals of Muslim, Native American, Wiccan, and Christian faiths, and with the exception of the Christian services, all are resident-led. MSOTC staff are required to be present at religious services, to provide supervision and to ensure that safety and security measures are observed. The Wiccans and Native Americans hold their services in designated circles outside, while the Muslims and Christians meet inside in the multi-purpose room and recreation room, respectively. Scheduling for religious services is conducted by a large group responsible for scheduling various programs at the MSOTC. Religious groups meet one time each week and once per year for a "feast," with the exception of the Christian group, which meets one additional time per week for Bible study.

Ms. Semar testified that the Christian group is allowed a second meeting for Bible study because volunteers contacted a previous chaplain and requested an additional service time, and MSOTC was able to provide one staff member to supervise. Defendants require the staff member to be present – that is, they require two non-residents to attend the services – in order to ensure

that security measures are observed, and the volunteer is necessary because the Christian chaplain is in charge of two facilities and does not have enough time for two weekly meetings at the MSOTC. (Trial Tr. Vol. III P.115 L.8-P.117 L.19; P.118 L.7-9; P.119 L.7-23; P.120 L.22-P.121 L.4). All religious volunteers who come into the facility are required to have training on HIPAA, confidential issues, security measures, and escorting. (Trial Tr. Vol. III P.121 L.14-23; P.122 L.4-12).

Mr. Strutton testified that he submitted a team request on August 16, 2007, to try to obtain a volunteer to have a second Wiccan group service. He explained that at the facility, any time the residents have a request – for example, to ask a family member to send a jar of coffee in a parcel, or to be allowed to get ten sheets of paper at one time – it is necessary to fill out a team request. His efforts at locating a volunteer were successful, although he made several inquiries and even asked one of the chaplains if he would serve as volunteer. MSOTC staff did not refuse to allow a second service under any circumstances; instead, they based their denial on Mr. Strutton's failure to secure a volunteer leader. (Trial Tr. Vol. II P.207 L.19-P.209 L.19) (Pl. Exh. 40).

Mr. Strutton has also been permitted to engage in Arts and Crafts[19] from time to time, working on religious items. Mr. Strutton related that he was originally not permitted to work on religious items, then late in 2008, MSOTC staff informed him that he could work on certain approved Wicca-related items. He testified that Christians were always allowed to work on Christmas cards in Arts and Crafts, and that he filed a team request and a grievance concerning

---

[19] During Arts and Crafts, residents have a variety of supplies including paint by number kits, drawing, drawing utensils, and drawing paper. They are also allowed to use construction paper. (Trial Tr. Vol. III P.127 L.20-P.128 L.1).

that issue.  Both of those filings were entered into evidence, dated March 18, 2006 and April 9, 2006, respectively.  (Trial Tr. Vol. II P.214 L.4-13; L.23-P.215 L.22; P.216 L.17-P.217 L.8) (Pl. Exhs. 47, 48).

With respect to the issue of the second service, Ms. Semar testified that if those of the Wiccan faith could find a volunteer, they could have a second service.  As of March 2009, the Wiccans continue to have one service.  (Trial Tr. Vol. III P.93 L.2-4, L.8-14).  Turning to the Arts and Crafts issue, Ms. Semar confirmed that there are Arts and Crafts activities available to residents at the MSOTC.  She stated that cards are available all year for all holidays, including Christmas.  She testified that residents are permitted to create any kind of card they like, including those having religious significance, although she acknowledged that Mr. Strutton was at certain times denied the right to make Wiccan items.  Ms. Semar also confirmed that in 2006, Mr. Strutton filed a team request "to participate in religious items" in his Arts and Crafts classes, but she stated that he was denied the right for such participation on "procedural" grounds, and that it was not related to security or safety.  (Trial Tr. Vol. III P.86 L.13-P.87 L.8; P.87 L.24-P.88 L.2, L.19-25; P.89 L.16-P.90 L.2) (Pl. Exh. 48).

### B.    Analysis

Mr. Strutton contends that the MSOTC rules (1) requiring a volunteer leader as a prerequisite to having a second Wiccan religious service per week, and (2) prohibiting him from making Wiccan arts and crafts in activities classes, impermissibly violate his rights under the Religious Land Use and Institutionalized Persons Act ("RLUIPA") and the Free Exercise Clause of the First Amendment.  Defendants claim that neither rule impermissibly infringed on Mr. Strutton's religious exercise.

The RLUIPA, 42 U.S.C. § 2000cc-1(a), provides that

No government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution . . . even if the burden results from a rule of general applicability, unless the government demonstrates that imposition of the burden on that person –

(1) is in furtherance of a compelling governmental interest; and

(2) is the least restrictive means of furthering that compelling governmental interest.

The term "religious exercise" extends to "any exercise of religion, whether or not compelled by, or central to, a system of religious belief." 42 U.S.C. § 2000cc-5(7)(A). Although this definition prohibits "inquiry into whether a particular belief or practice is 'central' to a prisoner's religion," *see Cutter v. Wilkinson*, 544 U.S. 709, 725 n.13 (2005) – meaning that the plaintiff does not need to provide doctrinal justification for the expression at issue – the plaintiff still bears burden of demonstrating that his religious exercise has been substantially burdened. *Van Wyhe v. Reisch*, 581 F.3d 639, 657 (8th Cir. 2009) (internal citation omitted).

The Supreme Court has emphasized that "context matters" in applying this "compelling interest" standard, and that courts should therefore apply the Act with "due deference to the experience and expertise of prison and jail administrators in establishing necessary regulations and procedures to maintain good order, security and discipline, consistent with considerations of costs and limited resources." *Cutter*, 544 U.S. at 723. The Court believes that similar deference is appropriate in the institutional setting; because context does matter, however, this Court is also mindful of a somewhat countervailing consideration – that "[p]ersons who have been involuntarily committed are entitled to more considerate treatment and conditions of confinement than criminals whose conditions of confinement are designed to punish." *Youngberg v. Romeo*, 457 U.S. 307, 321-22 (1982).

The First Amendment's Free Exercise Clause, of course, also protects against certain government regulations concerning religious practices. The threshold issue in such claims is

whether the regulation "infringes on a sincerely held religious belief." *Murphy v. Mo. Dep't of Corrections*, 372 F.3d 979, 983 (8th Cir. 2004) (internal quotations and citation omitted). If it does, rational basis review, unlike RLUIPA's statutory strict scrutiny analysis, applies; thus, a neutral regulation of general applicability will still be upheld if it is reasonably related to a legitimate state interest, even if it has an incidental effect on religious exercise. *See Church of the Lukumi Babalu Aye v. City of Hialeah*, 508 U.S. 520, 531 (1993). In the prison context, the reasonableness of such a regulation is evaluated under the following factors:

> (1) whether there exists a valid, rational connection between the prison regulation and the legitimate governmental interest put forward to justify it; (2) whether there are alternative means of exercising the right that remain open to prison inmates; (3) the impact accommodation of the asserted constitutional right will have on guards and other inmates, and on the allocation of prison resources generally; and (4) the existence, or absence of obvious, easy alternatives . . . that fully accommodate the prisoner's rights at *de minimis* cost to valid penological interests.

*Roe v. Crawford*, 514 F.3d 789, 794-95 (8th Cir. 2008) (citing *Turner v. Safley*, 482 U.S. 78, 89-91 (1987)) (internal quotations and alterations omitted). As with Mr. Strutton's RLUIPA claim, however, the Court recognizes that persons civilly confined are entitled to less restrictive conditions than are the criminally confined, and applies this reasonableness standard in light of that important consideration. *See Marsh v. Fla. Dep't of Corrections*, 330 Fed. App'x. 179, 182 (11th Cir. 2009) (noting that it is unclear whether *Turner* applies to free exercise claims brought by civil detainees).

An outdoor service for Wiccans undoubtedly constitutes "religious exercise" under the RLUIPA, *see* 42 U.S.C. § 2000cc-5(7)(A), but there was no evidence at trial indicating that a second weekly service is necessary to prevent that exercise from being substantially burdened. At its core, Mr. Strutton's claim is that his religious expression – meeting with the Wiccan group at its outside circle – is substantially burdened if it occurs only once per week for an hour, but not if

it occurs twice per week for a total of two hours.  If the Court were to so conclude, it would have no principled reason for doing so; the Court could just as easily conclude that Mr. Strutton's exercise is substantially burdened unless he has three, or four, or five services per week.  The Wiccan group is permitted to meet once per week at its designated outdoor circle for a religious service, and the Court finds that Mr. Strutton's religious exercise is not substantially burdened by not being allowed to meet a second time.  Having found that there was no substantial burden, the Court does not reach the question of whether the rule is necessary to meet a compelling governmental interest.

Because the Court concludes that Mr. Strutton's second-service claim fails under the RLUIPA's statutory strict scrutiny standard, his corresponding claim under the Free Exercise Clause also fails.  The threshold issue for Free Exercise claims is whether the regulation infringes on a sincerely-held religious belief, and there was no evidence that a second weekly service is an essential, or even common, component of the Wiccan faith.  Furthermore, even it were, the regulation at issue, requiring a volunteer leader in order for resident religious groups to hold a second service, is a neutral rule of general applicability.  Although the result under the rule is different for the Christian group because it has a volunteer, the evidence at trial was nonetheless clear that the rule applies equally to all groups, and that Defendants would readily permit the Wiccan group to hold a second service if it could find a volunteer to lead the service and fulfill the

requirement of two non-residents overseers.[20]  *See Church of the Lukumi Babalu Aye v. City of Hialeah*, 508 U.S. 520, 531 (1993).

With respect to Mr. Strutton's claims that Defendants prohibited him from making Wiccan religious items in Arts and Crafts classes as recently as 2006, testimony at trial from Ms. Semar and from Mr. Strutton established that Defendants have since begun permitting him to make such items.  The Court has substantial concerns that Defendants' prior refusal, in light of evidence that they permitted Christians to make Christian items in the same classes, would in fact be extremely problematic as a matter of both the RLUIPA and the Free Exercise Clause, and would likely fall under strict scrutiny due to Defendants' failure to articulate any reason for the refusal other than that it was "procedural."  Nevertheless, the Court declines to address the merits of these claims, which were not specifically pleaded in, or even suggested by, Mr. Strutton's Second Amended Complaint.  Defendants objected to this entire line of testimony as irrelevant, foreclosing the argument that the issue was tried by consent, and Mr. Strutton did not subsequently move to amend his pleadings to add such claims; as such, the evidence concerning Mr. Strutton making religious items in Arts and Crafts class is not "within the issues raised in the pleadings," and the Court therefore will not consider these claims.  *See* Fed. R. Civ. P. 15(b).

In sum, the Court finds that Mr. Strutton failed to demonstrate that Defendants' refusal to permit a second weekly Wiccan service, in the absence of an non-resident volunteer leader, substantially burdens his religious expression as a matter of the RLUIPA, or that it infringes on a

---

[20] Mr. Strutton focuses on the second weekly Christian meeting, suggesting that the requirement of a volunteer for a second Wiccan service is arbitrary and unreasonable because unlike the Christian services, all Wiccan services – and indeed all non-Christian services at the center – are resident-led.  Although this fact may well be relevant in the context of an Equal Protection Claim, it is irrelevant to the questions of whether his religious expression was substantially burdened and whether the rule infringed on a sincerely-held religious belief.

sincerely-held religious belief under the Free Exercise Clause. The Court also concludes that it

will not consider Mr. Strutton's claims related to MSOTC Arts and Crafts classes because they

were raised for the first time at trial, and were properly objected to by Defendants as irrelevant.

As a result, Defendants are entitled to judgment in their favor on Mr. Strutton's Count II.

## IV.    ESTABLISHMENT CLAUSE CLAIMS

### A.    *Findings of Fact*

Mr. Strutton testified that at one time attendance in addiction support groups was a

requirement of his Individual Treatment Plan, then it "stopped for a little while," and now it is a

new requirement. (Trial Tr. Vol. II P.209 L.20-24). He attended a resident-led AA Program on

one occasion, and when he was asked to recite the serenity prayer, he refused. He explained the

reaction to his refusal as follows:

> The residents in the room became uncomfortable with the fact, and felt I wasn't
> participating fully, and they ended up - [objection made] - They had felt
> uncomfortable with that, so after they had expressed that they didn't feel like I was
> participating, after a little while I felt it was probably better if I left because nobody
> was wanting to do anything and I didn't want to slow them down just because I
> was in there.

(Trial Tr. Vol. II P.210 L.5-P.211 L.11). Mr. Strutton testified that he left the group and filed a

grievance in connection with being required to state the serenity prayer. (Trial Tr. Vol. II P.210

L.16-19; P.212 L.12-25) (Plaintiff's Exhibit 18). Mr. Strutton testified that in his Individual

Treatment Plan, he is in two groups. He stated that since he filed the grievance over refusing to

recite the serenity prayer, addiction support groups have been a part of his Individual Treatment

Plan. (Trial Tr. Vol. II P.213 L.2-9; L.25-P.214 L.3).

Ms. Semar testified that Alcoholics Anonymous is not a psychoeducational class, but

rather a resident support group meeting. Attendance is not mandatory. She also explained that as

of sometime in 2008, the MSOTC has been offering meetings of the group Secular Organization

for Sobriety, a group which of course has no component which might characterized as "religious." (Trial Tr. Vol. III P.126 L.16-P.127 L.19).

## B. Analysis

The Establishment Clause of the First Amendment prohibits governments from makings any laws "respecting an establishment of religion." Under this clause, "[i]t is beyond dispute that, at a minimum, the Constitution guarantees that government may not coerce anyone to support or participate in religion or its exercise, or otherwise act in a way which establishes a state religion or religious faith, or tends to do so." *Lee v. Weisman*, 505 U.S. 577, 587 (1992). Although there is some question as to what the proper test is for determining whether the Establishment Clause has been violated in different contexts, *see, e.g.*, *Tangipahoa Parish Bd. of Educ. v. Freiler*, 530 U.S. 1251 (Scalia, J., dissenting from denial of cert.), it appears that the Eighth Circuit employs the *Lemon* test, under which a challenged practice will be upheld only if "(1) it has a secular purpose; (2) its principal or primary effect neither advances nor inhibits religion; and (3) it does not foster an excessive entanglement with religion." *ACLU Neb. Found. v. City of Plattsmouth, Neb.*, 419 F.3d 772, 775 (8th Cir. 2005) (citing *Lemon v. Kurtzman*, 403 U.S. 602, 612-13 (1971)).

As the Seventh Circuit has explained, the *Lemon* test is directed primarily at those situations in which the government has allegedly acted to assist an existing religious group, such as where local governments permit religious monuments on public lands, and it therefore is not a perfect fit for claims – such as Mr. Strutton's – in which the plaintiff alleges that a government actor "is coercing him or her to subscribe to religion generally, or to a particular religion." *Kerr v. Farrey*, 95 F.3d 472, 478-79 (7th Cir. 1996). In this latter situation, the Court agrees with the Seventh Circuit, in the absence of controlling authority from within this circuit, that the operative considerations can be more simply stated as (1) whether the state has acted; (2) whether that

action amounts to coercion; and (3) whether the object of the coercion is religious or secular. *Id.* at 479.

The Court finds that the evidence, specifically Mr. Strutton's testimony, demonstrates that Defendants' actions with respect to his participation in Alcoholics Anonymous did not amount to coercion. Mr. Strutton stated that he left the meeting of his own volition, after refusing to recite the serenity prayer, because other group members expressed that they were uncomfortable with his level of participation. A vague expression of discomfort does not, standing alone, amount to coercion, and even if one could infer from Mr. Strutton's testimony that other group members were coercing him into reciting the prayer, then there is still the problem of locating state action – at least absent evidence that Defendants encouraged or at the very least condoned such behavior. Furthermore, although testimony at trial was somewhat vague and contradictory concerning whether addiction therapy was at any time a mandatory component of Mr. Strutton's treatment, Ms. Semar did clearly testify that addiction therapy, at least as of the time of trial, is only offered as a support group and is not mandatory. Ms. Semar also testified, and was not contradicted by any other evidence, that the MSOTC has since begun to offer optional meetings of the addiction support group Secular Organization for Society.

Defendants are therefore entitled to judgment in their favor on Mr. Strutton's Establishment Clause claim. The evidence at trial indicated that Mr. Strutton attended one Alcoholics Anonymous meeting and refused to recite the serenity prayer, leading to statements of disapproval from fellow residents, which is insufficient to establish government coercion in violation of the First Amendment.

## V.     CONCLUSION

In this litigation, Mr. Strutton has brought important issues concerning the treatment of involuntarily committed sexual predators in Missouri to light.  In *In re Care & Treatment of Norton*, Judge Wolff of the Missouri Supreme Court expressed the concern that the involuntary commitment mechanism of the MSVPA would be used to "simply warehouse[] these men, without appropriate treatment and without a meaningful means to achieve re-integration with society."  123 S.W.3d 170, 182 (Mo. 2003) (concurring opinion).  Mr. Strutton has succeed in demonstrating that this remains a very real concern, especially given that the level of care and treatment available at the MSOTC is ultimately dependent on legislative funding for the benefit of what is, at best, an extremely unpopular segment of the population.

That said, the Court concludes that Mr. Strutton failed to prove his substantive due process claims concerning his confinement at the MSOTC.  With respect to his substantive due process claims of inadequate mental health treatment, there is no fundamental right under the Fourteenth Amendment to such treatment – at least as a matter of current binding authority – and as such, the adequacy of treatment at the MSOTC only violates the Fourteenth Amendment if it shocks the conscience.  The Court concludes that although the available treatment was not ideal, and in certain instances likely fell below any reasonable professional standard, it has been and continues to be constitutionally adequate.  The Court also finds that Defendants' use of the Restriction Table did not implicate any of Mr. Strutton's fundamental rights under the United States Constitution, and its use was not so egregious or arbitrary as to shock the conscience and render it unconstitutional as a matter of substantive due process.

Mr. Strutton likewise failed to prove his claims under the RLUIPA, the Free Exercise Clause, and the Establishment Clause.  Defendants are entitled to judgment in their favor on his

RLUIPA and Free Exercise Clause claims because the evidence at trial did not demonstrate that the lack of a second weekly Wiccan service constitutes a substantial burden on his religious exercise or that it infringes on any sincerely-held religious belief. Mr. Strutton's Establishment Clause claims fail because the evidence established that Defendants did not coerce him, actively or otherwise, into participating in any religious activities in Alcoholics Anonymous meetings.

Accordingly,

**IT IS HEREBY ORDERED** that Mr. Strutton's requested relief in his Second Amended Complaint [doc. #53] is **DENIED**.

**IT IS FURTHER ORDERED** that Mr. Strutton's Motion for Sanctions [doc. #164] is **DENIED**.

**IT IS FURTHER ORDERED** that Defendants' Motion to Dismiss [doc. #191] is **DENIED, as moot**.

Dated this 31st Day of March, 2010.

E. RICHARD WEBBER
UNITED STATES DISTRICT JUDGE